**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**DAVID ECKERT,**

                    **Plaintiff,**

          **v.**                                             **Civ. No. 13-727 JB/WPL**

**THE CITY OF DEMING,**
**DEMING POLICE OFFICERS**
**BOBBY OROSCO, ROBERT CHAVEZ,**
**and OFFICER HERNANDEZ;**
**HILDAGO COUNTY; HILDAGO COUNTY**
**SHERIFF OFFICERS DAVID ARREDONDO,**
**ROBERT RODRIGUEZ, and PATRICK GREEN;**
**DEPUTY DISTRICT ATTORNEY DANIEL DOUGHERTY,**
**GILA REGIONAL MEDICAL CENTER,**
**ROBERT WILCOX, M.D., and, OKAY H. ODOCHA, M.D.**

                    **Defendants.**

**PLAINTIFF'S RESPONSE TO DEFENDANT DEPUTY DISTRICT ATTORNEY**
**DANIEL DOUGHERTY'S MOTION AND MEMORANDUM TO DISMISS**
**ON THE GROUNDS OF QUALIFIED IMMUNITY**

Plaintiff David Eckert, through counsel, hereby responds to Defendant Deputy District

Attorney Daniel Dougherty's (hereinafter "DDA Dougherty") Memorandum in Support of his

Motion to Dismiss on Grounds of Qualified Immunity to Dismiss (Doc. 42) filed 12/11/13.

Defendant's Motion should be denied as his conduct was a clear violation of the Fourth

Amendment of the United States Constitution as he participated in the unlawful arrest and search

of Mr. Eckert acting as a detective detaining a suspect and gathering evidence rather than as a

prosecutor who files criminal charges. In further support of these contentions, Plaintiff states as

follows:

          **I.          INTRODUCTION**

Defendant DDA Dougherty seeks absolute immunity because he is a prosecutor.  DDA

Dougherty also seeks qualified immunity asserting that he merely advised the officers of the existence of probable cause to obtain a search warrant for an "anal cavity" search.   He notes correctly that a judge signed his approved warrant.  He moves to dismiss and argues that prosecutors are always immune for the advice they give. However, there is no absolute immunity as Dougherty never initiated prosecution. Also, under the functional analysis of immunity, Dougherty is protected by qualified immunity only since he acted as an investigator. The facially invalid warrant lacked probable cause and authorized an "anal cavity" search. The term "anal cavity" is so lacking in particularity that no reasonable attorney, exercising professional judgment, would believe that the warrant would be valid.  There is no meaning in medicine of an "anal cavity".  There is nothing in the warrant indicating the method of searching the "anal cavity".  Finally, DDA Dougherty knew that the officers were requesting, at a minimum, a search of Eckert's rectum.  The warrant did not authorize a search of the rectum.  Thus, Dougherty advice that the officers should take Eckert to a facilty willing to perform a rectal exam was unlawful and subjects him to liability for, at least, the digital searches of Eckert's anus.

Plaintiff incorporates herein his Statement of Undisputed Material Facts and Exhibits attached to both Plaintiff's Motion for Partial Summary Judgment No. I (Doc. 26) see, Doc. 27-1, Affidavit for Search Warrant, filed 10/24/13; Plaintiff's Motion for Partial Summary Judgment II (Doc. 27), filed 10/25/13; and, Plaintiff's Response to Defendant Wilcox's Motion for Summary Judgment (Doc. 45), filed 12/27/13, specifically, Exhibit A, Affidavit of Dr. Adam Ash (Doc 45-1), filed 12/27/13 to inform the Court of the relevant, material facts.   Plaintiff further attaches herein, Plaintiff's Exhibit 1, Affidavit of Joseph P. Kennedy, which requests discovery pursuant to Rule 56(d), to fully address Defendant DDA Dougherty's affirmative

qualified immunity defense.  Plaintiff's Response to Defendant's Motion to Dismiss respectfully requests that the Court, considering the facts in the light most favorable to Plaintiff, deny Defendant DDA Dougherty's Motion to Dismiss and to Stay Discovery.

## II.     PLAINTIFF'S STATEMENT OF MATERIAL FACTS

Defendant's motion to dismiss fails to properly frame Defendant's qualified immunity affirmative defense which turns on the degree DDA Dougherty participated in the unlawful arrest and search of Plaintiff.   The Court must consider the facts in the light most favorable to Plaintiff in deciding whether the grant Defendant's qualified immunity defense.  Thus, Plaintiff incorporates to following material facts from Plaintiff's Motion for Summary Judgment (Doc. 26), filed 10/24/13; Plaintiff's Motion for Partial Summary Judgment II (Doc. 27), filed 10/25/13; and, Plaintiff's Response to Defendant Wilcox's Motion for Summary Judgment (Doc. 45), filed 12/27/13, specifically, Exhibit A, Affidavit of Dr. Adam Ash (Doc 45-1), filed 12/27/13:

## I.     Relevant Medical Terms. See http://medical-dictionary.thefreedictionary.com/.

1.     An Enema is the Insertion of a tube into the rectum to infuse fluid into the bowel and encourage a bowel movement.

2.     A rectum is the lower part of the large intestine, about 12 cm long, continuous with the descending sigmoid colon, proximal to the anal canal. It follows the sacrococcygeal curve, ends in the anal canal, and usually contains three transverse semilunar folds: one situated proximally on the right side, a second one extending inward from the left side, and the third and largest fold projecting caudally. Each fold is about 12 mm wide. The folds overlap when the intestine is empty or defecation occurs.

3.      "Anal Cavity" is not defined in medical literature.  However, Anal Canal is the terminal portion of the alimentary canal, from the rectum to the anus.

4.      Bowel means: The intestine; a tube-like structure that extends from the stomach to the anus. Some digestive processes are carried out in the bowel before food passes out of the body as waste.  See http://medical-dictionary.thefreedictionary.com/bowel.

5.      A colonoscopy is the examination of the mucosal lining of the colon by using a colonoscope, an elongated endoscope. It requires the cleansing of the client's large intestine, clear liquids the evening before the exam, and nothing by mouth after midnight. The client is usually sedated with IV medication and is placed in a state of twilight sleep.

6.      Colon is the part of the large intestine extending from the cecum to the rectum.

7.      Cecum is the beginning of the large intestine and the place where the appendix attaches to the intestinal tract.

8.      On January 2, 2013, Plaintiff was pulled over for allegedly running a stop sign by Defendant Chavez, although Defendant Chavez did not witness the alleged traffic violation. See Plaintiff's Complaint, (Doc. 1) filed 8/07/2013, at ¶¶32-33 and Defendant City's Answer, (Doc. 22) filed 10/11/13, at ¶¶11-12.

9.      During the traffic stop, Defendant Chavez believed Plaintiff was avoiding eye contact, and his hands shook. See Plaintiff's Motion for Summary Partial Summary Judgment No. I (Doc. 26) Exhibit 1, Affidavit for Search Warrant, at ¶5-6.

10.      Defendant Chavez asked Plaintiff to step out of his vehicle and performed a *Terry* search. Id, at ¶7.

11.     Defendant Chavez waited for a different officer to arrive to issue the citation.  See

Plaintiff's Complaint, (Doc. 1), filed 8/07/2013, at ¶36, and Defendant City's Answer, (Doc. 22)

filed at 10/11/2013, at ¶14.

12.     During the traffic stop, Officers Villegas, Green and Arredondo where present in addition

to Defendant Chavez and Hernandez.  See Plaintiff's Complaint, (Doc. 1), filed 8/07/2013, at

¶36, 40, See Defendant City's Answer, (Doc. 22), filed at 10/11/2013, at ¶14, 17.

13.     During the traffic stop, Defendant Chavez claims the following occurred which provided

the basis for probable cause to search Plaintiff:

1.   "While speaking with Mr. Eckert I did notice that he was avoiding eye contact with me as I asked him for his driver's license, registration and proof of insurance." See Plaintiff's Motion for Summary Partial Summary Judgment No. I (Doc. 26) Exhibit 1, Affidavit for Search Warrant, at ¶5.
2.   "As Mr. Eckert handed me the documents that were requested I did notice his left hand began to shake at which time I had asked Mr. Eckert step out of the vehicle." Id, at ¶6.
3.   A *Terry* search was performed, and nothing was found. Id, at ¶7.
4.   "While Mr. Eckert was standing outside of the vehicle I did notice his posture to be erect and he kept his legs together." Id, at ¶8.
5.   Defendant Chavez claims he told Plaintiff he was free to leave, which Plaintiff disputes. Id, at ¶10.
6.   Defendant Chavez claims that Plaintiff gave consent to search his vehicle, which Plaintiff disputes. Id, at ¶11.
7.   Defendant Chavez requested to search Plaintiff's person and Plaintiff denied consent. Id, at ¶12.
8.   A K-9 officer walked his dog around and in Plaintiff's vehicle and allegedly alerted to Plaintiff's front seat. Id, at ¶14.
9.   An officer allegedly told Defendant Chavez that Plaintiff was known to insert drugs into his anal cavity. Id, at ¶15.
10.  "Mr. Eckert was then placed into investigative detention and was transported to the Deming Police Department." Id, at ¶16.

14.     Plaintiff was handcuffed and taken to Deming Police Department at or around 2:00 PM.

See Plaintiff's Complaint, (Doc. 1) filed 8/07/2013, at ¶44, and Defendant City's Answer (Doc.

22), filed 10/11/2013, at ¶ 21.

15.     Plaintiff was in police custody at least by 2:00 PM on January 2, 2013, and was de facto under arrest. (United States v. White, 584 F.3d 935, 952 (10th Cir. 2009) (where "[a]n arrest is distinguished from an investigative *Terry* stop by the involuntary, highly intrusive nature of the encounter. For example, the use of firearms, handcuffs, and other forceful techniques generally exceed the scope of an investigative detention and enter the realm of an arrest."(citations and quotations omitted)).

16.     On January 2, 2013, Defendant Chavez sought a search warrant for Plaintiff's person "to include but not limited to his anal cavity."  See Doc. 26-1, Affidavit for Search Warrant.

17.     On January 2, 2013, a Judge signed a search warrant for Plaintiff's anal cavity based on Defendant Chavez's affidavit.  The warrant did not authorize a nighttime search and expired at 10:00 PM. See Doc. 26-2, Signed Search Warrant.

18.     In January of 2013, Dr Adam Ash worked at William Beaumont Army Medical Center as an Army ER physician in El Paso, Texas.  Occasionally, he would drive from El Paso, Texas, to Mimbres Memorial Hospital in Deming, New Mexico to pick up work shifts in their Emergency Room (ER) Department. See, Plaintiff's Response to Defendant Wilcox's Motion for Summary Judgment (Doc. 45), filed 12/27/13, specifically, Exhibit A, Affidavit of Dr. Adam Ash at ¶ 2.

19.     On January 2, 2013, at approximately, 4:48 pm, the police brought Mr. David Eckert, a 53 year old man, into the Mimbres Hospital Emergency Department (ER). Id., ¶ 3.

20.     The patient, Mr. Eckert was triaged at approximately 4:52 pm.  The patient had no medical complaints.   Mr. Eckert appeared slightly irritated.  He was awake, conversational, and appropriate.  He did not appear at all intoxicated.  Id., ¶ 4.

21.     The police brought the patient, Mr. Eckert, to the ER with a search warrant.  Dr. Ash looked at the warrant and was not sure what to do.  Id., ¶ 5.

22.     The police were asking Dr. Ash to perform a digital rectal exam and/or an x-ray of Mr. Eckert.  Id., ¶ 6.

23.     The police told Dr. Ash that they believed that Mr. Eckert may have placed drugs in his rectum.  Id., ¶ 7.

24.     The police said that they did not believe that Mr. Eckert had swallowed drugs.  It did not appear to Dr. Ash that Mr. Eckert was in need of emergency medical care to remove drugs from his body or in need of medical care for any reason. Id., ¶ 8.

25.     Mr. Eckert told Dr. Ash that he did not place drugs in his rectum.   Dr. Ash thought that it was unfair to Mr. Eckert to perform a digital search or any type of medical procedure because it was not medically indicated.  Id., ¶ 9.

26.     Although Dr. Ash wanted to help the police, he did not think it was ethical to subject a patient to a medical evaluation when he was denying any medical complaints.  Dr. Ash did not think it was appropriate as a physician to attempt to gather evidence for the police. Id., ¶ 10.

27.     Dr. Ash reasonably believes that examining and testing a patient who does not have a medical complaint is unethical because it exposes the patient to the many risks of false positive testing which could result in even more invasive and unnecessary medical procedures.  Id., ¶ 11.

28.     Dr. Ash did not think it was ethical to perform a rectal exam or imaging study of the patient because 1. It was unlikely to yield helpful results in the absence of a medical complaint; 2. It was uncomfortable for the patient; 3. It may result in an incidental finding (or findings) not related to the potential foreign body, which would then require additional, potentially invasive, testing to definitively diagnose the patient.  (These so-called "incidentalomas," are major issues in Emergency Medicine and cause a patient a good deal of psychological stress and otherwise unneeded medical studies/procedures).   Id., ¶ 12.

29.     Dr. Ash did not want the police to think that he was refusing to perform their requested medical procedures just to give them a hard time. He thought the police would have some sort of routine or a procedure for these types of searches at the detention center.   Id., ¶ 13.

30.     Dr. Ash wanted to make sure that it was okay to refuse the requests to conduct the digital rectal exam and the x-ray on Mr. Eckert.  Id., ¶ 14.

31.     The Mimbres Memorial Hospital did not have an attorney on staff so Dr. Ash called to talk to the Judge who had signed the warrant for the anal cavity search of Mr. Eckert.  Dr. Ash was unable to get ahold of the Judge to talk with him over the phone.  Id., ¶ 15.

32.      Dr. Ash spoke further with the police and decided to call the Defendant District Attorney, Dan Dougherty, who the police told him had approved the search warrant.  Id., ¶ 16.

33.     Dr. Ash had a discussion with Mr. Dougherty over the phone at the hospital and explained his concern that it was unethical to subject a patient to a digital rectal exam when he denies medical complaints.  Dr. Ash explained to him his concern that examining and testing a patient who does not have a medical complaint is unethical as it exposes the patient to the many risks of false positive testing.  Dr. Ash explained to DDA Dougherty that he could find something incidental in the digital rectal exam that would result in him having to perform further, possibly more invasive testing. Id., ¶ 17.

34.     Mr. Dougherty agreed that Dr. Ash would not have to perform any medical procedures on Mr. Eckert.   He requested that Dr. Ash clear the patient to go to the detention center.   Dr. Ash told Mr. Eckert that if he did in fact hide something in his rectum that it could be potentially dangerous.  Dr. Ash told him that if he did have symptoms that he did need to let someone know.  Mr. Eckert again denied having placed any drugs into his rectum.  Dr. Ash then cleared him to go to the detention center.   Id., ¶ 18.

35.     Dr. Ash was surprised to learn that Mr. Eckert was later subjected to a colonoscopy at the Gila Regional Medical Center at approximately one in the morning due to the concerns that he had expressed to Defendant DDA Dougherty and due to the highly invasive nature of a colonoscopy.  Based on his conversations with the police and Defendant Dougherty, Dr. Ash thought that Mr. Eckert was being taken to the detention center.  Id., ¶ 19.

36.     Defendant Chavez' police report states:

> "At approximately 1401 hrs., I contacted DDA Dougherty and informed of the incident. DDA Dougherty did approve pursuit of a search warrant for Mr. Eckert's vehicle and also for Mr. Eckert's person to include Mr. Eckert's anal cavity." See, Doc. 26-3 (bottom of page two to top of page three).

37.     After Dr. Ash refused to perform a digital rectal exam, Officer Chavez talked to Defendant Dougherty again.

> "I later contacted DDA Dougherty and explained the situation to him. DDA Dougherty did state that I could contact a different ER facility to have the procedure conducted. A short time later I contacted Gila Regional in Silver City and informed them I had a search warrant signed by a District Judge for an anal cavity search, Gila Regional did state that they would perform the procedure." Id.

38.     Dr. Ash saw Eckert at 4:48 p.m. See Doc. 45-1, par. 3.

39.     At the time Chavez called Defendant Dougherty, Dougherty knew that Eckert had been in custody for close to three hours, that the police wanted a digital rectal exam and that a licensed medical professional believed it was unethical to perform such a search. Defendant Dougherty knew also that a "false positive" search could result in further medical exams.

40.     Defendant Chavez and Defendant Hernandez then took Plaintiff to Gila Regional Medical Center to execute the search warrant while Plaintiff was in handcuffs.  See Doc. 26-3. January 2, 2013 Police Report. See Also Plaintiff's Complaint (Doc. 1) filed 8/07/2013, at ¶ 59, and Defendant City's Answer (Doc. 22) filed 10/11/13, at ¶ 32.

41.     Plaintiff was admitted to Gila Medical Center where he was given an x-ray and two digital searches of his rectum by two different doctors.  No drugs were found.  See Plaintiff's Complaint, (Doc. 1) filed 8/07/2013.

42.     During the second digital search, Dr. Odocha determined that "There was stool in the rectum.  There were no masses felt apart from the soft stool." See, Doc. 26-4, Dr. Odocha's Notes.

43.     At 10:23 PM, Plaintiff was given the first enema. See Doc. 26-5, Nurses Notes.

44.     At 11:51 PM, Plaintiff was given the second enema. Id.

45.     At 12:00 AM, Plaintiff was given the third enema. Id.

46.     After each enema, Plaintiff had a forced bowl movement, and Defendant officers searched Plaintiff's stool after each bowl movement.  See Plaintiff's Complaint, (Doc. 1) filed 8/07/2013.

47.     After completing the three enemas, doctors performed a chest x-ray of Plaintiff.  See Doc. 26-6, Chest X-Ray Report.

48.     Plaintiff was scheduled for a colonoscopy to be conducted at 1:00 AM.  See, Doc. 26-7, Dr. Odocha's Written Order from 10:00 PM.

49.     The Colonoscopy was pursuant to the warrant. Id.

50.     At 1:26 AM, Plaintiff was taken into surgery.  See, Doc. 25-5, Nurses Notes.

51.     A Colonoscopy was performed on Plaintiff. See Doc. 26-8, Surgical Notes from Dr.

Odocha's Operative Report.

52.     At 2:20 AM, Plaintiff was approved for discharge. See Doc. 26-9, Post-Operative Note.

53.     At 2:35 AM, Defendant officers escorted Plaintiff back to Deming City from Silver City.

See, Doc. 26-3, January 2, 2013 Police Report.

54.     From the Demining Police Department, Plaintiff was eventually taken to his home in

Lordsburg, New Mexico. Id.

55.     Defendant Odocha spoke to Defendant police officers throughout the night, updating

them on the procedure, and specifically told Defendant officers that the colonoscopy could not

be performed until 1:00 AM. See, Doc. 26-3, January 2, 2013 Police Report.

56.     All three enemas, the second x-ray and the colonoscopy (the basis for Counts XIII, IX

and X) were performed after 10:00 PM on January 2, 2013, but before 6:00 AM on January 3,

2013.

57.     The warrant was not valid during the hours of 10:00 PM to 6:00 AM when these

procedures occurred.

58.     Although Plaintiff contends that he was in police custody from when he was pulled over

until approximately 5:00 AM when Plaintiff was taken home, it is undisputed that Plaintiff was

in custody from when he was handcuffed around 2:00 PM and discharged from the hospital

around 2:35 AM.

59.     Plaintiff was in custody for over twelve hours.

60.     No drugs were found in or on Plaintiff's person.

I.     <u>STANDARD OF REVIEW ON A MOTION TO DISMISS WHERE
       QUALIFIED IMMUNITY IS ASSERTED AS AN AFFIRMATIVE DEFENSE</u>

Plaintiff has no dispute with the standard offered on the motion to dismiss aspect of

Defendant's motion. The general rule for summary judgment based on qualified immunity is that

a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  Summary judgment procedure in this district requires that both the party seeking and the

party defending against summary judgment submit briefs setting out the material facts upon

which the judgment is to be based. D.N.M.LR-Civ. 56.1(b).  "All material facts set forth in the

Memorandum will be deemed undisputed unless specifically controverted."  Id.  Under Rule 56

"[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

citing to particular parts of materials in the record[,]" Fed. R. Civ. P. 56(c)(1)(A); or "showing

that the materials cited do not establish the absence or presence of a genuine dispute, or that an

adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P.

56(c)(1)(B). Summary judgment is appropriate only if the moving party should prevail as a

matter of law.  "Thus, the mere fact that the moving party's summary judgment record is

uncontested or even unresponded to is not enough." Federal Civil Rules Handbook, Baicker-

McKee, p. 1125 (Thomson-West 2014); citing, Edwards v. Aguilard, 482 U.S. 578, 595 (1987).

As the protection of qualified immunity is an affirmative defense needs to assert undisputed

material facts in support of his motion for qualified immunity.  In assessing such a motion, a

court must "accept all facts pleaded by the non-moving party as true and grant all reasonable

inferences from the pleadings in favor of the same." Park, 442 F.3d at 1244; Morris, 666 F.3d at

660 ("[u]nder that standard, we review the motion de novo, accepting factual allegations as true

and considering them in the light most favorable to the plaintiff,") (quoting Tomlinson v. El Paso

Corp., 653 F.3d 1281, 1285-86 (10th Cir. 2011)). "Judgment on the pleadings should not be

12

granted 'unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law.'" <u>Park</u>, 442 F.3d at 1244 (citation to persuasive authority omitted).

> When a defendant asserts a qualified immunity defense in a Fed.R.Civ.P. 12(c) motion, however, "we apply a heightened pleading standard, requiring the complaint to contain 'specific, non-conclusory allegations of fact sufficient to allow the district court to determine that those facts, if proved, demonstrate that the actions taken were not objectively reasonable in light of clearly established law.'"

<u>Ramirez v. Department of Corrections, Colo.</u>, 222 F.3d 1238, 1241 (10th Cir. 2000) (citing <u>Dill v. City of Edmond</u>, 155 F.3d 1193, 1204 (10th Cir.1998) (quoting <u>Breidenbach v. Bolish</u>, 126 F.3d 1288, 1293 (10th Cir.1997))). Thus, "[t]o overcome a defendant's claim of qualified immunity in the context of a Rule 12(c) motion, a plaintiff's pleadings must establish both that the defendant's actions violated a federal constitutional or statutory right and that the right violated was clearly established at the time of the defendant's actions." <u>Id.</u> (citing <u>Scott v. Hern</u>, 216 F.3d 897, 910 (10th Cir. 2000)).  Plaintiff's Complaint meets the burdens required by the heightened pleading standard at issue herein compelling denial of Defendant's Motion to Dismiss and Motion to Stay Discovery.

## II.  <u>DISCUSSION</u>

Defendant District Attorney Dougherty was engaging in an investigative capacity by aiding in the search for evidence when he approved an "anal cavity" search warrant. Defendant Dougherty also participated in the unlawful detention and arrest of Mr. Eckert by permitting police officers to hold a man in custody for at least three hours that he knew of and allowing him to be taken to Silver City from Deming for a search that went beyond that scope of the warrant. At the time that Mr. Eckert was taken from the roadside there was no probable cause to believe he had committed a crime.  Dougherty should have known that the detention was an arrest.

Certainly, once Defendant District Attorney Dougherty was told by Dr. Adam Ash that the execution of the search warrant was medically unethical, Mr. Eckert should have been released.

To come under the umbrella of absolute prosecutorial immunity, Defendant Dougherty would have to have been engaging in the judicial phase of the prosecution process.  Defendant Dougherty was not engaging in any function associated with the judicial phase of the process. He was trying to get a doctor to engage in the evidence gathering phase of a criminal investigation by authorizing the use of a vague and over-broad warrant to conduct a myriad of invasive medical procedures on Mr. Eckert without probable cause. Plaintiff knows that Defendant Dougherty was given the opportunity to do the right thing when he was told by Dr. Ash that such a search was medically unethical.  Plaintiff should be allowed to discover his involvement in the unimaginable medical procedures that were later inflicted upon Mr. Eckert. See Rule 56(d) Affidavit of Mr. Joseph P. Kennedy, Exhibit 1.

Buckley v. Fitzsimmons, 509 U.S. 259, 268 (1993), explains that when a prosecutor is engaged in the gathering of evidence, the qualified immunity affirmative defense that may protect him from suit is the same for the prosecutor as it would be for any detective:   "[w]hen the functions of prosecutors and detectives are the same … the immunity that protects them is also the same." Buckley v. Fitzsimmons, 509 U.S. 259, 276 (1993).

The United States Supreme Court has explicitly held that prosecutors "are not entitled to absolute immunity for their actions in giving legal advice to the police." Buckley v. Fitzsimmons, 509 U.S. 259, 270 (1993) (citing Burns v. Reed, 500 U.S. 478, 489-90 (1991), for the example of "giving legal advice to the police on the propriety of hypnotizing a suspect and on whether probable cause existed to arrest that suspect."); Id. ("In sum, we held that providing legal advice to the police was not a function "closely associated with the judicial process.").

14

"Qualified immunity represents the norm for executive officers, so when a prosecutor functions as an administrator rather than as an officer of the court he is entitled only to qualified immunity." Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993) (citations and internal quotation marks omitted).

> There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand. When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is "neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other."

Buckley v. Fitzsimmons, 509 U.S. 259, 274 (1993) (citations and internal quotation marks omitted). "Thus, if a prosecutor plans and executes a raid on a suspected weapons cache, he 'has no greater claim to complete immunity than activities of police officers allegedly acting under his direction.'" Id. (citations omitted).  "A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." Buckley v. Fitzsimmons, 509 U.S. 259, 274 (1993).

In this case, the prosecutor never had probable cause to have anyone arrested; nonetheless, he approved of Mr. Eckert being taken from a public road, he oversaw a shocking violation of Mr. Eckert's bodily integrity, in spite of being told by Dr. Ash that is was medically unethical to subject Mr. Eckert to even a digital rectum exam.  Dr. Ash's affidavit colors the reasonableness of the Defendant prosecutor's actions on the date in question as he was the first physician to whom the Defendant Officers brought Plaintiff Eckert.  Dr. Ash did not act on the officers' requests to digitally examine Plaintiff and instead sought to reason with the Defendant Prosecutor. As recited in Dr. Ash's affidavit:

A) Prior to transporting Plaintiff to the Gila Regional Medical Center, Defendant Police Officers brought Plaintiff to Dr. Ash at the Mimbres Memorial Hospital with a warrant, the same warrant at issue herein. See, Plaintiff's Response to Defendant Wilcox's Motion for Summary Judgment (Doc. 45), filed 12/27/13, specifically, Exhibit A, Affidavit of Dr. Adam Ash at ¶¶ 3-5.

B) Dr. Ash refused to perform a digital rectal exam on Plaintiff or otherwise carry out the warrant because, even though he wanted to help the police, Dr. Ash believed it was unethical to subject Plaintiff to a medical evaluation because he was denying medical complaints. Id., ¶¶ 6-10.

C) Dr. Ash told Defendant Dougherty that he did not believe that it was appropriate for a physician to gather evidence for the police. Id.

D) Dr. Ash believe that it was unethical to perform a rectal exam or x-ray on Plaintiff because they are uncomfortable for the patient, and because either procedure could have led to an incidental finding, which could have resulted in additional medical tests. Id., ¶¶ 11-12.

E) Because Dr. Ash was uncertain as to whether he could ethically execute the warrant, Dr. Ash discussed whether he was required to execute the warrant with Defendant District Attorney Dan Dougherty and gain permission from him not to do so.Id., ¶¶ 13-18.

F) Defendant District Attorney Dougherty agreed that Dr. Ash did not have to perform the medical procedures on Plaintiff and informed Dr. Ash that Plaintiff would be taken to the detention center.Id., ¶¶ 18-19.

Dr. Ash's perspective in this case is highly relevant and material to show that he explained to Defendant DDA Dougherty that doctors, caring for patients in emergency rooms, are not agents

16

of the states, at the call of officers or prosecutors in search of evidence of a criminal activity, but are rather providers of medical care, when indicated and when consented to by a patient, who are required under law and the ethics of their profession to make their own judgments about the use of medical procedures.   The fact that Defendant Dougherty did not heed Dr.  Ash's words subjects him not only to liability pursuant to the Fourth Amendment of the United States Constitution but also to a punitive damages instruction.

### III.     DEFENDANT DDA DOUGHERTY'S ACTIONS WERE UNCONSTITUTIONAL

Plaintiff's complaint alleges Fourth Amendment liability against Defendant Dougherty for his approval of the arrest, approval of the prolonged arrest of plaintiff and approval of a warrant that lacked probable cause and lacked sufficient particularity as to the area to be searched and the method of searching.  The legal allegations against Defendant Dougherty are contained in Count IV of Plaintiff's complaint.

While a warrant issued by a judge enjoys deference as to its validity, this deference is not boundless.  United States v. Leon,  468 U.S. 897, 914 (1984); United States v. Kennedy, 131 F. 3d 1371 (10th Cir. 1997). A warrant that is facially deficient is invalid. Police officers and other investigating officers must use professional judgment in determining whether probable cause exists. Poolaw v. Marcantel, 565 F. 3d 721, 734 (10th Cir. 2009). The standard for whether an officer used professional judgment in seeking a warrant is an objective standard. Id.

In addition to a requirement of a probable cause showing, the Fourth Amendment requires that a warrant describe the area to be searched with particularity.  The Fourth Amendment states unambiguously that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing* the place to be searched." Groh v.

Ramirez, 540 U.S. 551, 557, 124 S. Ct. 1284, 1289, 157 L. Ed. 2d 1068 (2004)(emphasis in

original).  "[A] warrant may be so facially deficient—i.e., in failing to particularize the place to

be searched or the things to be seized—that the executing officers cannot reasonably presume it

to be valid." United States v. Leon, 468 U.S. 897, 923, 104 S. Ct. 3405, 3421, 82 L. Ed. 2d 677

(1984).  A warrant "must describe the place to be searched with sufficient particularity so that

the executing officer can locate and identify it with reasonable effort."  United States v.

Williamson, 1 F.3d 1134, 1135-36 (10th Cir. 1993);  United States v. Medlin, 842 F.2d 1194,

1199 (10th Cir. 1988).

        The actual language of the warrant stated, "to include but not limited to his anal cavity."

The warrant, on its face, could be read to include every part of the body, exterior and interior.

The warrant lacks any specificity as to what is meant by the "anal cavity" and as to what type of

search is authorized that it clearly fails any test of particularity.  The proof of that is in the use of

the warrant to invade Eckert's body.  In a sense, the officer's, through the approval of DDA

Dougherty possessed a general search warrant for Eckert's body and they took full advantage of

it.  However, the law requires that any warrant for an invasive body search particularly describe

the area to be searched and the procedure to be used.

        In United States v. Gray, 669 F.3d 556, 560 (5th Cir. 2012) cert. granted, judgment

vacated, 133 S. Ct. 151, 184 L. Ed. 2d 2 (U.S. 2012), law enforcement officers "suspected Gray

of concealing crack cocaine in his "anal cavity," [but] did not describe the medical procedure to

be performed at all."  In Gray, the hospital preformed an x-ray where something was seen, but it

was unclear what the object was.  The doctors then performed a digital search, but Gray

struggled throughout the procedure. Id. Ultimately, the doctors, performed "a proctoscopic

examination of Gray's rectum.  In such an examination, the proctoscope, essentially an

illuminated tube, is inserted across the anal canal and into the rectum. The rectum is then filled with air, or insufflated, so that the interior can be examined. When the rectum is insufflated, the walls are distended, which permits a more thorough evaluation of the wall of the rectum and objects within the rectal vault." Id, at 560-61.  Gray was not then subjected to enemas and a colonoscopy.   In Gray, the court found the execution of the warrant unreasonable, and suggested that courts in the future specifically determine limitations for medical procedures. Id.  In Gray, the government had actual knowledge that the evidence was located in the defendant's body; in this case, Defendant officers were on a fishing expedition throughout Plaintiff's body- from his chest to his colon. Id.

There was no indication in the warrant that any search, beyond a visual search was authorized.  Certainly, the area to be searched and the method of searching carried no particularity.  The very nature of strip searches are so invasive that courts must protect the rights of the citizens who endure them.  "Of particular interest for this case, for more than two decades, courts have specifically and repeatedly recognized the importance of guarding against unreasonable strip searches, in view of the degrading nature of this particular invasion of privacy." Id.  Courts around the country have commented that "'[t]he intrusiveness of a body-cavity search cannot be overstated. Strip searches involving the visual exploration of body cavities is [sic] dehumanizing and humiliating.' Justice Marshall remarked in *Bell* that visual body cavity searches represent one of the most grievous offenses against personal dignity and common decency.' (Marshall, J., dissenting). The majority in *Bell* commented that '[a]dmittedly, this practice instinctively gives us the most pause.'"  Foster v. City of Oakland, 621 F. Supp. 2d 779, 789 (N.D. Cal. 2008)(quoting Kennedy v. Los Angeles Police Dep't, 901 F.2d 702, 711 (9th Cir. 1989), Bell v. Wolfish, 441 U.S. 520, 576–77, 99 S. Ct. 1861, 1903, 60 L. Ed. 2d 447

(1979), and <u>Bell v. Wolfish</u>. at 558, 99 S.Ct. 1861)).  See also <u>United States v. Booker</u>, 728 F.3d

535, 542 (6th Cir. 2013)( where "no reasonable police officer could believe that, without

direction from the police, and over the clear refusal to consent by a conscious and competent

patient, a doctor could lawfully go ahead and perform such a procedure. Even if LaPaglia was

motivated by benevolent medical ideals, his actions in paralyzing and intubating Booker and

performing a rectal examination without his express or implied consent constitute medical

battery.")."[I]t [is] necessary and important ...  for all courts to be precise in the language they

use to describe the various forms of searches administered by law enforcement personnel."

<u>United States v. Talkington</u>, 701 F. Supp. 681, 688 (C.D. Ill. 1988) <u>aff'd</u>, 875 F.2d 591 (7th Cir.

1989).  Without precise words authorizing the truly invasive and degrading procedures

performed on Plaintiff, no reasonable attorney could have believed that the warrant authorized

more than a visual search of Plaintiff's genital area.  Yet, Dougherty knew that the officers were

seeking a digital search of Eckert's rectum and he approved it, despite a rectal search being

unauthorized in the warrant.

     In addition, the probable cause showing for any search was so lacking that no police

officer or attorney could have relied upon it.  The affidavit contains three main pillars of support

to search Eckert's anus:

    1)  Eckert was standing erect with his "legs together";

    2)  "A dog alerted to the driver's side seat." (there was nothing in the affidavit
        about the dog's certification or training); and

    3)  "Hidalgo County K-9 Officer did inform [the officer seeking the warrant that]
        he had dealt with Mr. Eckert on a previous case and stated Mr. Eckert was

known to insert drugs into his anal cavity and had been caught in Hidalgo

County with drugs in his anal cavity."

The issue of what constitutes a sufficient showing of probable cause in a search warrant

for the reliability of a dog alert is open to some debate.  See, e.g.,  United States v. Florez, 871

F.Supp. 1411 (D.N.M. 1994)(Vazquez, J.)(comprehensive review of law in the area of dog

alerts).  However, what is clear is that the warrant must contain some type of showing of

reliability.  Florez, 871 F.Supp. at 1420, n.17; citing, United States v. Venema, 563 F.2d 1003,

1006 (10th Cir. 1977); see also, United States v. Ludwig, 641 F.3d 1243 (10th Cir.

2011)(affirmation of certification of dog sufficient for probable cause).

In his affidavit, Chavez makes no mention of the dog's certification or reliability.  Thus,

without even a mention of the dog's training or certification in the search warrant, it is easy to

see that any attorney should know that the alert drops from the search warrant.  In addition, the

alert was to the driver's seat.  There is no showing made in the warrant between the driver's seat

alert and a man's anus.  One can assume that the intent is that if one carry's drugs in one's anus,

then the scent is going to be left in an area where he sat.  However, we should expect more of a

showing in a request for an anal search than a mere inference.  Is there any training, experience

or testing to show that the scent of illicit drugs can travel from a rectum to a car seat?  If so, it

should be stated.  Does the alert on the car seat indicate the presence of drugs in the seat or of

drugs that had been in the seat?  The import of the alert is lost without a certification and some

type of showing that an inference can be made about a man's anus from the alert.

The allegation from the unnamed K-9 officer of previous incidents of drug transportation

via the anus is an uncorroborated anonymous tip and should be given no weight by a trained

professional.  United States v. Morales, 239 F.3d 138 (8th Cir. 2001).  The information lacks any

indicia of first-hand knowledge.  Law enforcement officers certainly have access to arrest

records and can determine the exact date when a person is arrested for felony crimes.  Any

information about previous arrests should have been detailed in the affidavit and any competent

district attorney should expect such detail, rather than an allegation that he "was known" to insert

drugs in his anus and that he had been "caught" with drugs in his anus in Hidalgo County.  Such

information is easy for law enforcement to corroborate if true, simply through a search of arrest

records.  Without the dog alert, what the affidavit presents is rumor that Eckert had been

"caught" with drugs in his anus in his past and his standing posture.  Certainly, the affidavit

woefully short of any showing of probable cause to search a man's anus, especially a man who is

not in the custody of a jail or prison.

    In addition to his approval of the warrant, Dougherty participated in Eckert's unlawful

arrest.  Dougherty knew of Eckert's three hour detention when he talked to Dr. Ash on the

telephone.  He also authorized transportation of Eckert from Deming to Silver City for a digital

rectal exam.  Dougherty participated in the arrest of Eckert.  In <u>Manzanares</u>, the Tenth Circuit

held that "No reasonable officer could divine from our precedent the notion that a three-hour,

handcuffed detention without any basis for the use of force was anything short of an arrest."

<u>Manzanares v. Higdon</u>, 575 F.3d 1135, 1150 (10th Cir. 2009).  Here Plaintiff was handcuffed

and held in detention for three hours at the point where Dougherty authorized further detention

and transportaiton.  Clearly, Plaintiff's detention evolved into an arrest; thereby requiring officers

to have probable cause for the arrest. See <u>United States v. Perdue</u>, 8 F.3d 1455, 1462 (10th Cir.

1993)(where "[a]n encounter between police and an individual which goes beyond the limits of a

*Terry* stop, however, may be constitutionally justified **only by** probable cause or consent."

<u>United States v. Perdue</u>, 8 F.3d 1455, 1462 (10th Cir. 1993)(emphasis added).

"An officer who fails to intervene to prevent another officer from depriving a person of his or her civil rights may be liable under § 1983." Smith v. Kenny, 678 F. Supp. 2d 1124, 1147-48 (D.N.M. 2009)(citing Lusby v. T.G. & Y Stores, Inc., 749 F.2d 1423, 1433 (10th Cir.1984). In *Hall v. Burke,* 12 Fed.Appx. 856 (10th Cir.2001)). The Tenth Circuit has found:

> [I]t is clearly established that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence. An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official.

Hall v. Burke, 12 F. App'x 856, 861 (10th Cir. 2001)(citing Anderson v. Branen, 17 F.3d 552, 557 (2d Cir.1994)).

Thus, Dougherty's knowledge of the illegal arrest and his approval of further transportation of Dougherty renders him liable for Eckert's unlawful arrest. Dougherty had a clearly established duty to intervene to stop the unlawful arrest of Eckert.

Defendant relies upon one case for his affirmative qualified immunity defense. United States v. Green, 178 F.3d 0199, 1105 (10th Cir. 1999). Green certainly does not approve an "anal cavity," search warrant or the unlawful taking of an innocent man from the side of pubic road to a hospital to fish for alleged drug evidence in his body.

In Rochin v. People of California, 342 U.S. 165 (1952), took their target to a hospital to have his stomach pumped after the officers saw the target swallow contraband. In that case, the United States Supreme Court found that the officers' conduct "do[es] more than offend some fastidious squeamishness or private sentimentalism about combating crime too energetically. This is conduct that shocks the conscience...There are methods too close to the rack and the screw to permit of constitutional differentiation." Id, at 209-210. Plaintiff was placed on the rack and the screw in this case into the wee hours of the morning after Dougherty approved his

transportation to Silver City when a doctor told him the search was unethical.  Dougherty wilfully ignored the doctor's admonition that to execute the warrant was medically unethical. The Supreme Court has strongly disfavored these type of medical procedures because they are, as Dr. Ash warned, extremely invasive.  It is important to note that the target in Rochin was searched incident to arrest, whereas Plaintiff merely looked nervous during a traffic stop and was not arrested for any other purpose but to search for evidence by executing a search warrant of his "anal cavity" that left no part, external or internal,  of his body safe.   Defendant's role in prolonging the torture of Plaintiff should, at the minimum, permit him to be deposed.  See Plaintiff's Exhibit 1, Affidavit of Joseph P. Kennedy, at ¶¶.

Defendant also had performed a chest x-ray of Plaintiff.  The chest is nowhere near Plaintiff's anal canal, and exceeds the scope of the warrant.  Plaintiff underwent a forced colonoscopy.  Like the enemas, the colonoscopy caused a medical instrument to be inserted through Plaintiff's anal canal, into and through his rectum, into his colon, through his large intestine and to his cecum.  Plaintiff's rectum was injected with fluid until nothing but fluid came back out.  There was no governmental interest in these medical procedures as previous probing via the enemas rendered no evidence of contraband.  Defendant sought an even more invasive surgery which explored Plaintiff's internal organs after it was medically certain there was nothing left in the area, not even stool, and after he was told by Dr. Ash that to do so was medically unethical.  They knew Plaintiff's digestive system was clean and empty when Plaintiff was subjected to the colonoscopy.  While the war on drugs has resulted in aggressive government tactics against drug traffickers, the Supreme Court has never authorized the seizing of alleged drug possessors for forced medical procedures to purge their bodies of drugs.  The fact that an attorney would orchestrate and authorize such conduct is shocking.

## CONCLUSION

WHEREFORE, for all of the above reasons, Plaintiff respectfully moves this Court to deny Defendant DDA Dougherty's Motion in its entirety and to affirmatively declare that Defendant is not protected by the doctrine of qualified immunity or to Deny Defendant's Motion to Stay and to allow Plaintiff to conduct limited discovery to further address Defendant's Motion to Dismiss based on Qualified Immunity.

Respectfully Submitted:

**KENNEDY LAW FIRM**

*/s/ Joseph P. Kennedy*
Joseph P. Kennedy
Shannon L. Kennedy
Theresa V. Hacsi
Attorneys for Plaintiff
1000 2nd Street NW
Albuquerque, NM  87102
 Phone: 505-244-1400   Fax:  505-244-1406

I hereby certify that the foregoing was delivered to all interested parties through the CM/ECF system on the day of its filing.

*/s/ Joseph P. Kennedy*
Joseph P. Kennedy

25