# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

DAVID ECKERT,

       Plaintiff,

vs.                                               No. CIV 13-0727 JB/WPL

THE CITY OF DEMING, DEMING
POLICE OFFICERS, BOBBY OROSCO,
ROBERT CHAVEZ and OFFICER
HERNANDEZ; HIDALGO COUNTY;
HIDALGO COUNTY SHERIFF
OFFICERS, DAVID ARREDONDO,
ROBERT RODRIGUEZ, PATRICK
GREEN, DEPUTY DISTRICT ATTORNEY
DANIEL DOUGHERTY, GILA REGIONAL
MEDICAL CENTER, ROBERT WILCOX, M.D.,
and OKAY ODOCHA, M.D.,

       Defendants.

## <u>MEMORANDUM OPINION AND AMENDED ORDER</u>[1]

**THIS MATTER** comes before the Court on: (i) Defendant Deputy District Attorney Daniel Dougherty's Motion to Dismiss on the Grounds of Immunity, filed December 11, 2013 (Doc. 41)("MTD"); and (ii) Plaintiff's Opposed Motion to Amend Complaint, filed January 30, 2015 (Doc. 75)("MTA"). The Court held hearings on August 29, 2014, and August 20, 2015.

---

[1]The Court earlier entered two Orders. The first Order, filed September 17, 2014 (Doc. 74)("First Order"), granted Defendant Deputy District Attorney Daniel Dougherty's Motion to Dismiss on the Grounds of Immunity, filed December 11, 2013 (Doc. 41)("MTD"). The Court stated that it would "at a later date issue a memorandum opinion more fully detailing its rationale for this decision." First Order at 1 n.1. The second Order, filed August 25, 2015 (Doc. 80)("Second Order"), denied the Plaintiff's Opposed Motion to Amend Complaint, filed January 30, 2015 (Doc. 75). This Memorandum Opinion and Amended Order is the promised opinion for both Orders.

The Court is amending the First Order, because it granted the MTD in part rather than in full and did not state the correct rationale for its decision. This Memorandum Opinion and Amended Order clarifies that qualified immunity, rather than prosecutorial immunity, is the basis for the Court's decision to grant the MTD.

The primary issues are: (i) whether qualified immunity protects Defendant Daniel Dougherty from liability for his approval of the search warrant covering Plaintiff David Eckert's vehicle, person, and anal cavity on the suspicion that he was concealing drugs; and (ii) if qualified immunity protects Dougherty from liability, whether the Plaintiff's First Amended Complaint to Recover Damages for[]Deprivation of Civil Rights and Personal Injury, filed January 30, 2015 (Doc. 75-1)("Proposed Amended Complaint"), overcomes that immunity.  The Court determines that Dougherty is entitled to qualified immunity because there is no evidence that he knew or should have known that his actions would result in a series of enemas or a colonoscopy.  Eckert's Proposed Amended Complaint also does not adequately allege this knowledge.  The Court will thus grant the MTD and dismiss the MTA with prejudice.

## FACTUAL BACKGROUND

The Court takes its facts from the Complaint, as it must when ruling on a motion under rule 12(b)(6) of the Federal Rules of Civil Procedure.  On January 2, 2013, Detective Robert Chavez of the Deming Police Department in Luna County, New Mexico stopped Eckert in a Wal-Mart parking lot for alleged failure to yield at a stop sign.  See Complaint to Recover Damages for Deprivation of Civil Rights and Personal Injury ¶ 32, at 5, filed August 7, 2013 (Doc. 1)("Complaint").  Chavez asked Eckert to exit his vehicle and patted Eckert down "without reasonable suspicion that he was armed."  Complaint ¶ 34, at 5.  Chavez says that he noticed that Eckert's posture was "erect and he kept his legs together."  Complaint ¶ 35, at 5.  Although Chavez told Eckert that he was free to leave, he began to interrogate Eckert without probable cause.  See Complaint ¶ 38, at 5.  Chavez falsely states that Eckert gave his consent to a vehicle search.  See Complaint ¶ 39, at 5.  Other officers arrived with a narcotics canine, which alerted to the driver's seat of Eckert's vehicle.  See Complaint ¶ 40, at 5.  Two other officers then

falsely informed Chavez that Eckert was known in neighboring Hidalgo County, New Mexico to "insert drugs into his anal cavity."  Complaint ¶ 42, at 5.  The officers handcuffed Eckert, took him to the Deming Police Department, and searched his vehicle.  They did not find any drugs.  See Complaint ¶¶ 42-46, at 5-6.

Chavez called Dougherty, a Deputy District Attorney for the Sixth Judicial District of New Mexico, which includes Luna County, Grant County, and Hidalgo County, at approximately 2:01 p.m.  See Complaint ¶ 48, at 6.  Chavez successfully sought permission to obtain a search warrant for Eckert's person, vehicle, and anal cavity.  See Complaint ¶ 48, at 6.  He then wrote an affidavit for a search warrant, which Dougherty approved.  See Complaint ¶ 49, at 6.  The affidavit stated that the search's scope was "to include but not limited to Eckert's anal cavity."  Complaint ¶¶ 48-49, at 6.  A state Magistrate Judge approved the request the same day.  See Complaint ¶ 49, at 6.  The resulting warrant did not specify any particular medical procedure.  See Complaint ¶ 50, at 6.  The warrant only covered searches conducted between the hours of 6:00 a.m. and 10:00 p.m.  See Complaint ¶ 71, at 8.

Chavez then took Eckert to the "Deming Emergency Room"[2] to execute the warrant.  See Complaint ¶ 52, at 6.  The attending physician at this emergency room, Dr. Adam Ash, refused to conduct an anal cavity search, because he believed it was unethical.  See Complaint ¶ 53, at 7.  Dougherty then authorized Chavez to take Eckert to Gila Regional Medical Center in Silver City, New Mexico.  See Complaint ¶ 52, at 6.  This hospital was located in neighboring Grant County, allegedly outside of the search warrant's valid scope.  See Complaint ¶ 52, at 6.

---

[2]The only emergency room in Deming is located at Mimbres Memorial Hospital and Nursing Home.  See Emergency Department, MIMBRES MEMORIAL HOSPITAL AND NURSING HOME (2015), http://www.mimbresmemorial.com/mimbres-memorial-hospital/emergencydepartment.aspx.

Physicians at Gila Regional Medical Center admitted Eckert on January 2, 2013 at 9:04 p.m.  See Complaint ¶ 60, at 7.  When the first abdominal X-ray came back negative for any foreign objects, one physician performed a digital rectal examination and felt "something soft," but said that it could have been stool.  Complaint ¶¶ 63-68, at 7-8.  The search warrant expired roughly one hour later that night.

After the search warrant expired, the same physician conducted a second digital rectal examination.  See Complaint ¶ 74, at 8.  When that examination did not produce any results, a surgeon ordered a series of three enemas[3] without Eckert's consent.  None of the enemas produced any foreign objects.  See Complaint ¶¶ 77-87, at 8-9.  The physicians then ordered a second X-ray, this time focused on the chest, which did not reveal any narcotics.  See Complaint ¶¶ 90-92, at 9.  The surgeon reacted to this result by scheduling a colonoscopy[4] for 1:00 a.m. on January 3, 2013.  See Complaint ¶ 94, at 9.  Like every other examination, the colonoscopy did not discover any narcotics.  See Complaint ¶ 97, at 10.  Eckert alleges that police officers "harass[ed], mock[ed], and berate[d] Plaintiff by making derogatory remarks about Plaintiff and his compromised position," and "expos[ed] him to the public hallway during the intimate and humiliating searches."  Complaint ¶¶ 104-105, at 10.  The hospital later billed Eckert "for the

_____

[3]An enema is a solution inserted into the rectum that stimulates the evacuation of the bowels.  It is frequently used to clear out feces or any other foreign bodies before surgery.  See Home Enemas:  Are They Safe?, MAYO CLINIC (March 7, 2007), http://www.riversideonline.com/health_reference/Questions-Answers/AN01562.cfm.

[4]A colonoscopy is a medical examination used to identify abnormalities in the large intestine and rectum.  During the procedure, physicians sedate the patient and insert a long, flexible tube with a camera into the rectum.  Physicians often use it to search for colon cancer.  See Tests and Procedures: Colonoscopy, MAYO CLINIC (Jun. 11, 2014), http://www.mayoclinic.org/tests-procedures/colonoscopy/basics/definition/prc-20013624.

'services' it provided at the request of law enforcement." Complaint ¶ 107, at 11. These bills amounted to thousands of dollars. See Complaint ¶ 108, at 11.

## PROCEDURAL BACKGROUND

Eckert filed suit in the Court on August 7, 2013. See Complaint at 1. His Complaint targets one city, one county, one hospital, and nine individual defendants, including Dougherty. See Complaint ¶¶ 2-13, at 2-3. It alleges: (i) ten searches in violation of the Fourth Amendment to the Constitution of the United States of America; (ii) due process violations; (iii) negligence; (iv) lack of informed consent; (v) violation of the New Mexico Unfair Practices Act, N.M.S.A. 1978 §§ 57-12-1 to 57-12-26; (vi) battery; and (vii) false imprisonment. See Complaint ¶¶ 113-233, 11-28. Eckert seeks: (i) actual and compensatory damages; (ii) punitive damages; (iii) treble damages; (iv) injunctive relief "sufficient to protect Plaintiff and his family from the ongoing harassment and intimidation of Defendants;" (v) attorney's fees, litigation expenses, costs, and pre- and post-judgment interest as the law provides; and (vi) "such other and further relief as the Court deems just and proper." Complaint ¶¶ I-VI, at 29.

### 1.    The MTD.

Dougherty filed the MTD on December 11, 2013. See MTD at 1. Dougherty argues: (i) that he is entitled to prosecutorial immunity, because he acted within the scope of his prosecutorial duties; and (ii) that he is entitled to qualified immunity, because he did not violate a clearly established constitutional right. See MTD at 4-6. Dougherty requests an order dismissing him from the suit with prejudice, attorney fees and costs, and "all other relief this Court deems just and proper." MTD at 10.

First, Dougherty argues that he is entitled to prosecutorial immunity. He contends that, as a prosecutor, he was acting in his employment's course and scope during all of the events that

the Complaint describes.  See MTD at 4.  This fact, he argues, means that his decisions were "intimately associated with the judicial phase of the criminal process" and thus absolutely immune from 42 U.S.C. § 1983 suits.  MTD at 4 (quoting Imbler v. Pachtman, 424 U.S. 409, 430 (1976)).  Dismissal, he argues, will preclude "harassment by unfounded litigation" that could "cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust."  MTD at 4 (quoting Imbler v. Pachtman, 424 U.S. at 423).

Second, Dougherty argues that qualified immunity protects him from Eckert's suit.  He notes that qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law."  MTD at 5 (citing Malley v. Briggs, 475 U.S. 335, 341 (1986)).  He then argues that he did not violate any of Eckert's clearly established constitutional rights.  He contends that there was probable cause for the search warrant, citing the district court judge's affirmative obligation to review the relevant facts, his approval of the warrant, and the deferential standard that reviewing courts apply to judge-approved warrants.  See MTD at 7-8.  These facts, he says, "cut[] off" any liability.  MTD at 8.

He then attacks Eckert's theory that the search and seizure was unreasonable because Dougherty allowed the police officers to take Eckert to a second hospital to execute the warrant.  See MTD at 9.  He concedes that the second hospital was "in another county in the Sixth Judicial District, the judicial district in which the warrant was issued."  MTD at 9.  He states that the warrant was valid, however, even if the second hospital was outside the officers' jurisdiction.  See MTD at 9.  In United States v. Green, 178 F.3d 1099 (10th Cir. 1999)(Anderson, J.), the United States Court of Appeals for the Tenth Circuit held that the Fourth Amendment may be satisfied even if police officers act outside of their jurisdiction as state law defines it.  See 178

F.3d at 1105.  That the officers in this case passed outside their state-law jurisdiction, Dougherty says, is thus irrelevant.

Finally, Dougherty argues that he should be entitled to a stay in the event that a scheduled mediation fails.  He contends that the "broad protection afforded by qualified immunity gives officials 'a right, not merely to avoid 'standing trial,' but also to avoid the burdens of 'such pretrial matters as discovery.'"  MTD at 10 (quoting Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1185 (10th Cir. 2001)(Jenkins, J.)).

**2.      The Response.**

Eckert responded on January 10, 2014.  See Plaintiff's Response to Defendant Deputy District Attorney Daniel Dougherty's Motion and Memorandum to Dismiss on the Grounds of Qualified Immunity at 1, filed January 10, 2014 (Doc. 49)("Response").

Eckert first accepts Dougherty's statement of the law in the MTD.  See Response at 12. He adds a new section describing the summary judgment standard, apparently assuming that the single, passing reference to summary judgment in the MTD means that Dougherty intends to convert his MTD into a motion for summary judgment.  See Response at 12-13.

**a.      Judicial Phase.**

Eckert argues that Dougherty fell outside of the "judicial phase of the prosecution process" that entitles prosecutors to prosecutorial immunity. He contends that Dougherty acted as a "detective detaining a suspect and gathering evidence rather than as a prosecutor who files criminal charges."  Response at 1.  Dougherty was "not engaging in any function associated with the judicial phase," but rather "trying to get a doctor to engage in the evidence gathering phase of a criminal investigation."  Response at 14.  Eckert draws a distinction between "the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand,

- 7 -

and the detective's role in searching for clues and corroboration . . . on the other hand." Response at 15 (quoting Buckley v. Fitzsimmons, 509 U.S. 259, 274 (1993)).  Dougherty, he argues, acted "in an investigative capacity," which prosecutorial immunity does not protect. Response at 13.

Eckert cites a 1993 decision from the Supreme Court of the United States of America holding that "[w]hen the functions of prosecutors and detectives are the same . . . the immunity that protects them is also the same."  Response at 14 (quoting Buckley v. Fitzsimmons, 509 U.S. at 276).  The same case, he notes, also explains that prosecutors "are not entitled to absolute immunity for their actions in giving legal advice to the police."  Response at 14 (quoting Buckley v. Fitzsimmons, 509 U.S. at 270).  According to Eckert, prosecutors providing advice to police whether they have probable cause to arrest a suspect, in short, do not enjoy absolute prosecutorial immunity.  See Response at 14.

### b. Flaws in the Warrant.

Eckert attacks the warrant's facial validity and specificity.  First, he contends that the warrant fails to describe the area to be searched with "sufficient particularity," see Response at 18 (quoting United States v. Williamson, 1 F.3d 1134, 1135-36 (10th Cir. 1993)), because its search area was "to include but not limited to his anal cavity," Response at 18.  Eckert notes that the warrant, "on its face, could be read to include every part of the body."  Response at 18.  Such a "general search warrant," he says, is inconsistent with the case law.  Response at 18.  In United States v. Gray, 669 F.3d 556 (5th Cir. 2012)(Prado, J.)(judgment vacated on other grounds by Gray v. United States, 133 S. Ct. 151, 184 L. Ed. 2d 2 (2012)), for example, police officers ordered a hospital to conduct X-ray, digital, and proctoscopic[5] examinations to search for drugs.

---

[5]In a proctoscopic examination,

See 669 F.3d at 560.  Eckert notes that, in United States v. Gray, "the government had actual knowledge that the evidence was located in the defendant's body" and that the United States Court of Appeals for the Fifth Circuit still found the execution of the warrant unreasonable. Response at 19 (citing United States v. Gray, 669 F.3d at 560-61).  Eckert's search, on the other hand, was a "fishing expedition throughout [his] body -- from his chest to his colon."  Response at 19.

Eckert notes that particularity is especially important in intrusive searches.  He explains that courts have "specifically and repeatedly recognized the importance of guarding against unreasonable strip searches, in view of the degrading nature of this particular invasion of privacy."  Response at 19 (quoting United States v. Gray, 669 F.3d at 561).  This logic, he says, applies with even greater force to body cavity searches.  In effect, he argues, Dougherty's approval allowed a "general search warrant" in a situation that required precision.  Response at 18.

Second, Eckert attacks the probable cause showing for the search.  He points to three possible reasons to search his anus:

1)   Eckert was standing erect with his "legs together";

2)   "A dog alerted to the driver's side seat." (there was nothing in the affidavit about the dog's certification or training); and

3)   "Hidalgo County K-9 Officer did inform [the officer seeking the warrant that] he had dealt with Mr. Eckert on a previous case and stated Mr. Eckert

---

the proctoscope, essentially an illuminated tube, is inserted across the anal canal and into the rectum. The rectum is then filled with air, or insufflated, so that the interior can be examined. When the rectum is insufflated, the walls are distended, which permits a more thorough evaluation of the wall of the rectum and objects within the rectal vault.

United States v. Gray, 669 F.3d at 560-61.

> was known to insert drugs into his anal cavity and had been caught in
> Hidalgo County with drugs in his anal cavity."

Response at 20-21 (brackets in original).  He questions the lack of a certification that the dog was trained or reliable, arguing that the Court should refuse to consider it evidence supporting probable cause.  See Response at 21.  He points to the lack of a detailed connection between the car seat alert and his anus, requesting something more "than a mere inference."  Response at 21.  Eckert's approach to the reports of previous drug transportation via anus is similar -- he notes that it is "an uncorroborated anonymous tip" with no "indicia of first-hand knowledge."  Response at 21-22.  He also notes that the officers could have easily obtained any information on his alleged history of drug transportation by searching arrest records.  See Response at 22.

### c.        Participation in the Arrest.

Finally, Eckert argues that Dougherty is liable because he actively participated in an unlawful arrest.  Dougherty, he notes, had a conversation with Dr. Ash and knew that Eckert had been detained, in handcuffs, for three hours.  See Response at 22.  See also Manzanares v. Higdon, 575 F.3d 1135, 1150 (10th Cir. 2009)(Lucero, J.)("No reasonable officer could divine from our precedent the notion that a three-hour, handcuffed detention without any basis for the use of force was anything short of an arrest.").   At this point, Dougherty authorized further detention and transportation to a second hospital.  See Response at 20.  Eckert argues that his continued detention had "evolved into an arrest" requiring arresting officers to have probable cause.  Response at 22.  Dougherty, Eckert adds, had an "affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence."   Response at 23 (quoting Hall v. Burke, 12 F. App'x 856, 861 (10th Cir. 2001)(Briscoe, J.)).  This duty applies both where the officer "observes" the violation, and where he or she "has reason to know" that it is occurring.  Response at 23 (quoting Hall v. Burke, 12 F.

App'x at 861).  Eckert concludes that Dougherty had a "clearly established duty" to stop the unlawful arrest.  Response at 23.

Eckert also contends that Dougherty's cited case, United States v. Green, 178 F.3d 1099 (10th Cir. 1999)(Anderson, J.), is distinguishable, because it does not approve either an anal cavity search warrant or a fishing expedition for alleged drug evidence.  Response at 23.  He contends that his case is more analogous to Rochin v. People of California, 342 U.S. 165 (1952), in which the Supreme Court found that a non-consensual stomach pump procedure was "conduct that shocks the conscience . . . .  There are methods too close to the rack and the screw to permit of constitutional differentiation."  342 U.S. at 209-10.  In many ways, Eckert argues, his case is actually worse than that case.  He was not searched incident to arrest, and officers did not observe him hide any drugs on or in his body.  See Response at 24.  Moreover, officers subjected Eckert to a chest X-ray, which had nothing to do with his anal canal.  See Response at 24.  The colonoscopy, which the Defendants ordered "after it was medically certain there was nothing left in the area," was an even greater abuse.  Response at 24.  In short, Eckert argues that Dougherty's authorization of the officers' conduct is "shocking."  Response at 24.

> **3.      The Reply.**

Dougherty replied on February 10, 2014.  See Defendant District Attorney Daniel Dougherty's Reply in Support of his Motion to Dismiss on the Grounds of Qualified Immunity at 1, filed February 10, 2014 (Doc. 55)("Reply").  The Reply first deals with Eckert's brief mention of summary judgment, explaining that his "attempt to convert the Motion into a motion for summary judgment . . . is inappropriate in response to a motion for judgment on the pleadings."  Reply at 1-2.  Dougherty thus asks the Court to disregard any facts not included in Eckert's Complaint.  See Reply at 1-2.  This refusal to convert the motion would limit the relevant facts,

according to Dougherty, to "the allegation that he approved the pursuit of a search warrant" and his advice to officers "regarding taking Plaintiff to another hospital for the search described in the warrant."  Reply at 2.

Second, Dougherty argues that he did not violate Eckert's constitutional rights.  He notes that the "relevant, dispositive inquiry is whether it would be clear to a reasonable public official that his conduct was unlawful in the situation he confronted."  Reply at 3 (citing Saucier v. Katz, 533 U.S. 194, 202 (2001), overruled on other grounds by Pearson v. Callahan, 555 U.S. 223, 236 (2009)).  Adding that the legal question must be "beyond debate," he states that the "Plaintiff fails to provide a case that holds a district attorney who reviews an affidavit for a search warrant for legal sufficiency before that search warrant is approved by a judge violates a person's constitutional rights."  Reply at 3-4.  He concludes that "[t]he review of a search warrant that facially establishes probable cause does not violate anyone's constitutional rights." Reply at 4.

Dougherty then makes a series of arguments to rebut Eckert's account of an unlawful detention and search:

> First, DDA Dougherty did not participate in any detention. DDA Dougherty never saw or interacted with Plaintiff. There is no allegation in the Complaint stating that he did.  Second, the detention was not unlawful. This is a conclusory statement by Plaintiff.  Third, DDA Dougherty only reviewed an affidavit for legal sufficiency; it is undisputed that he did not issue the search warrant that lead [sic] to the detention of Plaintiff. Fourth, there is no evidence that DDA Dougherty was ever apprised of the arrest or detention status of Plaintiff at any time. Fifth, there is no allegation in the Complaint that DDA Dougherty was apprised of the methods or extent of the medical procedures used to execute the warrant issued by the judge. Sixth, it is not clear from the allegations in the Complaint whether Plaintiff was arrested at all. Seventh, even assuming *arguendo* that Plaintiff was arrested, DDA Dougherty did not have the power of arrest and does not approve arrests. Eighth, DDA Dougherty did not have any authority to prolong any arrest or terminate any arrest. Ninth, it is undisputed that DDA Dougherty did not have the authority to override the search warrant. Finally, it is undisputed that DDA Dougherty did not search Plaintiff.

Reply at 4.  Dougherty again relies on the judge's approval of the warrant, arguing that it negates Eckert's argument that there was no probable cause.  See Reply at 4.  He argues that Eckert's suggested degree of specificity is unnecessary, noting that issuing a warrant is a "practical, common-sense decision" whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place."  Reply at 5 (quoting United States v. Reed, 195 F. App'x 815, 821 (10th Cir. 2006)(O'Brien, J.)).  The degree of proof required, he says, is "less than a certainty."  Reply at 5.  Dougherty also argues that Eckert has lobbed his allegations at the wrong target.  He states that Eckert's "challenge is appropriately directed at the judge" and notes that the police could act only on the judge's order.  Reply at 5.

Third, Dougherty focuses on the legality of his advice that the police could take Eckert to the second hospital.  See Reply at 6.  He notes that Dr. Ash's ethical refusal to search Eckert has no legal significance.  See Reply at 6 n.2.  He maintains that there was a valid search warrant or court order and that the second hospital was the closest facility capable of carrying out that order.  See Reply at 6.  He also downplays his own authority, noting that he "never had the authority to execute or dismiss the court order."  Reply at 6.  He concludes that, "[d]espite Plaintiff's suggestion, DDA Dougherty did not plan or execute a raid on Plaintiff's anal cavity."  Reply at 7.

Fourth, Dougherty emphasizes his ignorance of the search's ultimate scope.  He explains that he had no communication with the police officers after he advised them on the move to a second hospital.  See Reply at 7.  The Complaint does not allege that he was aware of what occurred at the hospital, including the enemas and the colonoscopy.  See Reply at 7.  He concludes that to hold him "responsible for the activities of medical and law enforcement

personnel exercising their professional judgment is as perverse as expecting him to override a court order based on a doctor's opinion of his personal ethical obligation." Reply at 7.

Finally, Dougherty emphasizes that he cannot be held liable for the misconduct of the law enforcement personnel who directly oversaw the colonoscopy and enemas. He argues that Eckert "tries to make [him] a police officer and give him the duties of a police officer in the field." Reply at 8. He contends that he "authorized" neither further detention nor transport from Deming to the second hospital. Reply at 8. He resists any suggestion that he had a duty to intervene to stop Eckert's alleged arrest. See Reply at 8. He concludes that "[u]nder no scenario does Plaintiff connect the dots in a way that makes [Dougherty] responsible for any arrest or detention." Reply at 9. He again insists that he is entitled to a stay of discovery. See Reply at 9.

**4.      The First Hearing.**

The Court held a hearing on August 29, 2014. See Transcript of Hearing (taken August 29, 2014)("Tr. 1").[6]   Dougherty emphasized that the Court should not convert his MTD into a motion for summary judgment. See Tr. 1 at 38:19-25 (Williams). He argued that his involvement in the Complaint was very minor: he "looked at an affidavit submitted by law enforcement for legal sufficiency, and he took two phone calls." Tr. 1 at 41:12-15 (Williams). He asserted that he did not "overreach for absolute immunity," because he "clearly meets the qualified immunity test," so there was no need to "go at full bore for absolute immunity." Tr. 1 at 41:18-23 (Williams).[7]

---

[6]The Court's citations to the transcripts of any hearings refer to the court reporter's original, unedited versions. Any final versions may contain slightly different page and/or line numbers.

[7]The Court finds this statement confusing. Dougherty's MTD clearly advanced an absolute prosecutorial immunity theory, his Reply did not withdraw that argument, and his Second Response repeated it. See MTD at 4-5; Reply at 1-15; Second Response at 4.

Dougherty then presented his version of events.  First, he said, the state judge's decision to approve the search warrant "breaks the chain of argument" that there was no probable cause for the search.  Tr. 1 at 43:6-8 (Williams).  Second, he contended that, once the warrant was issued, he had no authority to tell the police that they did not need to execute the warrant.  See Tr. 1 at 42:13-16 (Williams).  He summed up his qualified immunity argument: "The law was unambiguous for the need of probable cause for a search warrant and it's unambiguous that not just deputy district attorney Dougherty but the officer before him and the judge after him both determined and felt that there was probable cause for the issuance of the warrant."  Tr. 1 at 43:20-25 (Williams).

The Court then questioned Dougherty about the lack of certification for the narcotics dog.  See Tr. 1 at 44:21-25 (Court).  Dougherty replied that the Complaint included no allegations that the dog was uncertified, and that, in any case, it "had been a certified drug dog."  Tr. 1 at 45:1-6 (Williams).

Eckert urged the Court to "just treat [Dougherty] like another police officer."  Tr. 1 at 47:10-14 (Court, Kennedy).  Eckert agreed that "qualified immunity and not absolute immunity" was at issue.  Tr. 1 at 46:22-24 (Kennedy).  Eckert then contended that he was "clearly under arrest" and that Dougherty was "participating in the arrest."  Tr. 1 at 48:11-20 (Kennedy).  Eckert then pointed to three problems with the warrant.  First, he said, a warrant "at a minimum on a dog alert should inform the judge . . . as to the certification of the dog and the fact that the dog has some reliability."  Tr. 1 at 49:1-6 (Kennedy).  Second, he again complained about the absence of a nexus between the dog's alert and his anus.  See Tr. 1 at 49:6-15 (Kennedy).  Third, he questioned the uncorroborated police statement that he was known to carry drugs in his anus.  See Tr. 1 at 49:15-19 (Kennedy).  He then stated that Dougherty knew: (i) that Eckert would be

in custody between the time of the first call and the time he reached an emergency room; (ii) that the first doctor posed numerous ethical objections to the procedure; and (iii) that officers would perform an X-ray and a digital search.  See Tr. 1 at 50:1-52:9 (Kennedy).

Eckert responded with additional support for his legal arguments.  He stated that the Tenth Circuit has held that "all you have to do is show an affirmative link the between the deprivation and some exercise of control or direction or a failure to supervise."  Tr. 1 at 51:18-22 (Kennedy).  He argued that there is no rule that "once a state district court Judge signs a warrant that cuts off any 1983 claims."  Tr. 1 at 52:5-9 (Kennedy).  He also noted that even the vague warrant was insufficient to support a transfer to a second medical facility, a colonoscopy, and a chest X-ray.  See Tr. 1 at 53:9-21 (Kennedy).

Eckert also defended his inclusion of additional facts in his Response.  He explained that, if the Court finds a deficiency in the pleading, it should allow him to amend his Complaint to incorporate the new information.  See Tr. 1 at 54:1-14 (Kennedy).  In response to the Court's questioning, he maintained that his claims would survive even if the affidavit was sufficient.  See Tr. 1 at 55:16-57:16 (Court, Kennedy).

Dougherty argued on rebuttal that many of Eckert's arguments, including Dougherty's failure to prevent an unlawful search, are based on allegations absent from his Complaint.  See Tr. 1 at 58:16-17 (Williams).  Dougherty again confirmed that the Court could "ignore all the prosecutorial immunity, absolute immunity and just focus on qualified immunity."  Tr. 1 at 61:4-8 (Court, Williams).

Eckert then warned the Court that he might move to amend his Complaint "to be extra, extra safe" and to include all possible issues.   Tr. 1 at 79:15-23 (Kennedy).  The Court urged

him to "hold [his] powder," and wait for a ruling to determine "whether you want to move to amend or if it's going to make any difference."  Tr. 1 at 80:1-8 (Court).

### 5.    __The First Order and Resulting Pleadings.__

The Court reached a decision on September 17, 2014.  See Order, filed September 17, 2014 (Doc. 74)("First Order").  The Court granted the MTD in part and denied it in part.  It explained that

> prosecutorial immunity protects Defendant Daniel Dougherty from liability for his approval of the search warrant. The Court will dismiss the Complaint without prejudice to amendment, and Plaintiff David Eckert may file a motion for leave to amend the Complaint to allege that Dougherty directed police officers to conduct an unlawful search.

First Order at 2.

Eckert reacted to the order by moving to amend his Complaint.  See MTA at 1.  Eckert's Proposed Amended Complaint "does not add any new theories."  MTA at 3.  He argues, however, that he obtained new details on the conversation between Dougherty and the physician who refused to conduct a search after he filed his Complaint.  See MTA at 4.

Eckert concedes that he "does not and cannot allege that Dougherty directed the officers to conduct an unlawful search."  MTA at 3.  He notes that the Court "may deny leave to amend if the Court finds that the proposed amendment would be futile."  MTA at 4.  Although he cannot be sure whether the Court will find his additions futile, he requests that "the Court squarely rule on the factual allegations as Eckert knows them so that a clear record can be maintained."  MTA at 4.  He also "seeks a ruling whether the allegations made in the proposed amended complaint amount to direction from Dougherty that a search be completed."[8]  MTA at 4.

---

[8]This final request seems at tension with Eckert's statement in the MTA that he "does not and cannot allege that Dougherty directed the officers to conduct an unlawful search."  MTA at 3.

Dougherty responded on February 13, 2015.   See Deputy District Attorney Daniel Dougherty's Response in Opposition to Plaintiff's Opposed Motion to Amend Complaint, filed February 13, 2015 (Doc. 76)("Second Response").   Dougherty notes that the First Order allowed Eckert to amend the Complaint "to allege that Dougherty directed police officers to conduct an unlawful search of Plaintiff."   Second Response at 2 (quoting First Order at 2).   Dougherty says that Eckert has failed to make this new and required allegation in his Proposed Amended Complaint.   First, Dougherty contends that the First Order mooted any claims involving his approval of the search warrant.   See Second Response at 3.   Second, he argues that his conversation with one physician who refused to comply with a search warrant "for personal reasons" did not give him "the authority to direct the police to disobey a court order."   Second Response at 4.   Third, he points to the Court's conclusion that he had "prosecutorial immunity" for his actions relating to the affidavit and to the draft search warrant.   Second Response at 4.

Dougherty next argues that the MTA's true purpose is to "posture [Eckert] more favorably for an appeal of the Complaint, by alleging post dismissal those facts he wishes had been included in his Complaint."   Second Response at 6.   He says that Eckert unduly delayed in seeking these changes, given that he had his purportedly new facts "the day after the MTD was filed and over nine months before the hearing on the MTD."   Second Response at 6.

Finally, Dougherty attacks Eckert's final request for a ruling "whether the allegations made in the proposed amended complaint amount to direction from Dougherty that a search be completed."   Second Response at 6.   He explains that Eckert wants an "advisory opinion on what the answer would be."   Second Response at 6.   He concludes that the Court should deny addressing the issue without a case or controversy, adding that Eckert "requests an improper

judicial resolution of his shaky ability to plead what the Court requires, not the settling of a dispute between the parties."  Second Response at 7.

Eckert replied on March 6, 2015.  <u>See</u> Plaintiff's Reply in Support of Motion to Amend, filed March 6, 2015 (Doc. 77)("Second Reply").  He first points out that an amendment would not prejudice Dougherty, because discovery has not yet begun.  <u>See</u> Second Reply at 1.  He then challenges the Court's requirement that he show that "Dougherty directed the police officers in an unlawful search of Eckert."  Second Reply at 1.  He argues instead that "an official is liable for any action he takes that causes a deprivation of civil rights," that physical presence at the scene of the search is unnecessary, and that the "causal connection is satisfied if the defendant set in motion a series of events that [he] knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights."  Second Reply at 1 (quoting <u>Poolaw v. Marcantel</u>, 565 F.3d 721, 732-33 (10th Cir. 2009)(Lucero, J.)).  Eckert argues that "the officers' consultation with Dougherty and his approval of a digital rectum search at another medical facility caused the unlawful search."  Second Reply at 2.

**6.      The Second Hearing.**

The Court held a hearing on the MTA on August 20, 2015.  <u>See</u> Transcript of Hearing (taken August 20, 2015)("Tr. 2").  The Court first apologized for its delay in releasing a full Memorandum Opinion, which "might have obviated some of the problems" that arose in subsequent litigation.  Tr. 2 at 2:18-23 (Court).  It also acknowledged that its "order was not as robust [as] it could have been," which could have added to the parties' confusion.  Tr. 2 at 3:5-12 (Court).

The Court then explained its view of the issues.  First, it stated that qualified immunity, rather than prosecutorial immunity, protects Dougherty from liability for his actions.  <u>See</u> Tr. 2 at

3:24-4:3 (Court).   Second, it explained that the digital examination and the X-rays were permissible, but the enema and colonoscopy were not.   See Tr. 2 at 4:4-8 (Court).   The Court stated that the police officers had probable cause thanks to the dog's alert to the seat.   See Tr. 2 at 4:11-13 (Court).   The Court's conclusion meant that "everybody was still on firm ground" and that Dougherty had qualified immunity when the police officers took the search warrant to the first hospital.   Tr. 2 at 4:8-10 (Court).   The Court determined that the enemas and colonoscopy were "beyond the scope of the search and the search warrant," but that Eckert failed to link Dougherty to any of these procedures.   Tr. 2 at 4:14-15 (Court).   The Court thus stated that it would allow Eckert to "file a motion for leave to [] amend the complaint to allege that Dougherty directed police officer[s] to conduct [an] unlawful search or knew or should have known that officers would have conducted an unlawful search."   Tr. 2 at 4:21-5:1 (Court).

The Court explained that proximate cause for 1983 liability requires three elements.   See Tr. 2 at 5:21-5:1 (Court).   First, the state agent must have set in motion the series of events that resulted in the constitutional violation.   See Tr. 2 at 5:13-16 (Court).   Second, the state agent must have known, or reasonably should have known, that the events he or she set in motion would result in a constitutional violation.   See Tr. 2 at 5:16-19 (Court).   Third, no foreseeable intervening and superseding act could have occurred between the events that the state agent set in motion and the ultimate constitutional violation.   See Tr. 2 at 5:20-23 (Court).   The Court focused on the "known or reasonably should have known" element, asking whether Dougherty knew or reasonably should have known that the police officers would carry out the enemas and the colonoscopy.   Tr. 2 at 6:1-9 (Court).   It concluded that he did not, and that "I don't think [Eckert's Proposed Amended Complaint] solves the problem."   Tr. 2 at 6:9-10 (Court).

Eckert argued in response that Dr. Ash warned Dougherty that a digital search could result in "false positives" and lead to further invasive procedures.  Tr. 2 at 6:20-7:5 (Kennedy).  Eckert contended that this conversation shows that Dougherty knew or should have known that the search could result in enemas or a colonoscopy.  See Tr. 2 at 7:6-9 (Kennedy).  The Court was skeptical of this argument.  See Tr. 2 at 7:14-15 (Court).  The Court promised to produce "an opinion and final judgment so you can be on your way" to an appeal to the Tenth Circuit.  Tr. 2 at 7:21-24 (Court).

## LAW REGARDING MOTIONS TO DISMISS UNDER RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994)(Brorby, J.).  The complaint's sufficiency is a question of law; and, when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)(Briscoe, J.)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).   "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."   Ashcroft v. Iqbal, 556 U.S. at 678.   "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face.  See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010)(Seymour, J.).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556).   "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."  Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(Kelly, J.)(emphasis omitted). The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a
> complaint: if they are so general that they encompass a wide swath of conduct,
> much of it innocent, then the plaintiffs "have not nudged their claims across the
> line from conceivable to plausible."   The allegations must be enough that, if
> assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for
> relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(citations omitted).

Although affirmative defenses must generally be pled in the defendant's answer, not argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions where: (i) the defendant asserts an immunity defense -- the courts handle these cases differently than other motions to dismiss, see Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M. 2012)(Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009) and Robbins v. Oklahoma, 519 F.3d 1242 (10th Cir. 2008)); and (ii) where the facts establishing the affirmative defense are apparent on the face of the complaint, see Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965)(Hill, J.)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim.   If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule.").

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority."   Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).   "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'"   Roybal v. City of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).   The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials."   Butz v. Economou, 438 U.S. 478, 504 (1978).   "The qualified immunity

analysis is the same whether the claims are brought under <u>Bivens</u> or pursuant to the post-Civil War Civil Rights Acts." <u>Breidenbach v. Bolish</u>, 126 F.3d 1288, 1291 (10th Cir. 1997), <u>overruled on other grounds as recognized in</u> <u>Currier v. Doran</u>, 242 F.3d 905 (10th Cir. 2001).

> Under § 1983 (invoked in this case) and <u>Bivens v. Six Unknown Fed. Narcotics Agents</u>, 403 U.S. 388 . . . (1971), a plaintiff may seek money damages from government officials who have violated her constitutional or statutory rights. But to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties," <u>Anderson v. Creighton</u>, 483 U.S. 635, 638 . . . (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, they are shielded from personal liability, <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 . . . (1982). That means a court can often avoid ruling on the plaintiff's claim that a particular right exists. If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

<u>Camreta v. Green</u>, 131 S. Ct. 2020, 2030-31 (2011).

Issues of qualified immunity are best resolved at the "earliest possible stage in litigation." <u>Pearson v. Callahan</u>, 555 U.S. at 232 (quoting <u>Hunter v. Bryant</u>, 502 U.S. 224, 227 (1991)(per curiam)). "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit." <u>Lewis v. Tripp</u>, 604 F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Pearson v. Callahan</u>, 555 U.S. at 231 (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. at 818). Qualified immunity also shields officers who have "reasonable, but mistaken beliefs" and operates to protect officers from the law's sometimes "hazy border[s]." <u>Saucier v. Katz</u>, 533 U.S. at 205. When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights;

and (ii) that the right was clearly established at the time of the alleged misconduct.  See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

## 1.    Procedural Approach to Qualified Immunity.

In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." 555 U.S. at 236.  The Supreme Court also noted that, while no longer mandatory, the protocol outlined in Saucier v. Katz -- by which a court first decides if the defendant's actions violated the Constitution, and then the court determines if the right violated was clearly established -- will often be beneficial.  See Pearson v. Callahan, 555 U.S. at 241.  In rejecting the prior mandatory approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district court and courts of appeals with "what may seem to be an essentially academic exercise."   555 U.S. at 237.  The Supreme Court also recognized that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable."   555 U.S. at 241 (alterations omitted)(internal quotation marks omitted).   See Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior case law "comports with our usual reluctance to decide constitutional questions unnecessarily").  Once the plaintiff establishes an inference that the defendant's conduct violated a clearly established constitutional right, a

qualified immunity defense generally fails.  See Cannon v. City & Cnty. of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

The Supreme Court recognizes seven circumstances where district courts should proceed directly to and "should address only" the clearly established prong of the qualified immunity analysis: when (i) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right."  Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(quoting Pearson v. Callahan, 555 U.S. at 236-42)(internal quotation marks omitted).[9]  Regarding the last of these seven circumstances, the Supreme Court has clarified that

---

[9]As former-Tenth Circuit judge, and now Stanford Law School professor, Michael McConnell, has noted, much of what lower courts do is read the implicit, unwritten signs that the superior courts send them through their opinions.  See Michael W. McConnell, Address at the Oliver Seth American Inn of Court: How Does the Supreme Court Communicate Its Intentions to the Lower Courts: Holdings, Hints and Missed Signals (Dec. 17, 2014).  This practice is good for the nation's judicial system to achieve uniformity in a nation of 319 million people.  See, e.g., Michigan v. Long, 463 U.S. 1032, 1040 (1983)(stating that "there is an important need for uniformity in federal law").  But see Amanda Frost, Overvaluing Uniformity, 94 Va. L. Rev. 1567 (2008)(criticizing courts' focus on uniformity of the law).  If a district court in New Mexico is trying -- as it does diligently and faithfully -- to receive and read the unwritten signals of its superior courts, it would appear that Justice Alito in Pearson v. Callahan and Judge

courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely only to face challenges in the qualified immunity context. Camreta v. Greene, 131 S. Ct. 2020, 2031-2 (2011). See Kerns v. Bader, 663 F.3d at 1181.[10] "Courts should think carefully before expending 'scarce judicial resources' to resolve

_____

Gorsuch in Kerns v. Bader are trying to suggest that district courts should, whenever possible, decide qualified immunity on the clearly established prong. For example, Justice Alito and Judge Gorsuch gave seven situations when the Court should decide a case solely on the clearly established element and not "avoid avoidance." Kerns v. Bader, 663 F.3d at 1180-81. Even the phrase "avoid avoidance" suggests that the district court is to generally avoid, not decide, the constitutional issue.

        The Court is concerned about this push to not decide constitutional issues, for a number of reasons. The Court set forth some of these concerns in Kerns v. Board of Education. Additionally, there is a practical problem. Sometimes, for a district court to really know whether a right is clearly established, it has to do the first analysis, and thoroughly explore whether there is a right and whether it has been violated. If it jumps to the mushy, hazy area of clearly established without knowing what the right is, the analysis lacks any precision. While appellate courts may think that jumping to the clearly established prong saves district courts a lot of trouble, in the Court's experience, the old rule -- in Saucier v. Katz -- made more sense and, practically, is the way the Court still has to go in many cases.

    [10]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer. 663 F.3d at 1183. In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question. And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84. The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)." 663 F.3d at 1187 n.5. On remand, the Court stated:

While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations.   A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations.   See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972).  In Mitchum v. Foster, the Supreme Court explained:

> Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." . . .  The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.

407 U.S. at 238-39 (modifications in original).  Congress did not say it would remedy only violations of "clearly established" law, but that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (emphasis added).  The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional.  See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010).  The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith."  Wood v. Strickland, 420 U.S. 308, 322 (1975).  In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly-established prong became a part of the qualified immunity test.  See 457 U.S. at 818 ("We therefore hold that government officials performing

difficult and novel questions of constitutional or statutory interpretation that will 'have no effect

on the outcome of the case.'"   Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011)(quoting Pearson

discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights."). It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983. J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011). Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations. See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . . These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives). In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering. See 547 U.S. at 596-97. Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress. It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights. It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized in Ysasi v. Brown, No. CIV 13-0183 JB/CG, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.). See Fourth Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations).

v. Callahan, 555 U.S. at 236-37).  See Camreta v. Greene, 131 S. Ct. at 2032 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones." [11]).  The

---

[11]In Kerns v. Board of Commissioners, the Court expressed concern with Justice Elena Kagan's comments about "large" and "small" cases:

> While the Court is, of course, obligated to follow faithfully the Supreme Court's decisions and opinions, the Court has always been unenlightened and even troubled by Justice Elena Kagan's comments in Camreta v. Greene about "large" and "small" cases.  131 S. Ct. at 2032.  As a trial judge, the Court has tried assiduously to avoid thinking about or categorizing some cases as "large" and some as "small."  It usually is not mentally healthy for a judge to put all his or her energy into "large" cases and slight "small cases"; to the litigants, their case is the most important case on the Court's docket, and it is usually wise for the judge to treat each case on which he or she is working -- at that moment -- as the most important case at that moment.  Getting the decision "right," i.e. getting the law and facts correct and accurate, is obviously important, but getting it right is only one-half of a judge's task, particularly a trial judge's job.  The other half of dispensing justice is the appearance of justice -- did the Court listen to the litigant's arguments, wrestle with those arguments, and deal with them in an intellectually honest way.  Americans are pretty good about accepting a judicial decision -- even an adverse one -- and cease obsessing over an issue, if they are convinced that an authority figure has dressed up, taken them seriously, listened patiently and politely, wrestled with the arguments, addressed them, and accurately stated the facts.  The Court believes that, if it starts looking at some cases before it as "large" and some as "small," it begins a slippery slope that does not accomplish both halves of the task of dispensing justice.  The justice system depends so much on the nation respecting and accepting the courts' proceedings and decisions, because courts have very little "power" that does not depend on that acceptance.  Thus, Justice Kagan's comments are not self-defining and disturbing.

> If, perhaps, a "large" case is a Supreme Court case or one that comes from the East Coast or California, rather than one in a district court in New Mexico, then it helps to look at what cases the Supreme Court has decided for the plaintiff.  The three most recent qualified immunity cases the Supreme Court dealt with are: (i) Reichle v. Howards, 132 S. Ct. 2088 (2012); (ii) Filarksy v. Delia, 132 S. Ct. 1657 (2012); and (iii) Messerschmidt v. Millender, 132 S. Ct. 1235 (2012).  In Reichle v. Howards, the Supreme Court determined that secret service agents were entitled to qualified immunity for arresting a protestor who touched the Vice President and held that it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation.  See 132 S. Ct. at 2092, 2097.  In Filarsky v. Delia, the Supreme Court held that a private individual that the government hires to do its work, an internal affairs review, is entitled to seek qualified immunity for Fourth and Fourteenth Amendment violations.

Tenth Circuit will remand a case to the district court for further consideration when the district court has given cursory treatment to the clearly established prong of the qualified immunity analysis.  See Kerns v. Bader, 663 F.3d at 1182.

### 2.        Clearly Established Rights in the Qualified Immunity Analysis.

To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colo. Dep't of Corr., 429

---

See 132 S. Ct. at 1660, 1668.  In Messerschmidt v. Millender, the Supreme Court held that police officers in Los Angeles, California were entitled to qualified immunity when they relied on an invalid warrant to search a home, because a reasonable officer would not have realized the error.  See 132 S. Ct. at 1241, 1250.  The Supreme Court has not denied qualified immunity since 2004 in Groh v. Ramirez, 540 U.S. 551 (2004), where it held that an officer unreasonably relied on a deficient warrant.  See 540 U.S. at 565. The Court does not think those presumably "large" cases (they are Supreme Court cases, after all) are any different -- substantively, legally, or factually -- than this case involving the search of a citizen's home after someone shot down a police helicopter and then detained that suspect for nine months until the United States realized that J. Kerns could not have shot down the helicopter.

    On the flip side, treating large cases like they are large cases can create an appearance problem to the public and to the litigants -- that only big cases deserve the Court's attention.  A trial judge can overwork a "large" case.  It is better to treat even "large" cases like every other case; large cases and their litigants need to know and appreciate that they are not the only case on the court's docket, and realize that the scarcity of judicial resources applies to them too.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d at 1222 n.35.

F. App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).[12]

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001). On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful." Anderson v. Creighton, 483 U.S. at 640. "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202). A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d at 1298.

---

[12]Lobozzo v. Colo. Dep't of Corr. is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court finds that Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707 (10th Cir. 2011) and United States v. Reed, 195 F. App'x 815, 821 (10th Cir. 2006) all have persuasive value with respect to material issues and will assist the Court in its preparation of this MO.

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 131 S. Ct. at 2083. "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 131 S. Ct. at 2083). "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639. "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 131 S. Ct. at 2084. The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" on the application of law to facts and operates to protect officers from the law's sometimes "hazy border[s]." Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit held in Kerns v. Bader that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference." 663 F.3d at 1188 (emphasis in original). In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification." 663 F.3d at 1183 (emphasis added). Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined, applied a sliding scale to determine

when the law is clearly established.  See Casey v. City of Fed. Heights, 509 F.3d at 1284 ("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.").  "[W]hen an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a second decision with greater specificity to clearly establish the law."  Casey v. City of Fed. Heights, 509 F.3d at 1284.  Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning . . . ."  Hope v. Pelzer, 536 U.S. at 741.

In Rivera v. Bates, No. CIV 12-0473 JB/RHS, 2014 WL 3421050 (D.N.M. June 21, 2014)(Browning, J.), the Court used the Kerns v. Bader qualified-immunity framework to determine if it was clearly established that arresting a suspect in his underwear and failing to retrieve his clothing to cover him while transporting him from his house to a patrol car makes the arrest unreasonable.  See 2014 WL 3421050, at *54.  The Court stated:

> Even if the Court could, on the record before it, conclude, as a matter of law, that the manner in which Hernandez effectuated the arrest was [un]reasonable, the Court finds that the law was not clearly established such that a reasonable officer in Hernandez' position would have recognized that he needed to retrieve clothing for S. Rivera rather than escort him directly to the police vehicle.  As the Tenth Circuit has emphasized, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction *might* make a constitutional difference."  Kerns v. Bader, 663 F.3d at 1188 (emphasis in original).  In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was *beyond debate* in 2005 that the officers' entry and search lacked legal justification."  663 F.3d at 1183 (emphasis added).  Here, S. Rivera has relied on Cortez v. McCauley to establish that his clearly established rights were violated, but the Tenth Circuit in that case stated that it had "little difficulty concluding that a small amount of force, like grabbing Rick Cortez and placing him in the patrol car, is permissible in effecting an arrest under the Fourth Amendment."  663 F.3d at 1128.  The Tenth Circuit only made one comment regarding Cortez' clothing during the arrest:
>
> > Although the dignity aspects of this arrest are troubling, specifically hauling Rick Cortez (clad only in his shorts) into the

patrol car in the middle of the night without any explanation, the police were investigating a serious felony and claimed a need for quick action to separate the accused from any other children that might be in the home.

478 F.3d at 1128-29.  The Tenth Circuit did not explain what would have to be different about the "dignity aspects" for the arrest to violate the Fourth Amendment.  More importantly, the Court emphasizes that Hernandez did not participate in any of the alleged wrongdoing inside S. Rivera's house, nor did he refuse to allow S. Rivera to get dressed; instead, Hernandez was involved in the arrest only after S. Rivera was outside the house.  S. Rivera has not pointed to, nor has the Court been able to identify, any cases that demand that an officer delay taking the arrestee to a police vehicle so the officer can enter the arrestee's home to search for clothing or otherwise find some covering for an arrestee on the way to the police vehicle.  The Court will thus grant the MSJ on S. Rivera's excessive and unreasonable force claim against Hernandez.

Rivera v. Bates, 2014 WL 3421050, at *54 (emphasis in original).

## LAW REGARDING LIABILITY FOR CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983

Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988).  Individual, non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's

constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.   See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)(McKay, J.)("The requisite causal connection is satisfied if [the defendants] set in motion a series of events that [the defendants] knew or reasonably should have known would cause others to deprive [the plaintiffs] of [their] constitutional rights.")(quoting Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006)(Henry, J.)).   The Supreme Court has made clear that there is no respondeat superior liability under 42 U.S.C. § 1983.   See Ashcroft v. Iqbal, 556 U.S. at 675 ("Because vicarious liability is inapplicable to Bivens[13] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).   "An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor."   Garcia v. Casaus, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 689 (1978)).   Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts.   See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998)(Seymour, J.).

Government actors may be liable for the constitutional violations that another committed, if the actors "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights," thus establishing the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations.   Trask v. Franco, 446 F.3d at 1046.   The Tenth Circuit has explained

---

[13]In Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), the Supreme Court held that a violation of the Fourth Amendment to the Constitution of the United States "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct."   403 U.S. at 389.

that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'" Martinez v. Carson, 697 F.3d at 1255 (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961), overruled in part by Monell v. Dep't of Soc. Servs., 436 U.S. at 663).  "Thus, Defendants are liable for the harm proximately caused by their conduct." Martinez v. Carson, 697 F.3d at 1255 (citing Trask v. Franco, 446 F.3d at 1046).  As the Court has previously concluded, "a plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations.  The recovery should be guided by common-law tort principles -- including principles of causation . . . ." Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009)(Browning, J.).

The Tenth Circuit has found liability for defendants who proximately cause an injury alleged under § 1983, explaining that the "conduct of other people may have concurrently caused the harm does not change the outcome as to [the defendant]," so long as there was not a superseding-intervening cause of a plaintiff's harm. Lippoldt v. Cole, 468 F.3d 1204, 1220 (10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the officers only "would be liable for the harm 'proximately' or 'legally' caused by their tortious conduct." Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995). "They would not, however, necessarily be liable for all of the harm caused in the 'philosophic' or but-for sense by the illegal entry." Id.  In civil rights cases, a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability. See, e.g., Warner v. Orange Cnty. Dep't of Prob., 115 F.3d 1068, 1071 (2d Cir. 1997); Springer v. Seaman, 821 F.2d 871, 877 (1st Cir. 1987), abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 . . . (1989).

Trask v. Franco, 446 F.3d at 1046.  Thus, in the context of a claim under the Fourth Amendment, the Tenth Circuit has held that government actors "may be held liable if the further unlawful detention and arrest would not have occurred but for their conduct and if there were no

unforeseeable intervening acts superseding their liability." Martinez v. Carson, 697 F.3d at 1255.

The Tenth Circuit gave an example of a superseding intervening cause, quoting the Honorable

Samuel J. Alito, then-United States Circuit Judge for the United States Court of Appeals for the

Third Circuit, now-Associate Justice for the Supreme Court:

> Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking and announcing their presence. Once inside, they encounter the suspect, identify themselves, show him the warrant, and tell him that they are placing him under arrest. The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in the process injures him. Is the third officer necessarily liable for the harm caused to the suspect on the theory that the illegal entry without knocking and announcing rendered any subsequent use of force unlawful? The obvious answer is "no." The suspect's conduct would constitute a "superseding" cause, see Restatement (Second) of Torts § 442 (1965), that would limit the officer's liability. See id. § 440.

Trask v. Franco, 446 F.3d at 1046 (quoting Bodine v. Warwick, 72 F.3d at 400)(citations in

original). Additionally, "[f]oreseeable intervening forces are within the scope of the original risk,

and . . . will not supersede the defendant's responsibility." Trask v. Franco, 446 F.3d at 1047

(quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 44, at 303-04

(5th ed. 1984)). If

> the reasonable foreseeability of an intervening act's occurrence is a factor in determining whether the intervening act relieves the actor from liability for his antecedent wrongful act, and under the undisputed facts there is room for reasonable difference of opinion as to whether such act was wrongful or foreseeable, the question should be left for the jury.

Trask v. Franco, 446 F.3d at 1047 (citing Restatement (Second) of Torts § 453 cmt. b

(1965)).

## RELEVANT LAW REGARDING FOURTH AMENDMENT SEARCHES

The Fourth Amendment protects "[t]he right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.  In determining whether a Fourth Amendment violation has occurred, courts must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." United States v. Jones, 132 S. Ct. 945, 950 (2012)(Scalia, J.)(alteration in original)(quoting Kyllo v. United States, 533 U.S. 27, 31 (2001)(Scalia, J.)).

"Not all searches require a warrant.  The hallmark of the Fourth Amendment is reasonableness." United States v. Harmon, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011)(Browning, J.).  See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'")(quoting Brigham City, Utah v. Stuart, 547 U.S. 398 (1978)).  "In the criminal context, reasonableness usually requires a showing of probable cause." Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1184 (D.N.M. 2011)(Browning, J.)(quoting Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. 822, 828 (2002)).  The Supreme Court has stated in the law enforcement context that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967)(footnotes omitted).

### 1.    United States v. Jones.

The defendant in United States v. Jones was suspected of drug trafficking, and a joint Federal Bureau of Investigation and District of Columbia Metropolitan Police Department task force obtained a warrant authorizing installation in Washington, D.C., within ten days, of a

Global Positioning System device to the defendant's car.  See 132 S. Ct. at 948.  On the eleventh

day, task force agents attached the GPS device to the bottom of the defendant's car while the car

was in Maryland.  The agents then used the GPS device to track the defendant's movements over

the next twenty-eight days, replacing the battery once, and collecting over two-thousand pages of

data sent from the device.  See 132 S. Ct. at 948.

The Honorable Antonin G. Scalia, Associate Justice of the Supreme Court, writing for the

majority, in which Chief Justice Roberts and Justices Kennedy, Thomas, and Sotomayor joined,

held that "the Government's installation of a GPS device on a target's vehicle, and its use of that

device to monitor the vehicle's movements, constitutes a 'search.'"  132 S. Ct. at 949.  Justice

Scalia reasoned that the United States' conduct was a Fourth Amendment search, because the

government trespassed on a constitutionally protected area.  See 132 S. Ct. at 949 ("The Fourth

Amendment provides . . . that '[t]he right of the people to be secure in their persons, houses,

papers, and effects, against unreasonable searches and seizures, shall not be violated.'  It is

beyond dispute that a vehicle is an 'effect' as that term is used in the Amendment.").  Such a

physical intrusion, Justice Scalia opined, would have come within the Framers' intended

definition of a "search": "It is important to be clear about what occurred in this case: The

Government physically occupied private property for the purpose of obtaining information.  We

have no doubt that such a physical intrusion would have been considered a 'search' within the

meaning of the Fourth Amendment when it was adopted."  132 S. Ct. at 949.  Justice Scalia

reconciled the Supreme Court's conclusion that attaching a GPS device to track a Jeep in plain

view was a Fourth Amendment search with New York v. Class, 475 U.S. 106 (1986), in which

the Supreme Court concluded that a visual examination of the outside of a vehicle while in plain

view does not constitute a search, by noting that "[i]n Class itself we suggested that this

[physical invasion] would make a difference, for we concluded that an officer's momentary reaching into the interior of a vehicle did constitute a search."  132 S. Ct. at 952.

Justice Scalia reasoned that the Fourth Amendment's text supports taking a property law based approach to determine whether there is a search, but did not shy away from the fact that, in recent history, the Supreme Court had deviated from this approach:

> The text of the Fourth Amendment reflects its close connection to property, since otherwise it would have referred simply to "the right of the people to be secure against unreasonable searches and seizures"; the phrase "in their persons, houses, papers, and effects" would have been superfluous.
>
> Consistent with this understanding, our Fourth Amendment jurisprudence was tied to common-law trespass, at least until the latter half of the 20th century. Kyllo v. United States, 533 U.S. [at] 31 . . . .  Our later cases, of course, have deviated from that exclusively property-based approach. . . . [and] have applied the analysis of Justice Harlan's concurrence in [Katz v. United States], which said that a violation occurs when government officers violate a person's "reasonable expectation of privacy," id., at 464 . . . .

132 S. Ct. at 949-50.

The United States had contended that, under the "Harlan standard" -- i.e., the Katz v. United States reasonable-expectation-of-privacy approach -- "no search occurred here, since Jones had 'no reasonable expectation of privacy' in the area of the Jeep accessed by the Government agents (its underbody) and in the locations of the Jeep on the public roads, which were visible to all."  132 S. Ct. at 950.  Justice Scalia concluded, however, that the Supreme Court "need not address the Government's contentions" in relation to the Katz v. United States reasonable-expectation-of-privacy test analysis, because the trespass-based search approach, which existed at the time of the Fourth Amendment's adoption, disposed of the issue:

> Jones's Fourth Amendment rights do not rise or fall with the Katz formulation. At bottom, we must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." Kyllo[ v. United States, 533 U.S. at 34].  As explained, for most of our history the Fourth Amendment was understood to embody a particular concern for government

trespass upon the areas ("persons, houses, papers, and effects") it enumerates.
<u>Katz</u> did not repudiate that understanding.  Less than two years later the Court
upheld defendants' contention that the Government could not introduce against
them conversations between other people obtained by warrantless placement of
electronic surveillance devices in their homes.  The opinion rejected the dissent's
contention that there was no Fourth Amendment violation "unless the
conversational privacy of the homeowner himself is invaded."   <u>Alderman v.</u>
<u>United States</u>, 394 U.S. 165, 176 . . . (1969).  "[W]e [do not] believe that <u>Katz</u>, by
holding that the Fourth Amendment protects persons and their private
conversations, was intended to withdraw any of the protection which the
Amendment extends to the home . . . ."  <u>Id.</u>, at 180.

132 S. Ct. at 950-51 (some alteration in original)(footnotes omitted).

In her concurrence, Justice Sotomayor agreed that "the trespassory test applied in the

majority's opinion reflects an irreducible constitutional minimum: When the Government

physically invades personal property to gather information, a search occurs.  The reaffirmation of

that principle suffices to decide this case."  132 S. Ct. at 955 (Sotomayor, J., concurring).  She

continued:

Of course, the Fourth Amendment is not concerned only with trespassory
intrusions on property.  <u>See</u>, <u>e.g.</u>, <u>Kyllo v. United States</u>, 533 U.S. [at] 31-33 . . . .
Rather, even in the absence of a trespass, "a Fourth Amendment search occurs
when the government violates a subjective expectation of privacy that society
recognizes as reasonable." <u>Id.</u>, at 33; <u>see also</u> <u>Smith v. Maryland</u>, 442 U.S. 735,
740-741 . . . (1979); <u>Katz v. United States</u>, 389 U.S. [at] 361 . . . (Harlan, J.,
concurring).

132 S. Ct. at 954-55 (Sotomayor, J., concurring).  Justice Sotomayor's concurrence focused on

the reality, in her view, that,

physical intrusion is now unnecessary to many forms of surveillance. . . .   In
cases of electronic or other novel modes of surveillance that do not depend upon a
physical invasion on property, the majority opinion's trespassory test may provide
little guidance. But "[s]ituations involving merely the transmission of electronic
signals without trespass would remain subject to <u>Katz</u> analysis."

132 S. Ct. at 955 (Sotomayor, J., concurring)(alteration in original)(quoting the majority opinion,

132 S. Ct. at 953).

Justice Alito, joined by Justices Ginsburg, Breyer, and Kagan, concurred in the judgment only, reasoning that, although he agreed with the result, given the use of twenty-first century technology, he would have analyzed whether the government's long-term monitoring of the defendant violated the Katz v. United States reasonable-expectation-of-privacy test:

> This case requires us to apply the Fourth Amendment's prohibition of unreasonable searches and seizures to a 21st-century surveillance technique, the use of a Global Positioning System (GPS) device to monitor a vehicle's movements for an extended period of time. Ironically, the Court has chosen to decide this case based on 18th-century tort law. By attaching a small GPS device to the underside of the vehicle that respondent drove, the law enforcement officers in this case engaged in conduct that might have provided grounds in 1791 for a suit for trespass to chattels. And for this reason, the Court concludes, the installation and use of the GPS device constituted a search. [132 S. Ct.] at 948-949.

> This holding, in my judgment, is unwise. It strains the language of the Fourth Amendment; it has little if any support in current Fourth Amendment case law; and it is highly artificial.

> I would analyze the question presented in this case by asking whether respondent's reasonable expectations of privacy were violated by the long-term monitoring of the movements of the vehicle he drove.

132 S. Ct. at 957-58 (Alito, J., concurring in the judgment). Justice Alito first took issue with what he called the majority's "questionable proposition that the[] two procedures [of attaching and using a GPS device] cannot be separated for Fourth amendment purposes." 132 S. Ct. at 958. Justice Alito submitted that, "[i]f these two procedures are analyzed separately, it is not at all clear from the Court's opinion why either should be regarded as a search." 132 S. Ct. at 958.

Justice Alito contended that the majority's opinion suggests that "the concept of a search, as originally understood, comprehended any technical trespass that led to the gathering of evidence," but disagreed with the majority, stating: "[W]e know this is incorrect." 132 S. Ct at 958. Justice Alito pointed out that the open-fields doctrine grew out of the distinction between a physical intrusion of any private property and property that is part of a home: "At common law,

any unauthorized intrusion on private property was actionable, but a trespass on open fields . . . does not fall within the scope of the Fourth Amendment because private property outside the curtilage is not part of a 'hous[e]' within the meaning of the Fourth Amendment."  132 S. Ct. at 958-959 (Alito, J., concurring in the judgment)(quoting <u>Oliver v. United States</u>, 466 U.S. 170 (1984)).

Justice Alito asserted that the trespass-based approach that the majority used was "repeatedly criticized" and ultimately "repudiated," based largely on its incompatibility with cases involving wiretapping and eavesdropping surveillance.  <u>United States v. Jones</u>, 132 S. Ct. at 959, 960 (Alito, J., concurring in the judgment).  Justice Alito contended that "the majority is hard pressed to find support in post-<u>Katz</u> cases for its trespass-based" decision that, when the United States attached the GPS device to Jones' Jeep, it trespassed on his effects and performed a Fourth Amendment search.  132 S. Ct. at 960-61.  Justice Alito pointed to multiple problems that he believes the majority's trespass-based approach creates.  First, he asserted that the majority's analysis is irreconcilable with the element of the United States' conduct that he contends society would find offensive -- the GPS-monitoring and not the attachment of the device.  If the United States could follow a car without physically trespassing on a person, home, paper, or effect, such as remotely monitoring a car via an internal GPS device, this monitoring would not constitute a Fourth Amendment search under the majority's analysis.  <u>See</u> 132 S. Ct. at 961.  Second, along the same lines, Justice Alito pointed out an "incongruous result[]" from the majority's opinion that a short-term tracking of a vehicle with a GPS device, merely tracking a vehicle down a single street, is a Fourth Amendment search, while, "if the police follow the same car for a much longer period using unmarked cars and aerial assistance, this tracking is not subject to any Fourth Amendment constraints."  132 S. Ct. at 961.  Justice Alito also asserted

that, by tying Fourth Amendment searches to property law and trespass concepts, the Fourth Amendment's protections "may vary from State to State," based on different property and contract laws in the various states.  132 S. Ct. at 961-62.

> ### 2.        Florida v. Jardines.

In Florida v. Jardines, 133 S. Ct. 1409 (2013), Justice Scalia, writing for the majority once again, held that using a drug-sniffing dog to sniff a person's "home and its immediate surroundings" is a Fourth Amendment search.   133 S. Ct. at 1417-18.   Justices Thomas, Ginsburg, Sotomayor, and Kagan joined Justice Scalia's majority opinion in Florida v. Jardines. The Honorable Elena Kagan, Associate Justice, filed a separate concurring opinion, in which Justices Ginsburg and Sotomayor joined, adding "further thoughts, suggesting that a focus on Jardines' privacy interests would make 'an easy cas[e] easy' twice over," but "join[ing] the Court's opinion in full."  133 S. Ct. at 1420 (Kagan, J., concurring).  Justice Alito dissented, and Chief Justice Roberts, Justice Kennedy, and Justice Breyer joined his opinion.

In Florida v. Jardines, based on a tip that the defendant, Jardines, was growing marijuana in his home, the Miami-Dade, Florida, police department and the Drug Enforcement Administration sent a surveillance team to Jardines' home.  See 133 S. Ct. at 1413.  Observing nothing of note in the first fifteen minutes watching the home, two detectives approached the home accompanied by a dog trained to detect marijuana, cocaine, heroin, and several other drugs by alerting the detectives with behavioral changes.  See 133 S. Ct. at 1413.  As the dog approached Jardines' front porch, the dog "apparently sensed one of the odors he had been trained to detect," and after tracking back and forth, sat at the base of the front door, "which is the trained behavior upon discovering the odor's strongest point."  133 S. Ct. at 1413.  The dog's handler then immediately left the porch, and told the other agents and officers at the scene that

there had been a positive alert for drugs, at which time the officers applied for and received a search warrant for the residence, the execution of which revealed marijuana plants.  See 133 S. Ct. at 1413.  Jardines was arrested for trafficking in marijuana and moved to suppress the evidence based on an illegal search.  See 133 S. Ct. at 1413.

Justice Scalia held that the use of a drug-sniffing dog was a Fourth Amendment search, reasoning:

> [T]his case [is] a straightforward one.  The officers were gathering information in an area belonging to Jardines and immediately surrounding his house -- in the curtilage of the house, which we have held enjoys protection as part of the home itself. And they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner.

133 S. Ct. at 1414.  Justice Scalia noted that "[t]he Fourth Amendment 'indicates with some precision the places and things encompassed by its protections': persons, houses, papers, and effects." 133 S. Ct. at 1414 (quoting Oliver v. United States, 466 U.S. at 176).  Thus, the Fourth Amendment does not cover every "investigation[] on private property; for example, an officer may (subject to Katz) gather information in what we have called 'open fields' -- even if those fields are privately owned -- because such fields are not enumerated in the Amendment's text." 133 S. Ct. at 1414.

Justice Scalia held that "the officers' investigation took place in a constitutionally protected area," the home, as the front porch is the home's curtilage.  See 133 S. Ct. at 1414-15.  Justice Scalia then "turn[ed] to the question of whether it was accomplished through an unlicensed physical intrusion," 133 S. Ct. at 1415, and reasoned that it was:

> While law enforcement officers need not "shield their eyes" when passing by the home "on public thoroughfares," [California v. Ciraolo, 476 U.S. 207, 213 (1986)], an officer's leave to gather information is sharply circumscribed when he steps off those thoroughfares and enters the Fourth Amendment's protected areas. In permitting, for example, visual observation of the home from "public navigable

> airspace," we were careful to note that it was done "in a physically nonintrusive manner."  Id. Entick v. Carrington, 2 Wils. K.B. 275, 95 Eng. Rep. 807 (K.B. 1765), a case "undoubtedly familiar" to "every American statesman" at the time of the Founding, Boyd v. United States, 116 U.S. 616, 626 . . . (1886)[, abrogated by Warden, Md. Penitentiary v. Hayden, 387 U.S. 294 (1967)], states the general rule clearly: "[O]ur law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave."  2 Wils. K.B., at 291.  As it is undisputed that the detectives had all four of their feet and all four of their companion's firmly planted on the constitutionally protected extension of Jardines' home, the only question is whether he had given his leave (even implicitly) for them to do so.  He had not.

133 S. Ct. at 1415.  Justice Scalia noted that, while society recognizes an implicit license which "typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave," he concluded that "introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do that."  133 S. Ct. at 1415-16 (emphasis in original).  Justice Scalia explained:

> An invitation to engage in canine forensic investigation assuredly does not inhere in the very act of hanging a knocker.  To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to -- well, call the police.  The scope of a license -- express or implied -- is limited not only to a particular area but also to a specific purpose.  Consent at a traffic stop to an officer's checking out an anonymous tip that there is a body in the trunk does not permit the officer to rummage through the trunk for narcotics.  Here, the background social norms that invite a visitor to the front door do not invite him there to conduct a search.

133 S. Ct. at 1416.

The State of Florida argued "that investigation by a forensic narcotics dog by definition cannot implicate any legitimate privacy interest."  133 S. Ct. at 1417.  The State of Florida cited to United States v. Place, 462 U.S. 696 (1983), United States v. Jacobsen, 466 U.S. 109 (1984), and Illinois v. Caballes, 543 U.S. 405 (2005), "which held, respectively, that canine inspection of

luggage in an airport, chemical testing of a substance that had fallen from a parcel in transit, and canine inspection of an automobile during a lawful traffic stop, do not violate the 'reasonable expectation of privacy' described in <u>Katz</u>." 133 S. Ct. at 1417.  Justice Scalia pointed out that, in <u>United States v. Jones</u>, the Supreme Court had already concluded that "[t]he <u>Katz</u> reasonable-expectations test 'has been <u>added to</u>, not <u>substituted for</u>,' the traditional property-based understanding of the Fourth Amendment, and so it is unnecessary to consider [the test under <u>Katz v. United States</u>] when the government gains evidence by physically intruding on constitutionally protected areas." 133 S. Ct. at 1417 (quoting <u>United States v. Jones</u>, 132 S. Ct. at 951-52).  Because the Supreme Court had already concluded that the conduct was a Fourth Amendment search under the trespass-based analysis, therefore, it held that it was unnecessary to consider whether the conduct amounts to a search under the <u>Katz v. United States</u> reasonable-expectation-of-privacy analysis:

> Thus, we need not decide whether the officers' investigation of Jardines' home violated his expectation of privacy under <u>Katz</u>.  One virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy.  That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred.

133 S. Ct. at 1417.

Justice Kagan wrote a concurring opinion, noting: "The Court today treats this case under a property rubric; I write separately to note that I could just as happily have decided it by looking to Jardines' privacy interests."  133 S. Ct. at 1418 (Kagan, J., concurring).  Justice Kagan analogized the government's conduct in using a drug sniffing dog on Jardines' porch to a stranger coming to the front door, who "doesn't knock or say hello," but instead, peers through the windows "into your home's furthest corners" with "super-high-powered binoculars," and "in just a couple of minutes, his uncommon behavior allows him to learn details of your life you

disclose to no one." 133 S. Ct. at 1418 (Kagan, J., concurring).  This conduct, she posited, is a

trespass which exceeds any implied license and is also an invasion of reasonable expectations of

privacy; she argued that, like her analogy, the facts in <u>Florida v. Jardines</u> likewise involved a

trespass and a violation of privacy expectations:

> That case is this case in every way that matters.  Here, police officers came to
> Joelis Jardines' door with a super-sensitive instrument, which they deployed to
> detect things inside that they could not perceive unassisted.  The equipment they
> used was animal, not mineral.  But contra the dissent, <u>see</u> [133 S. Ct.] at 1420
> (opinion of Alito, J.)(noting the ubiquity of dogs in American households), that is
> of no significance in determining whether a search occurred.

133 S. Ct. at 1418 (Kagan, J., concurring).  According to Justice Kagan, had she written the

majority opinion based on the <u>Katz v. United States</u> reasonable-expectations-of-privacy search

test,

> [a] decision along those lines would have looked . . . well, much like this one.  It
> would have talked about "'the right of a man to retreat into his own home and
> there be free from unreasonable governmental intrusion.'"  [133 S. Ct.] at 1414
> (quoting <u>Silverman v. United States</u>, 365 U.S. 505, 511 . . . (1961)).  It would
> have insisted on maintaining the "practical value" of that right by preventing
> police officers from standing in an adjacent space and "trawl[ing] for evidence
> with impunity."  [133 S. Ct.] at 1414.  It would have explained that "'privacy
> expectations are most heightened'" in the home and the surrounding area.  [133 S.
> Ct.] at 1414-15 (quoting <u>California v. Ciraolo</u>, 476 U.S. [at] 213 . . . ).  And it
> would have determined that police officers invade those shared expectations when
> they use trained canine assistants to reveal within the confines of a home what
> they could not otherwise have found there.  <u>See</u> [133 S. Ct.] at 1415-16, and n. 2-
> 3.

133 S. Ct. 1409, 1418-19 (Kagan, J., concurring).

Justice Alito's dissenting opinion, in which Chief Justice Roberts, and Justices Kennedy

and Breyer, joined, submitted that "[t]he Court's decision in this important Fourth Amendment

case is based on a putative rule of trespass law that is nowhere to be found in the annals of

Anglo-American jurisprudence."  133 S. Ct. at 1420 (Alito, J., dissenting).  Justice Alito noted

that general trespass law permits a license to public members to use a walkway to approach a

house's door, including strangers such as mailmen and solicitors, and the majority's conclusion

that "the police officer in this case, Detective Bartelt, committed a trespass because he was

accompanied during his otherwise lawful visit to the front door of respondent's house by his dog,

Franky," is without a sound basis in trespass law.  133 S. Ct. at 1420-21 (Alito, J., dissenting).

Justice Alito also asserted that decision is inconsistent with the Katz v. United States'

reasonable-expectations-of-privacy test: "A reasonable person understands that odors emanating

from a house may be detected from locations that are open to the public, and a reasonable person

will not count on the strength of those odors remaining within the range that, while detectible by

a dog, cannot be smelled by a human."  Florida v. Jardines, 133 S. Ct. at 1421 (Alito, J.,

dissenting).

Justice Alito contended that the majority's opinion that the detective "exceeded the

boundaries of the license to approach the house that is recognized by the law of trespass, . . . is

unfounded."  133 S. Ct. at 1421 (Alito, J., dissenting).  Justice Alito pointed out that the law of

trespass does not distinguish between visitors or reasons for the visit in granting an implied

license to approach a house's front door.  See 133 S. Ct. at 1421-22 (Alito, J., dissenting).  He

also asserted: "As I understand the law of trespass and the scope of the implied license, a visitor

who adheres to these limitations is not necessarily required to ring the doorbell, knock on the

door, or attempt to speak with an occupant," and uses mail carriers as an example of such a

visitor.  133 S. Ct. at 1423 (Alito, J., dissenting).  Justice Alito pointed out that the implied

license also applies to law enforcement and cited to Kentucky v. King, 131 S. Ct. 1849 (2011), in

which the Supreme Court held that law enforcement officers approaching the front door of a

residence to conduct a "knock and talk" is not a Fourth Amendment search.  Florida v. Jardines,

133 S. Ct. at 1423 (Alito, J., concurring).  Given that "Detective Bartelt did not exceed the scope

of the license to approach respondent's front door," Justice Alito took issue with the majority's

conclusion "that Detective Bartelt went too far because he had the 'objectiv[e] . . . purpose to

conduct a search.'"  133 S. Ct. at 1423 (Alito, J., dissenting)(emphasis in original).  According to

Justice Alito, because approaching a house to conduct a knock and talk is not a search,

> [w]hat the Court must fall back on, then, is the particular instrument that
> Detective Bartelt used to detect the odor of marijuana, namely, his dog. But in the
> entire body of common-law decisions, the Court has not found a single case
> holding that a visitor to the front door of a home commits a trespass if the visitor
> is accompanied by a dog on a leash.  On the contrary, the common law allowed
> even unleashed dogs to wander on private property without committing a trespass.
>
> The Court responds that "[i]t is not the dog that is the problem, but the
> behavior that here involved use of the dog."  But where is the support in the law
> of trespass for this proposition? Dogs' keen sense of smell has been used in law
> enforcement for centuries. The antiquity of this practice is evidenced by a Scottish
> law from 1318 that made it a crime to "disturb a tracking dog or the men coming
> with it for pursuing thieves or seizing malefactors."  If bringing a tracking dog to
> the front door of a home constituted a trespass, one would expect at least one case
> to have arisen during the past 800 years.  But the Court has found none.

133 S. Ct. at 1424 (Alito, J., dissenting)(emphasis in original)(internal citations omitted).  Justice

Alito thus concluded: "For these reasons, the real law of trespass provides no support for the

Court's holding today.  While the Court claims that its reasoning has 'ancient and durable roots,'

its trespass rule is really a newly struck counterfeit."   133 S. Ct. at 1424 (Alito, J.,

dissenting)(internal citations omitted).

Justice Alito did not look any more favorably upon Justice Kagan's conclusion that

Detective Bartelt's conduct violated Jardines' reasonable privacy expectations, asserting:

> [W]e have already rejected a very similar, if not identical argument, see Illinois v.
> Caballes, . . . and in any event I see no basis for concluding that the occupants of a
> dwelling have a reasonable expectation of privacy in odors that emanate from the
> dwelling and reach spots where members of the public may lawfully stand.

133 S. Ct. at 1424 (Alito, J., dissenting).  Justice Kagan asserted that Detective Bartelt's use of

Franky, the drug-sniffing dog, was an invasion of Jardines' privacy in his home, because the

government's conduct was similar to the conduct in <u>Kyllo v. United States</u>, in which the Supreme Court held that using a thermal imaging device to monitor movements in a home was a Fourth Amendment search.  Justice Alito pointed out that "[t]his Court . . . has already rejected the argument that the use of a drug-sniffing dog is the same as the use of a thermal imaging device.  The very argument now advanced by the concurrence appears in Justice Souter's <u>Caballes</u> dissent.  But the Court was not persuaded."  133 S. Ct. at 1425 (Alito, J., dissenting)(internal citations omitted)(citing <u>Illinois v. Caballes</u>, 543 U.S. at 409-10 and 413 n.3).  Justice Alito contended that "<u>Kyllo</u> is best understood as a decision about the use of new technology. . . .  A dog, however, is not a new form of 'technology' or a 'device.'  And, as noted, the use of dogs' acute sense of smell in law enforcement dates back many centuries."  133 S. Ct. at 1425 (Alito, J., dissenting).  Justice Alito therefore concluded that the government's conduct in <u>Florida v. Jardines</u> "did not constitute a trespass and did not violate respondent's reasonable expectations of privacy.  I would hold that this conduct was not a search, and I therefore respectfully dissent." 133 S. Ct. at 1426.

### 3.   __Standing__.

The Tenth Circuit has referred to the test whether a particular search implicates a defendant's Fourth Amendment interests -- whether the search violates the defendant's reasonable privacy expectation -- as one of "standing."  <u>E.g.</u>, <u>United States v. Creighton</u>, 639 F.3d 1281, 1286 (10th Cir. 2011)("The Defendant has the burden of establishing . . . standing, or, in other words, a subjective expectation of privacy in the [item searched] that society is prepared to recognize as reasonable."); <u>United States v. Poe</u>, 556 F.3d 1113, 1121 (10th Cir. 2009)("[A] defendant raising a Fourth Amendment challenge must first demonstrate that he has standing to object to the search.")(citing <u>United States v. Rubio-Rivera</u>, 917 F.2d 1271, 1274 (10th Cir.

1990)); United States v. Shareef, 100 F.3d 1491, 1499 (10th Cir. 1996)("A Defendant has standing to challenge a search only if he or she has a reasonable expectation of privacy in the area being searched.").  Accordingly, the Court, tracing the Tenth Circuit's language has also referred to this test as one of standing.  See, e.g., United States v. Harmon, 785 F. Supp. 2d at 1157 ("Standing requires the defendant to show 'that he had a subjective expectation of privacy in the premises searched and that society is prepared to recognize that expectation as reasonable.'")(quoting United States v. Poe, 556 F.3d at 1121).  The Supreme Court's decisions in United States v. Jones and Florida v. Jardines, however, suggest that this test has now expressly been designated a substantive Fourth Amendment analysis alongside the trespass-based Fourth Amendment analysis, rather than a distinct analysis under the rubric entitled standing.

In Rakas v. Illinois, 439 U.S. 128 (1978), the Supreme Court disapproved of labeling the inquiry whether a search implicates a defendant's personal Fourth Amendment interests "as one of standing, rather than simply recognizing it as one involving the substantive question of whether or not the proponent of the motion to suppress had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge." 439 U.S. at 133.  Dispensing with this label, the Supreme Court noted:

> Had we accepted petitioners' request to allow persons other than those whose own Fourth Amendment rights were violated by a challenged search and seizure to suppress evidence obtained in the course of such police activity, it would be appropriate to retain Jones[ v. United States, 362 U.S. 257 (1960, overruled by United States v. Salvucci, 448 U.S. 83 (1980)]' use of standing in Fourth Amendment analysis.  Under petitioners' target theory, a court could determine that a defendant had standing to invoke the exclusionary rule without having to inquire into the substantive question of whether the challenged search or seizure violated the Fourth Amendment rights of that particular defendant. However, having rejected petitioners' target theory and reaffirmed the principle that the "rights assured by the Fourth Amendment are personal rights, [which] . . . may be enforced by exclusion of evidence only at the instance of one whose own

protection was infringed by the search and seizure," Simmons v. United States, 390 U.S. at 389 . . . , the question necessarily arises whether it serves any useful analytical purpose to consider this principle a matter of standing, distinct from the merits of a defendant's Fourth Amendment claim. We can think of no decided cases of this Court that would have come out differently had we concluded, as we do now, that the type of standing requirement discussed in Jones and reaffirmed today is more properly subsumed under substantive Fourth Amendment doctrine. Rigorous application of the principle that the rights secured by this Amendment are personal, in place of a notion of "standing," will produce no additional situations in which evidence must be excluded. The inquiry under either approach is the same. But we think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing. The Court in Jones also may have been aware that there was a certain artificiality in analyzing this question in terms of standing because in at least three separate places in its opinion the Court placed that term within quotation marks. 362 U.S., at 261, 263, 265 . . . .

439 U.S. at 138-39. The Supreme Court emphasized:

[N]othing we say here casts the least doubt on cases which recognize . . . as a general proposition, the issue of standing [generally.] . . . But this Court's long history of insistence that Fourth Amendment rights are personal in nature has already answered many of these traditional standing inquiries, and we think that definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.

439 U.S. at 139-40. In Minnesota v. Carter, the Supreme Court recognized that Rakas v. Illinois put an end to the Fourth Amendment standing analysis as separate from the substantive Fourth Amendment search analysis:

The Minnesota courts analyzed whether respondents had a legitimate expectation of privacy under the rubric of "standing" doctrine, an analysis that this Court expressly rejected 20 years ago in Rakas . . . . Central to our analysis [in Rakas v. Illinois] was the idea that in determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the "definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." Id., at 140 . . . .

525 U.S. at 87-88. The Supreme Court has thus noted that the analysis under either approach -- the substantive Fourth Amendment doctrine that the rights that the Amendment secures are personal versus the separate notion of "standing" -- is the same and that Katz v. United States'

reasonable-expectation-of-privacy analysis has now been classified as a substantive Fourth

Amendment test, as opposed to a standing test.  Rakas v. Illinois, 439 U.S. at 139.

> Rigorous application of the principle that the rights secured by this Amendment are personal, in place of a notion of "standing," will produce no additional situations in which evidence must be excluded.  But we think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing.

Rakas v. Illinois, 439 U.S. at 139 (footnote omitted).  This development is in line with the

Supreme Court's guidance that the analysis "is more properly subsumed under substantive

Fourth Amendment doctrine."  Rakas v. Illinois, 439 U.S. at 139.

### 4.    **Whether a Fourth Amendment Search Occurred**.

A Fourth Amendment search occurs either where the government, to obtain information,

trespasses on a person's property or where the government, to collect information, violates a

person's subjective expectation of privacy that society recognizes as reasonable.  See United

States v. Jones, 132 S. Ct. at 947.  "[T]he Katz reasonable-expectation-of-privacy test has been

added to, not substituted for, the common-law trespassory test."  United States v. Jones, 132 S.

Ct. at 947 (emphasis in original)(citing Alderman v. United States, 394 U.S. 165, 176 (1969);

Soldal v. Cook Cnty., 506 U.S. 56, 64 (1992)).  "When 'the Government obtains information by

physically intruding' on persons, houses, papers, or effects, 'a 'search' within the original

meaning of the Fourth Amendment' has 'undoubtedly occurred.'"  Florida v. Jardines, 133 S. Ct.

at 1414 (quoting United States v. Jones, 132 S. Ct. at 950 n.3).

### a.    **Trespass-Based Analysis**.

The Fourth Amendment "establishes a simple baseline, one that for much of our history

formed the exclusive basis for its protections: When 'the Government obtains information by

physically intruding' on persons, houses, papers, or effects, 'a 'search' within the original

meaning of the Fourth Amendment' has 'undoubtedly occurred.'"  Florida v. Jardines, 133 S. Ct.

at 1414 (quoting United States v. Jones, 132 S. Ct. at 950 n.3 ("[A] 'search' within the original

meaning of the Fourth Amendment" occurs "[w]here . . . the Government obtains information by

physically intruding on a constitutionally protected area.")).  "[A]n actual trespass," however, "is

neither necessary nor sufficient to establish a constitutional violation."  United States v. Jones,

132 S. Ct. at 951 n.5 (Scalia, J.)(emphasis omitted)(quoting United States v. Karo, 468 U.S. 705,

713 (1984)).

     In determining whether a search has occurred, "[t]resspass alone does not qualify, but

there must be conjoined with that . . . an attempt to find something or to obtain information."

United States v. Jones, 132 S. Ct. at 951 n.5.  The Supreme Court has also noted that

"[p]hysically invasive inspection is simply more intrusive than purely visual inspection."  Bond

v. United States, 529 U.S. 334, 337 (2000).  Moreover, the Supreme Court in Florida v. Jardines

suggested that the trespass-based analysis applies only when the trespass occurs in one of the

four places or things listed in the Fourth Amendment:

> The Fourth Amendment "indicates with some precision the places and things
> encompassed by its protections": persons, houses, papers, and effects. The Fourth
> Amendment does not, therefore, prevent all investigations conducted on private
> property; for example, an officer may (subject to Katz) gather information in what
> we have called "open fields" -- even if those fields are privately owned -- because
> such fields are not enumerated in the Amendment's text. . . .  But when it comes
> to the Fourth Amendment, the home is first among equals.

133 S. Ct. at 1414.

     In United States v. Alabi, 943 F. Supp. 2d 1201 (D.N.M. 2013)(Browning, J.), the Court

analyzed whether the Secret Service's digital scan of electronic information contained in the

defendants' credit and debit cards' magnetic strips was a Fourth Amendment search under a

trespass-based analysis, concluding that it was not, because the Secret Service properly

possessed the credit and debit cards, and the additional act of scanning the cards to read the

virtual data contained on the strips did not involve a physical intrusion or physical penetration of

space.  See 943 F. Supp. 2d at 1264-65.  The Court noted that, "[e]ven if the Supreme Court were

to extend the trespass-based analysis for Fourth Amendment searches to virtual invasions, the

Secret Service's conduct scanning the thirty-one credit and debit cards still would not amount to

a Fourth Amendment search," because the magnetic strip, as opposed to the credit or debit card

separately, is not a constitutionally protected area.  943 F. Supp. 2d at 1267-68.

> When a law enforcement officer sees only the exterior of a credit
> or debit card, however, given that the financial institution which issues the card
> places the same information on the magnetic strip as embossed on the card's
> exterior, the only instances in which the information inside the credit or debit card
> is not information already seen by and known to the officer is when the
> information has been reencoded for unlawful purposes.  In these instances, not
> only does the person asserting his or her Fourth Amendment right not own or
> otherwise lawfully possess the information contained inside the card on the
> magnetic strip, but the person has stolen the information with the intent to use that
> information to steal further from the person whose information is on the magnetic
> strip.  Protecting this area from law enforcement search and seizure would thus
> not further the Fourth Amendment's express purpose of protecting "[t]he right of
> the people to be secure in their persons, houses, papers, and effects . . . ."  U.S.
> Const. amend IV.

943 F. Supp. 2d at 1273 (alteration in original).

### b.    Katz v. United States' Reasonable-Expectations-of-Privacy Search Test Remains Good Law.

The Court has noted that, in light of the Supreme Court's recent decisions in Florida v.

Jardines and United States v. Jones, both of which Justice Scalia wrote for the majority, and both

of which analyze whether government conduct constituted a Fourth Amendment search using the

trespass-based approach, "the question arises whether the Katz v. United States reasonable-

expectation-of-privacy test is still good law."  United States v. Alabi, 943 F. Supp. 2d at 1242

(citing <u>Minnesota v. Carter</u>, 525 U.S. 83, 97-98 (1998)(Scalia, J. concurring)).  Justice Scalia has

consistently criticized this "notoriously unhelpful test":

> In my view, the only thing the past three decades have established about the <u>Katz</u>
> test (which has come to mean the test enunciated by Justice Harlan's separate
> concurrence in <u>Katz</u> . . .) is that, unsurprisingly, those "actual (subjective)
> expectation[s] of privacy" "that society is prepared to recognize as 'reasonable,'"
> bear an uncanny resemblance to those expectations of privacy that this Court
> considers reasonable.  When that self-indulgent test is employed (as the dissent
> would employ it here) to determine whether a "search or seizure" within the
> meaning of the Constitution has <u>occurred</u> (as opposed to whether that "search or
> seizure" is an "unreasonable" one), it has no plausible foundation in the text of the
> Fourth Amendment.  That provision did not guarantee some generalized "right of
> privacy" and leave it to this Court to determine which particular manifestations of
> the value of privacy "society is prepared to recognize as 'reasonable.'"  Rather, it
> enumerated ("persons, houses, papers, and effects") the objects of privacy
> protection to which the <u>Constitution</u> would extend, leaving further expansion to
> the good judgment, not of this Court, but of the people through their
> representatives in the legislature.

<u>Minnesota v. Carter</u>, 525 U.S. at 97-98 (Scalia, J., concurring)(emphasis in original)(internal

citations omitted).[14]  In both <u>United States v. Jones</u> and <u>Florida v. Jardines</u>, however, Justice

Scalia, writing for the majority, never stated that the Supreme Court was substituting the

trespass-based analysis for <u>Katz v. United States</u>' reasonable-expectation-of-privacy analysis.

Rather, his majority opinions asserted that the <u>Katz v. United States</u> reasonable-expectation-of-

privacy analysis added to the trespass-based analysis.  See <u>Florida v. Jardines</u>, 133 S. Ct. at 1417

("The <u>Katz</u> reasonable-expectations test 'has been <u>added to</u>, not <u>substituted for</u>,' the traditional

property-based understanding of the Fourth Amendment." (emphasis in original))(quoting <u>United

States v. Jones</u>, 132 S. Ct. at 952).  The Court concluded in <u>United States v. Alabi</u> that, "as the

Supreme Court now stands, Justices Alito, Breyer, Kagan, Ginsburg, and Sotomayor still adhere

to application of the <u>Katz v. United States</u> reasonable-expectation-of-privacy Fourth Amendment

---

[14]The Honorable Clarence Thomas, Associate Justice, was the only other Justice to join
Justice Scalia's <u>Minnesota v. Carter</u> concurrence.

analysis, at least as a possible approach alongside of the trespass-based approach." 2013 WL 1876791, at *35.

In June, 2013, Justice Scalia dissented from the Supreme Court's decision in Maryland v. King, 133 S. Ct. 1958 (2013), in which the Supreme Court held that "DNA identification of arrestees is a reasonable search that can be considered part of a routine booking procedure," 133 S. Ct. at 1980. Justice Scalia criticized the majority's opinion for analogizing DNA testing to taking an arrestee's photograph by citing to Katz v. United States and pointing out that "we have never held that merely taking a person's photograph invades any recognized 'expectation of privacy.'" Maryland v. King, 133 S. Ct. at 1986 (Scalia, J., dissenting). Justice Scalia also pointed out that a person's "privacy-related concerns" in their body are weighty:

> We are told that the "privacy-related concerns" in the search of a home "are weighty enough that the search may require a warrant, notwithstanding the diminished expectations of privacy of the arrestee." But why are the "privacy-related concerns" not also "weighty" when an intrusion into the body is at stake? (The Fourth Amendment lists "persons" first among the entities protected against unreasonable searches and seizures.)

Maryland v. King, 133 S. Ct. at 1982 (Scalia J., dissenting)(emphasis in original). Justice Scalia also suggested that the Founders would have shared these privacy-related concerns:

> Today's judgment will, to be sure, have the beneficial effect of solving more crimes; then again, so would the taking of DNA samples from anyone who flies on an airplane (surely the Transportation Security Administration needs to know the "identity" of the flying public), applies for a driver's license, or attends a public school. Perhaps the construction of such a genetic panopticon is wise. But I doubt that the proud men who wrote the charter of our liberties would have been so eager to open their mouths for royal inspection.

Maryland v. King, 133 S. Ct. at 1989 (Scalia J., dissenting). The Court therefore concludes that Justice Scalia and the Supreme Court may still rely on a person's privacy expectation when determining whether a search is reasonable for Fourth Amendment purposes, although Justice Scalia may not turn to the expectations prong until he runs the facts through the trespass prong.

See Apodaca v. New Mexico Adult Probation and Parole, No. CIV 13-0113 JB/SMV, 2014 WL

712588, at *14 (D.N.M. Feb. 13, 2014)(Browning, J.)(reaching this conclusion).

> ### c.      Katz v. United States' Reasonable-Expectations-of-Privacy Analysis.

"'Fourth Amendment rights are personal rights which, like some other constitutional

rights, may not be vicariously asserted.'"    Rakas v. Illinois, 439 U.S. at 133-34 (quoting

Alderman v. United States, 394 U.S. at 174).   "A district court cannot suppress evidence unless

the movant proves that a search implicates personal Fourth Amendment interests."   United States

v. Jones, 44 F.3d 860, 871 (10th Cir. 1995)(emphasis in original).   "'[N]o interest legitimately

protected by the Fourth Amendment' is implicated by governmental investigative activities

unless there is an intrusion into a zone of privacy, into 'the security a man relies upon when he

places himself or his property within a constitutionally protected area.'"   United States v. Miller,

425 U.S. 435, 440 (1976)(Hoffa v. United States, 385 U.S. 293, 301-02 (1966)).[15]   The Tenth

---

[15]The Court has previously stated: "[T]he Supreme Court has vigorously asserted that the proper analysis under the Fourth Amendment is not whether the place searched is a 'constitutionally protected area.'"   Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 888 F. Supp. 2d 1176, 1219 (D.N.M. 2012)(Browning, J.)(quoting Katz. V. United States, 389 U.S. at 351).   In support for this proposition, the Court relied on the majority's decision in Katz v. United States, where the Supreme Court stated that focusing on whether the area is a "constitutionally protected area . . . . deflects attention from the problem," as it focuses attention on the place, rather than the person:

> Because of the misleading way the issues have been formulated, the parties have attached great significance to the characterization of the telephone booth from which the petitioner placed his calls.   The petitioner has strenuously argued that the booth was a "constitutionally protected area."     The Government has maintained with equal vigor that it was not.   But this effort to decide whether or not a given "area," viewed in the abstract, is "constitutionally protected" deflects attention from the problem presented by this case.   For the Fourth Amendment protects people, not places.   What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.   See Lewis v. United States, 385 U.S. 206, 210 [1966]; United States v. Lee, 274 U.S. 559, 563 . . . (1927).   But what he seeks to preserve as private, even in an area

Circuit has thus noted that "[a]n illegal search or seizure only harms those with legitimate

expectations of privacy in the premises searched."  United States v. Jones, 44 F.3d at 871 (citing

United States v. Roper, 918 F.2d 885, 886-87 (10th Cir. 1990)).  Thus, "[t]he proper inquiry" to

determine whether a search implicates a defendant's Fourth Amendment interests still depends,

after conducting a trespass-based analysis, on "whether the defendant had an expectation of

privacy in the place searched and whether that expectation was objectively reasonable."  Kerns v.

Bd. of Comm'rs of Bernalillo Cnty., 888 F. Supp. 2d 1176, 1219 (D.N.M. 2012)(Browning, J.).

    "Official conduct that does not 'compromise any legitimate interest in privacy' is not a

search subject to the Fourth Amendment."  Illinois v. Caballes, 543 U.S. at 409 (quoting United

States v. Jacobsen, 466 U.S. at 123).  The Supreme Court has thus recognized that, rather than

determining whether law enforcement conduct was a search, it sometimes proves easier to

"assess[] when a search is not a search."  Kyllo v. United States, 533 U.S. at 32.

        In assessing when a search is not a search, we have applied somewhat in reverse
        the principle first enunciated in Katz v. United States.   Katz involved

    _____

        accessible to the public, may be constitutionally protected.  See Rios v. United
        States, 364 U.S. 253 . . . [1960]; Ex parte Jackson, 96 U.S. 727, 733 . . . [1877].

Katz v. United States, 389 U.S. at 351-52.  The Supreme Court appears to have changed course
in its two most recent opinions on Fourth Amendment searches.  In Florida v. Jardines, the
particular place at which the search occurred weighs heavily on the Supreme Court's holding,
reasoning that "[t]he [Fourth] Amendment establishes [as] a simple baseline . . . . protections
'when the Government does engage in a physical intrusion of a constitutionally protected area.'"
133 S. Ct. at 1414 (original alterations and original emphasis omitted)(emphasis added)(quoting
United States v. Knotts, 460 U.S. 276, 286 (1983)(Brennan, J., concurring)).  See United States
v. Jones, 132 S. Ct. at 951 ("Katz did not erode the principle 'that, when the Government does
engage in physical intrusion of a constitutionally protected area in order to obtain information,
that intrusion may constitute a violation of the Fourth Amendment. . . .  Katz did not narrow the
Fourth Amendment's scope.'"  (emphasis added)).  The Court thus concludes that, while it may
be true that the analysis does not turn on the place searched, the Court's prior statement -- "the
Supreme Court has vigorously asserted that the proper analysis under the Fourth Amendment is
not whether the place searched is a 'constitutionally protected area,'" Kerns v. Bd. of Comm'rs
of Bernalillo Cnty., 888 F. Supp. 2d at 1219 -- may no longer accurately reflect the Supreme
Court's recent reversion to property-based analysis as a Fourth Amendment analysis baseline.

eavesdropping by means of an electronic listening device placed on the outside of a telephone booth -- a location not within the catalog ("persons, houses, papers, and effects") that the Fourth Amendment protects against unreasonable searches. We held that the Fourth Amendment nonetheless protected Katz from the warrantless eavesdropping because he "justifiably relied" upon the privacy of the telephone booth.   As Justice Harlan's oft-quoted concurrence described it, a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable.

Kyllo v. United States, 533 U.S. at 32-33.   The Supreme Court thus articulated the Katz v. United States rule -- which Professor Wayne R. LaFave has noted is "somewhat inaccurately stated as the 'reasonable expectation of privacy' test," Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.1(b), at 435 (4th ed. 2004)(citing Anthony G. Amsterdam, Perspectives on the Fourth Amendment, 58 Minn. L. Rev. 349, 383-388 (1974)(criticizing this formulation of the standard and explaining that "the common formula for Katz fails to capture Katz at any point because the Katz decision was written to resist captivation in any formula") --  which posits: "[A] Fourth Amendment search does not occur . . . unless 'the individual manifested a subjective expectation of privacy in the object of the challenged search,' and 'society [is] willing to recognize that expectation as reasonable.'" Kyllo v. United States, 533 U.S. at 33 (emphasis in original)(quoting California v. Ciraolo, 476 U.S. at 211).

A "reasonable expectation of privacy" is "said to be an expectation 'that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" United States v. Jones, 132 S. Ct. at 951.  See United States v. Harmon, 785 F. Supp. 2d at 1157 ("To decide whether a reasonable expectation of privacy exists, courts consider concepts of real or personal property law . . . .").   In analyzing whether an expectation of privacy is reasonable in the Fourth Amendment context based on property law, "arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control." Rakas v. Illinois, 439

U.S. at 143 & n.12.  While ownership or lawful possession is not determinative under the Katz v. United States reasonable-expectation-of-privacy test, it is often a dispositive factor; because the Fourth Amendment is a personal right, a defendant bears the burden of demonstrating "that he gained possession [of the area searched] from the owner or someone with the authority to grant possession."  United States v. Arango, 912 F.2d 441, 445-46 (10th Cir. 1990).

### i.      Subjective Expectation of Privacy.

A defendant maintains a subjective expectation of privacy when the defendant "has shown that 'he sought to preserve something as private.'"  Bond v. United States, 529 U.S. at 338 (internal alterations omitted)(quoting Smith v. Maryland, 442 U.S. 735, 740 (1979)).  Thus, there is no reasonable expectation of privacy in otherwise private information disclosed to a third party.  Under the Katz v. United States expectation-of-privacy test -- although perhaps not under United States v. Jones and Florida v. Jardines -- "[t]he Fourth Amendment protects people, not places.   What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection."  Katz v. United States, 389 U.S. at 351.  The Supreme Court has noted:

> This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.

United States v. Miller, 425 U.S. at 443.

The Supreme Court has recognized, however, that subjective expectations of privacy do not always coincide with the interests that the Fourth Amendment is universally thought to protect.  In Smith v. Maryland, for instance, the Supreme Court identified situations in which it would not follow the subjective approach:

> Situations can be imagined, of course, in which Katz' two-pronged inquiry would provide an inadequate index of Fourth Amendment protection.  For example, if

the Government were suddenly to announce on nationwide television that all homes henceforth would be subject to warrantless entry, individuals thereafter might not in fact entertain any actual expectation or [sic] privacy regarding their homes, papers, and effects.  Similarly, if a refugee from a totalitarian country, unaware of this Nation's traditions, erroneously assumed that police were continuously monitoring his telephone conversations, a subjective expectation of privacy regarding the contents of his calls might be lacking as well. In such circumstances, where an individual's subjective expectations had been "conditioned" by influences alien to well-recognized Fourth Amendment freedoms, those subjective expectations obviously could play no meaningful role in ascertaining what the scope of Fourth Amendment protection was.   In determining whether a "legitimate expectation of privacy" existed in such cases, a normative inquiry would be proper.

442 U.S. at 740 n.5.  Most recently, in Jones v. United States, Justice Sotomayor commented that, given the reality of technology in the twenty-first century, it may no longer be sound to universally hold to the third-party disclosure rule to determine whether a subjective expectation of privacy exists:

> [I]t may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties.  This approach is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks.  People disclose the phone numbers that they dial or text to their cellular providers; the URLs that they visit and the e-mail addresses with which they correspond to their Internet service providers; and the books, groceries, and medications they purchase to online retailers.16  Perhaps, as Justice Alito notes, some people may find the "tradeoff" of privacy for convenience "worthwhile," or come to accept this "diminution of privacy" as "inevitable," and perhaps not.  I for one doubt that people would accept without complaint the warrantless disclosure to the Government of a list of every Web site they had visited in the last week, or month, or year. But whatever the societal expectations, they can attain constitutionally protected status only if our Fourth Amendment jurisprudence ceases to treat secrecy as a prerequisite for privacy.  I would not assume that all information voluntarily disclosed to some member of the public for a limited purpose is, for that reason alone, disentitled to Fourth Amendment protection.

---

[16]URL is the abbreviation for a "uniform resource locator, . . . .  URLs occur most commonly to reference web pages (http), but are also used for file transfer (ftp), email (mailto), database access (JDBC), and many other applications."  Uniform Resource Locator, Wikipedia.org, http://en.wikipedia.org/wiki/ Uniform_resource_locator (last visited July 31, 2015).

132 S. Ct. at 957 (Sotomayor, J., concurring)(internal citations omitted).  Regardless what the Supreme Court decides to do with social media on the internet, only the most ignorant or gullible think what they post on the internet is or remains private.  See United States v. Meregildo, 883 F. Supp. 2d 523, 526 (S.D.N.Y. 2012)(Pauley, J.)(holding that a person posting to his Facebook profile had "no justifiable expectation that his 'friends' would keep his profile private").

### ii.     Privacy Expectation that Society is Prepared to Recognize as Reasonable.

Under the second step of Katz v. United States' reasonable-expectation-of-privacy approach, courts must determine "whether society is prepared to recognize that [subjective privacy] expectation as objectively reasonable."  United States v. Ruiz, 664 F.3d at 838.  The Supreme Court has cautioned: "The concept of an interest in privacy that society is prepared to recognize as reasonable is, by its very nature, critically different from the mere expectation, however well justified, that certain facts will not come to the attention of the authorities."  United States v. Jacobsen, 466 U.S. 109, 122 (1984).  Determining whether society would view the expectation as objectively reasonable turns on whether the government's intrusion infringes on a legitimate interest, based on the values which the Fourth Amendment protects.  See California v. Ciraolo, 476 U.S. at 212 (explaining that "[t]he test of legitimacy is not whether the individual chooses to conceal assertedly 'private' activity," but instead "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment")(quoting Oliver v. United States, 466 U.S. at 181-83).  This second factor of the Katz v. United States reasonable-expectation-of-privacy analysis developed from Justice Harlan's "attempt to give content to the word 'justifiably' in the majority's assertion that eavesdropping on Katz was a search because it 'violated the privacy upon which he justifiably relied while using the telephone

booth.'"  LaFave, supra §2.1(d), at 439 (quoting Katz v. United States, 389 U.S. at 353).  Thus, whether society will recognize a certain expectation of privacy does not turn on whether the hypothetical reasonable person would hold the same expectation of privacy, but rather whether the expectation of privacy is justified or legitimate.  The Supreme Court has provided that, while no single factor determines legitimacy, whether society recognizes a privacy interest as reasonable is determined based on our societal understanding regarding what deserves protection from government invasion:

> No single factor determines whether an individual legitimately may claim under the Fourth Amendment that a place should be free of government intrusion not authorized by warrant.  In assessing the degree to which a search infringes upon individual privacy, the Court has given weight to such factors as the intention of the Framers of the Fourth Amendment, the uses to which the individual has put a location, and our societal understanding that certain areas deserve the most scrupulous protection from government invasion.

Oliver v. United States, 466 U.S. at 177-78 (internal citations omitted).

The Supreme Court has held that "[o]fficial conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment."  Illinois v. Caballes, 543 U.S. at 409 (quoting United States v. Jacobsen, 466 U.S. at 123).  In United States v. Place, the Supreme Court held that the "canine sniff" of a drug-sniffing dog does "not constitute a 'search' within the meaning of the Fourth Amendment."  United States v. Place, 462 U.S. at 707.  The case arose when law enforcement seized the luggage of an airline passenger and transported it to another location, where a drug-sniffing dog could sniff it.  See 462 U.S. at 699.  The drug sniffing dog alerted the officers that drugs were in the luggage, the officers obtained a search warrant, and, upon opening the bags, the officers found over one-thousand grams of cocaine.  See 462 U.S. at 699.  While recognizing that a person has a reasonable expectation of privacy in the contents of his or her luggage, the Supreme Court held that the

dog's sniff test was not a Fourth Amendment search and emphasized the unique nature of the investigative technique, which could disclose only criminal activity:

> We have affirmed that a person possesses a privacy interest in the contents of personal luggage that is protected by the Fourth Amendment. A "canine sniff" by a well-trained narcotics detection dog, however, does not require opening the luggage. It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage.  Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item.  Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.
>
> In these respects, the canine sniff is *sui generis*.  We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure.  Therefore, we conclude that the particular course of investigation that the agents intended to pursue here -- exposure of respondent's luggage, which was located in a public place, to a trained canine -- did not constitute a "search" within the meaning of the Fourth Amendment.

462 U.S. at 707.

In United States v. Jacobsen, the Supreme Court extended this holding to the chemical field test of a white powdery substance to reveal that the substance was cocaine.  See 466 U.S. at 122-24.  A Federal Express employee and supervisor had opened a damaged package, and exposed four zip-lock plastic bags containing six and one-half ounces of white powder.  See 466 U.S. at 111.  They then called the DEA and repacked the contents in the original packaging, before they provided the package to the DEA officers.  See 466 U.S. at 111.  When the agents arrived, the agents removed the exposed plastic bags from the broken package, opened each of the four bags, and field-tested the white powder, identifying the powder as cocaine.  See 466

U.S. at 111-12.  The Supreme Court first held that removal of the plastic bags from the tubes and the agent's visual inspection were not Fourth Amendment searches:

> The removal of the plastic bags from the tube and the agent's visual inspection of their contents enabled the agent to learn nothing that had not previously been learned during the private search.  It infringed no legitimate expectation of privacy and hence was not a "search" within the meaning of the Fourth Amendment.

466 U.S. at 120 (footnote omitted).  The Supreme Court noted: "The question remains whether the additional intrusion occasioned by the field test, which had not been conducted by the Federal Express agents and therefore exceeded the scope of the private search, was an unlawful 'search' or 'seizure' within the meaning of the Fourth Amendment."  United States v. Jacobsen, 466 U.S. at 122.  The Supreme Court, relying on United States v. Place, held that the additional digital scan of the white substance was not a Fourth Amendment search, because the test discloses only whether the substance is cocaine and "nothing [else] of special interest":

> The field test at issue could disclose only one fact previously unknown to the agent -- whether or not a suspicious white powder was cocaine.  It could tell him nothing more, not even whether the substance was sugar or talcum powder.  We must first determine whether this can be considered a "search" subject to the Fourth Amendment -- did it infringe an expectation of privacy that society is prepared to consider reasonable?
>
> . . . .
>
> A chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy.  This conclusion is not dependent on the result of any particular test.  It is probably safe to assume that virtually all of the tests conducted under circumstances comparable to those disclosed by this record would result in a positive finding; in such cases, no legitimate interest has been compromised.  But even if the results are negative -- merely disclosing that the substance is something other than cocaine -- such a result reveals nothing of special interest.  Congress has decided -- and there is no question about its power to do so -- to treat the interest in "privately" possessing cocaine as illegitimate; thus governmental conduct that can reveal whether a substance is cocaine, and no other arguably "private" fact, compromises no legitimate privacy interest.

. . . .

Here, as in Place, the likelihood that official conduct of the kind disclosed by the record will actually compromise any legitimate interest in privacy seems much too remote to characterize the testing as a search subject to the Fourth Amendment.

United States v. Jacobsen, 466 U.S. at 122-24.

Most recently, where a "dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation," the Supreme Court, again relying on United States v. Place and also on United States v. Jacobsen, held that "[a]ny intrusion on respondent's privacy expectations does not rise to the level of a constitutionally cognizable infringement." Illinois v. Caballes, 543 U.S. at 409.[17]  The Supreme Court reasoned that the dog sniff in Illinois v. Caballes fell squarely in line with the line of cases holding "that any interest in possessing contraband cannot be deemed 'legitimate,' and th[at] governmental conduct that only reveals the possession of contraband 'compromises no legitimate privacy interests.'"  Illinois v. Caballes, 543 U.S. at 408 (quoting United States v. Jacobsen, 466 U.S. at 123)(emphasis in original).  The Supreme Court explained: "This is because the expectation 'that certain facts will not come to the attention of the authorities' is not the same as an interest in 'privacy that society is prepared to consider reasonable.'"  Illinois v. Caballes, 543 U.S. at 408-09 (quoting United States v. Jacobsen, 466 U.S. at 122).  The Supreme Court in Illinois v. Caballes noted that its decision was consistent with Kyllo v. United States, as the thermal imaging device in Kyllo v. United States could detect lawful, "intimate details" in a home:

This conclusion is entirely consistent with our recent decision that the use of a thermal-imaging device to detect the growth of marijuana in a home constituted

---

[17]The Honorable John Paul Stevens, former Associate Justice of the Supreme Court, penned the majority's opinion in Illinois v. Caballes.  Out of the current Supreme Court Justices, Justices Scalia, Kennedy, Thomas, and Breyer joined Justice Stevens' majority opinion, while Justice Ginsburg dissented.  See 543 U.S. at 405.

an unlawful search.  Kyllo v. United States, 533 U.S. 27 . . . .  Critical to that decision was the fact that the device was capable of detecting lawful activity -- in that case, intimate details in a home, such as "at what hour each night the lady of the house takes her daily sauna and bath."  Id., at 38 . . . .  The legitimate expectation that information about perfectly lawful activity will remain private is categorically distinguishable from respondent's hopes or expectations concerning the nondetection of contraband in the trunk of his car.  A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment.

Illinois v. Caballes, 543 U.S. at 409-10.

In United States v. Alabi, the defendants possessed thirty-one credit and debit cards, "many of them in their own names, several of which had information on the magnetic strips that related to persons other than the Defendants."  943 F. Supp. 2d at 1275.  The Court reluctantly accepted the defendants' assertion that they "subjectively intended not to disclose this information to a third party -- i.e., intended not to use the cards," 943 F. Supp. 2d at 1275, but determined that "a privacy expectation in the account information stored on credit and debit cards' magnetic strips -- separate and beyond the credit and debit cards themselves -- is not objectively reasonable," 943 F. Supp. 2d at 1280.  The Court explained that the Secret Service's scan of the cards' magnetic strips "reveals only the same information revealed in a private search when the card is used as intended," and, further, that, even if the cards had never been used, the scan "discloses only information known by viewing the outside of the card, or information that the cards and account information are possessed unlawfully . . . ."  943 F. Supp. 2d at 1281.  Noting the Supreme Court's decision in Rakas v. Illinois, in which the Supreme Court "reasoned that society is not prepared to recognize as reasonable an expectation of privacy in a burglar robbing a summer cabin during the offseason," the Court concluded that society would not recognize "as reasonable a privacy expectation which, at least in contemporary society, would benefit only criminals."  943 F. Supp. 2d at 1287.

5.      **Reasonable Government Searches**.

"[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" when a search implicating the Fourth Amendment has occurred, the district court must determine whether the search is reasonable.  Kentucky v. King, 131 S. Ct. at 1856 (quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)).   See Samson v. California, 547 U.S. 843, 848 (2006)("'[U]nder our general Fourth Amendment approach' we 'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment.")(quoting United States v. Knights, 534 U.S. 112, 118 (2001)).   "Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable." United States v. Knights, 534 U.S. at 121 (citing, as an e.g. cite, Terry v. Ohio, 392 U.S. 1 (1968)).  The Supreme Court has justified this balancing test with the recognition that "[t]he Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'"  Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654 (1995)(quoting New Jersey v. T.L.O., 649 U.S. 325, 338 (1985)).

"Whether a search is reasonable 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'"  Samson v. California, 547 U.S. at 848 (quoting United States v. Knights, 534 U.S. at 118).  See Banks v. United States, 490 F.3d 1178, 1184 (10th Cir. 2007)(stating that the Supreme Court "described the totality-of-the-circumstances test as one where 'the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy, and on the other, the

degree to which it is needed for the promotion of legitimate governmental interests'" (quoting

United States v. Knights, 534 U.S. at 119-20).

> As the text of the Fourth Amendment indicates, the ultimate measure of the
> constitutionality of a governmental search is "reasonableness."   At least in a
> case . . . where there was no clear practice, either approving or disapproving the
> type of search at issue, at the time the constitutional provision was enacted,
> whether a particular search meets the reasonableness standard "'is judged by
> balancing its intrusion on the individual's Fourth Amendment interests against its
> promotion of legitimate governmental interests.'"

Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 652-53 (1995)(quoting Skinner v. Ry. Labor

Executives' Ass'n, 489 U.S. 602, 617 (1989)).   The Supreme Court has held that the test of

reasonableness under the Fourth Amendment is not a concrete test:

> The test of reasonableness under the Fourth Amendment is not capable of
> precise definition or mechanical application.   In each case [determining
> reasonableness] requires a balancing of the need for the particular search against
> the invasion of personal rights that the search entails.   Courts must consider the
> scope of the particular intrusion, the manner in which it is conducted, the
> justification for initiating it, and the place in which it is conducted.

Bell v. Wolfish, 441 U.S. 520, 559 (1979).

In analyzing the first factor -- the intrusion on the individual's privacy -- courts and the

Tenth Circuit look to the individual's privacy expectations.  See, e.g., United States v. Knights,

534 U.S. 112, 119-120 (2001)(noting that the petitioner had a "significantly diminished . . .

reasonable expectation of privacy," because a condition of his probation was to consent to search

of his apartment without notice or probable cause, and because he was clearly notified and

informed of the provision); Banks v. United States, 490 F.3d at 1186-87 (noting that the

plaintiffs, convicted felons on probation, have a more limited expectation of privacy than the

ordinary citizen, noting: "Those who have never been convicted of a felony are the last distinct

category. What is 'reasonable' under the fourth amendment for a person on conditional release,

or a felon, may be unreasonable for the general population."); Boling v. Romer, 101 F.3d 1336,

1340 (10th Cir. 1999)("[W]hile obtaining and analyzing the DNA or saliva of an inmate convicted of a sex offense is a search and seizure implicating Fourth Amendment concerns, it is a reasonable search and seizure.  This is so in light of an inmate's diminished privacy rights . . . .")

As Justice Kagan has noted, property law informs society's expectations about what government intrusions are reasonable: "It is not surprising that in a case involving a search of a home, property concepts and privacy concepts should so align.  The law of property 'naturally enough influence[s]' our 'shared social expectations' of what places should be free from governmental incursions."  Florida v. Jardines, 133 S. Ct. at 1419 (Kagan, J., concurring)(quoting Georgia v. Randolph, 547 U.S. 103, 111 (2006)).  Similarly, in Vernonia Sch. Dist. 47J v. Acton, Justice Scalia, writing for the majority noted: "What expectations are legitimate varies, of course, with context, depending, for example, upon whether the individual asserting the privacy interest is at home, at work, in a car, or in a public park."  515 U.S. at 654 (internal citations omitted).

### 6.       **Consensual Searches.**

Searches conducted pursuant to consent constitute one exception to the Fourth Amendment's search-warrant and probable cause requirements.  See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  When an individual consents to a police search, and the consent is "freely and voluntarily given," the search does not implicate the Fourth Amendment.  United States v. Peña, 143 F.3d 1363, 1366 (10th Cir. 1998)(quoting Schneckloth v. Bustamonte, 412 U.S. at 219).  The Tenth Circuit has provided a two-part test for determining voluntariness, which requires that the government (i) "'proffer clear and positive testimony that consent was unequivocal and specific and intelligently given,'" and (ii) "the officers must have used no

'implied or express duress or coercion.'"  United States v. Sanchez, 608 F.3d 685, 690 (10th Cir.

2010)(quoting United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003)).

Determining whether a party's consent was free and voluntary is a question of fact to be

determined from the totality of the circumstances.  See United States v. Peña, 143 F.3d at 1366.

The Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that

courts should consider when trying to determine whether a defendant's consent was voluntarily

given:

> (i) the "threatening presence of several officers;" (ii) the "use of aggressive
> language or tone of voice indicating that compliance with an officer's request is
> compulsory," or, conversely, the "officer's pleasant manner and [ ] tone of voice;"
> (iii) the "prolonged retention of a person's personal effects such as identification,"
> or, conversely, "the prompt return of the defendant's identification and papers;"
> (iv) the "absence of other members of the public," or, conversely, whether the
> stop occurs in "a public location such as 'the shoulder of an interstate highway, in
> public view;'" (v) the "officer's failure to advise the defendant that [he or] she is
> free to leave."  United States v. Ledesma, 447 F.3d [1307,] 1314 [10th Cir.
> 1997)](citing and quoting numerous sources).  Other factors include: (vi) "the
> display of a weapon, [and (vii)] physical touching by the officer."  United States
> v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997).

United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *12 (D.N.M. Feb. 19, 2010)

(Browning, J)(some alterations in original).  See United States v. Fox, 600 F.3d 1253, 1258 (10th

Cir. 2010).

Because courts are required to look at the totality of the circumstances in determining

whether an individual's consent was voluntary, see United States v. Peña, 143 F.3d at 1366, no

one factor is dispositive in a court's inquiry into the circumstances.  For example, although an

officer's failure to advise a defendant that he or she is free to leave might suggest that coercive

law enforcement conduct caused the defendant's consent to search, the Supreme Court has ruled

that officers do not need to advise an individual of his or her right to refuse to consent to a search

for that individual's consent to be voluntary.  See Schneckloth v. Bustamonte, 412 U.S. at 232.

Moreover, the mere presence of officers by exits to a building, threatening no more than to question individuals if they seek to leave, "should not [result] in any reasonable apprehension by any [individual] that they would be seized or detained in any meaningful way." United States v. Drayton, 536 U.S. 194, 205 (2002)(internal citations omitted).  Additionally, an officer's display of a weapon may contribute to the coercive nature of a situation, but "[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon." United States v. Drayton, 536 U.S. at 205.  As such, "it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced.  It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches." Schneckloth v. Bustamonte, 412 U.S. at 232.

### 7.    The Probable Cause Requirement for Search Warrants.

Probable cause must support a search warrant, which requires "more than mere suspicion but less evidence than is necessary to convict." United States v. Burns, 624 F.2d 95, 99 (10th Cir. 1980).  To establish probable cause to justify a search of a home, an affidavit in support of a search warrant "must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity." United States v. Danhauer, 229 F.3d 1002, 1006 (10th Cir. 2000).  "Probable cause undoubtedly requires a nexus between suspected criminal activity and the place to be searched." United States v. Corral-Corral, 899 F.2d 927, 937 (10th Cir. 1990).  The task of the Magistrate Judge issuing the search warrant

> is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

United States v. Reed, 195 F. App'x 815, 821 (10th Cir. 2006)(unpublished)(quoting Illinois v. Gates, 462 U.S.213, 238 (1983)).   See United States v. Glover, 104 F.3d 1570, 1578 (10th Cir. 1997)(finding that, in determining whether an affidavit supports a finding of probable cause, the court must review the affidavit as a whole and look to the totality of the information contained therein), abrogated on other grounds by Corley v. United States, 556 U.S. 303 (2009). In making his or her determination, the Magistrate Judge "may draw reasonable inferences from the material provided in the warrant application."   United States v. Rowland, 145 F.3d 1194, 1205 (10th Cir. 1998).

"A reviewing court should accord great deference to a magistrate's determination of probable cause."   United States v. Reed, 195 F. App'x at 822. The court's duty is "simply to ensure that the magistrate had a substantial basis for . . . conclud[ing] that probable cause existed."   Illinois v. Gates, 462 U.S. at 236, 238-39.   This deference is appropriate to further the Fourth Amendment's strong preference for warrants. See Massachusetts v. Upton, 466 U.S. 727, 733 (1984); United States v. Ventresca, 380 U.S. 102, 105-06 (1965)("An evaluation of the constitutionality of a search warrant should begin with the rule that the informed and deliberate determinations of magistrates empowered to issue warrants . . . are to be preferred over the hurried action of office[r]s . . . .").   Because of the strong preference for warrants, "in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall." United States v. Ventresca, 380 U.S. at 106.

The deference accorded a Magistrate Judge's probable cause determination, however, is not boundless.   See United States v. Leon, 468 U.S. 897, 914 (1984).   The Court should not defer to a Magistrate Judge's probable cause determination where there is no substantial basis for concluding that the affidavit in support of the warrant established probable cause.   See United

States v. Danhauer, 229 F.3d at 1006.  Specifically, the Court should not defer to a Magistrate Judge's probable cause determination if it "is a mere ratification of the bare conclusions or 'hunches' of others or where it involves an improper analysis of the totality of the circumstances."  United States v. Reed, 195 F. App'x at 822 (citing United States v. Leon, 468 U.S. at 915; Massachusetts v. Upton, 466 U.S. 727, 734 (1984); Illinois v. Gates, 462 U.S. at 239).

###    8.    The Particularity Requirement for Search Warrants.

The Supreme Court has stated that "those searches deemed necessary should be as limited as possible."  Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971).  The Tenth Circuit has explained that "the Fourth Amendment requires that the government describe the items to be seized with as much specificity as the government's knowledge and circumstances allow, and warrants are conclusively invalidated by their substantial failure to specify as nearly as possible the distinguishing characteristics of the goods to be seized."  Cassady v. Goering, 567 F.3d 628, 635 (10th Cir. 2009)(quoting United States v. Leary, 846 F.2d 592, 600 (10th Cir. 1988)).  The particularity requirement prevents general searches and strictly limits the discretion of the officer executing the warrant.  See Voss v. Bergsgaard, 774 F.2d 402, 404 (10th Cir. 1985)("The particularity requirement ensures that a search is confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause."); United States v. Janus Indus., 48 F.3d 1548, 1553 (10th Cir. 1995)("'As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.'")(quoting Stanford v. Texas, 379 U.S. 476, 485 (1965))).  "A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized."  United States v. Janus

Indus., 48 F.3d at 1553 ("The test applied to the description of the items to be seized is a practical one.").

In Cassady v. Goering, the search warrant authorized the search of the plaintiff's entire farm, including his house, and the seizure of "[a]ny & all narcotics," "[a]ny and all illegal contraband," and various specific items mostly related to a narcotics operation, as well as the search and seizure of "all other evidence of criminal activity" and all personal property that was stolen, embezzled, or otherwise illegal.  567 F.3d at 635.  The Tenth Circuit found that the warrant violated the plaintiff's Fourth Amendment rights, because "[t]he warrant[] allowed precisely the kind of rummaging through a person's belongings, in search of evidence of even previously unsuspected crimes or of no crime at all, that the Fourth Amendment proscribes." 567 F.3d at 635 (quoting Voss v. Bergsgaard, 774 F.2d at 405).  The Tenth Circuit in Cassady v. Goering explained that it had previously "applied a blanket suppression where officers *conducted a general search for evidence* of crimes not specifically listed in the warrant," 567 F.3d at 643 (emphasis in original)(citing United States v. Foster, 100 F.3d 846, 851-52 (10th Cir. 1996); United States v. Medlin, 842 F.2d 1194, 1199-1200 (10th Cir. 1988)); given that line of cases, the Tenth Circuit said "it would be an odd result not to suppress *warrants that expressly authorize* a general search and seizure," Cassady v. Goering, 567 F.3d at 643 (emphasis in original).

### 9.    **Body Cavity Searches.**

Body cavity searches implicate the "most personal and deep-rooted expectations of privacy," and the "Fourth Amendment analysis thus require[s] a discerning inquiry into the facts and circumstances to determine whether the intrusion[s] [are] justifiable."  Winston v. Lee, 470 U.S. 753, 760 (1985).  "The Fourth Amendment neither forbids nor permits all such intrusions;

rather, the Amendment's 'proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner.'"   Winston v. Lee, 470 U.S. at 760 (quoting Schmerber v. California, 384 U.S. 757, 767 (1966)).

In Winston v. Lee, the state of Virginia sought a court order forcing a suspect to undergo surgery to extract a bullet from his chest.  See 470 U.S. at 753.  Although the state "plainly" had probable cause and the bullet would serve as evidence of the suspect's involvement in an armed robbery, the Court rejected the request on Fourth Amendment grounds.  470 U.S. at 763, 767.  It explained that body searches require "a more substantial justification" than other searches.  470 U.S. at 767.  It explained the problem with the proposed search: "[T]o drug this citizen -- not yet convicted of a criminal offense -- with narcotics and barbiturates into a state of unconsciousness, and then to search beneath his skin for evidence of a crime . . . involves a virtually total divestment of respondent's ordinary control over surgical probing beneath his skin."  470 U.S. at 765 (citation and quotation marks omitted).  It then set out the three primary factors used to evaluate a body cavity search's reasonableness, including (1) "the extent to which the procedure may threaten the individual's safety or health;" (2) "the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity;" and (3) "the community's interest in fairly and accurately determining guilt or innocence."  470 U.S. at 754.

Subsequent courts have applied these factors in specific cases.  The first factor has not presented a great impediment to anal cavity searches.  See George v. Edholm, 752 F.3d 1206, 1217 (9th Cir. 2014)(Fletcher, J.)(describing the "danger to [the plaintiff's] health and safety" to be "slight, though not nonexistent"); United States v. Gray, 669 F.3d at 564 ("Though . . . there was some risk of respiratory depression or arrest associated with the sedatives administered and

risk of anal bleeding or perforation associated with the use of the proctoscope, these risks were low in the hospital setting where the proctoscopy occurred.").  Anal cavity searches "do not seem to rise to the level of the risks associated with the surgery found unreasonable in *Winston* [v. Lee]."  United States v. Gray, 669 F.3d at 564.  Courts consider X-rays even less invasive.  In Spencer v. Roche, 659 F.3d 142 (1st Cir. 2011)(Selya, J.), the United States Court of Appeals for the First Circuit dismissed a prisoner's concerns about an X-ray examination: "First, a diagnostic x-ray is a routine medical procedure that is brisk, painless, and generally regarded as safe. Second, there is no evidence that the x-ray was carried out in a dangerous or otherwise inappropriate manner; to the contrary, the imaging was performed by trained professionals in a hospital setting."  659 F.3d at 147.

Second, courts have consistently emphasized body cavity searches' "intrusion upon the individual's dignitary interests in personal privacy and bodily integrity."  Winston v. Lee, 470 U.S. at 754.  Body cavity searches are "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission." Blackburn v. Snow, 771 F.2d 556, 564 (1st Cir. 1985)(Pettine, J.)(quotation omitted).   "In a situation thus laden with the potential for fear and anxiety, a reasonable search will include, beyond the usual procedural requirements, reasonable steps to mitigate the anxiety, discomfort, and humiliation that the suspect may suffer."  United States v. Cameron, 538 F.2d 254, 258 (9th Cir. 1976)(Kennedy, J.).  These dignity concerns impose greater requirements on government actors, because "the greater the intrusion, the greater must be the reason for conducting a search." Blackburn v. Snow, 771 F.2d at 565.  Even "a clear indication that the suspect is concealing contraband does not authorize government officials to resort to any and all means at their disposal to retrieve it."  United States v. Cameron, 538 F.2d at 258.

In United States v. Cameron, then-Judge Anthony Kennedy, now an Associate Justice of the Supreme Court, found a digital rectal examination, two enemas, and the forced administration of a liquid laxative unreasonable.  538 F.2d 258-60.  The Fifth Circuit condemned a proctoscopy[18] in United States v. Gray:

> [T]he proctoscopy here was a greater affront to Gray's dignitary interest than full-on exploratory surgery.  Though sedated, Gray was conscious throughout the entire procedure.  Moreover, the procedure targeted an area of the body that is highly personal and private.  In our society, the thought of medical technicians, under the direction of police officers, involuntarily sedating and anally probing a conscious person is jarring.  Such a procedure is degrading to the person being probed -- both from his perspective and society's.

669 F.3d at 564-65.  In United States v. Booker, 728 F.3d 535 (6th Cir. 2013)(Rogers, J.), the United States Court of Appeals for the Sixth Circuit rejected a search in which the defendant was "paralyzed, intubated, and anally probed without his consent."  728 F.3d at 547.  It noted that "[t]he affront to personal dignity in Booker's case is categorically greater than what was not permitted in [Winston v.] Lee."  728 F.3d at 547.  See George v. Edholm, 752 F.3d at 1218 ("Forced sedation, anoscopy,[19] intubation,[20] and bowel evacuation are more invasive than the stomach-pumping that [Rochin v. People of California] described as 'close to the rack and screw.'"); Huguez v. United States, 406 F.2d 366, 379 (9th Cir. 1968)(Hauk, J.)(describing a forced digital rectal search as "a brutal invasion of privacy, an illegal and frightening example of

---

[18]A proctoscopy is a "[v]isual examination of the rectum and anus" with a specialized tool.  *Proctoscopy*, STEDMAN'S MEDICAL DICTIONARY (27th ed. 2000).

[19]An anoscopy is a visual examination of the anal canal and rectum with an anoscope, a short and lighted tube.  See Diseases and Conditions: Anal Cancer, MAYO CLINIC (Jul. 26, 2013), http://www.mayoclinic.org/diseases-conditions/anal-cancer/basics/tests-diagnosis/con-20024923.

[20]In an intubation procedure, physicians insert a tube through the nose and into the stomach or small intestine.  The tube allows them to deliver food, medication, or liquid laxatives directly into the digestive system.  See Tests and Procedures: Home Enteral Nutrition, MAYO CLINIC (Dec. 9, 2014), http://www.mayoclinic.org/tests-procedures/home-enteral-nutrition/basics/definition/prc-20012832.

unlawful law enforcement"); Tribble v. Gardner, 860 F.2d 321, 325 (9th Cir. 1988)(Hall, J.)("[D]igital rectal searches are one of the most intrusive methods of detecting contraband[.]"); Kennedy v. Los Angeles Police Dep't, 901 F.2d 702, 711 (9th Cir. 1989)(Hall, J.)("Strip searches involving the visual exploration of body cavities [are] dehumanizing and humiliating.").

Anal cavity searches may nonetheless be reasonable under certain circumstances.  In the prison context, a "policy of allowing rectal searches must be considered reasonable unless contradicted by a showing of wanton conduct."  Daughtery v. Harris, 476 F.2d 292, 294 (10th Cir. 1973)(Lewis, J.).  Sanchez v. Pereira-Castillo, 590 F.3d 31 (1st Cir. 2009)(Lipez, J.), involved a prisoner's Fourth Amendment challenge to a digital rectal examinations for a suspected cellular phone.  590 F.3d at 37.  The First Circuit approved the searches, noting that they were "conducted by medical professionals in the professional, hygienic confines of a hospital," and that there was "no abusive or otherwise unprofessional conduct on the part of the correctional officers or the doctors during the rectal exams."  590 F.3d at 43.

In Spencer v. Roche, police officers conducting a traffic stop obtained a search warrant for a suspect's "anal cavity" based on testimony from a confidential informant.  659 F.3d at 144. They then transported the suspect to a hospital, where they restrained him in handcuffs while a physician performed a two-finger digital examination.  See 659 F.3d at 144.  When this search failed to reveal any contraband, the physician ordered an X-ray which also captured images of the "stomach, kidneys, and other organs surrounding the anal cavity."  659 F.3d at 144-45.  This broad X-ray was the only way to search the entire anal cavity.  659 F.3d at 144-45.  The prisoner unsuccessfully challenged the X-ray as an unreasonable search in violation of the Fourth Amendment.  659 F.3d at 149.  The First Circuit cited the warrant and the lack of real alternatives, noting that the "digital examination searched only a portion of the anal cavity.

Accordingly, the negative result did not foreclose the possibility that the appellant might be harboring drugs in his anal cavity."  659 F.3d at 148.

The third factor recognizes the community's interest in accurately determining guilt or innocence.  It allows that "under certain circumstances it would be permissible to force a suspect to undergo a compelled medical procedure in order to enable the police to recover evidence of a crime."  United States v. Husband, 226 F.3d 626, 633 (7th Cir. 2000)(en banc).  In United States v. Crowder, 543 F.2d 312 (D.C. Cir. 1976)(Robb, J.), for example, the U.S. Court of Appeals for the District of Columbia allowed surgery to remove a bullet from a defendant's arm for use as evidence.  543 F.2d at 316.  The D.C. Circuit noted that

> (1) the evidence sought was relevant, could have been obtained in no other way, and there was probable cause to believe that the operation would produce it; (2) the operation was minor, was performed by a skilled surgeon, and every possible precaution was taken to guard against any surgical complications, so that the risk of permanent injury was minimal; (3) before the operation was performed the District Court held an adversary hearing at which the defendant appeared with counsel; (4) thereafter and before the operation was performed the defendant was afforded an opportunity for appellate review by this court.

543 F.2d at 316.  The community's interest includes the "strong interest in prosecuting those who are selling cocaine base," particularly if the search target "could not have been prosecuted without the evidence he had hidden in his rectum."  George v. Edholm, 752 F.3d at 1220.  See Rodriques v. Furtado, 950 F.2d 805, 811 (1st Cir. 1991)(Hill, J.)

> Society's interest in the prevention and punishment of drug trafficking weighs in favor of intrusive searches in certain instances. In the present case, other, less intrusive means of investigation and prosecution may have been available. However, given the circumstances as a whole, the existence of other means of investigation and prosecution in this case does not render the vaginal search unreasonable.

Spencer v. Roche, 659 F.3d at 147 ("[T]he evidence sought in the x-ray search was indispensable to corroborate the officers' suspicion that the appellant had violated Massachusetts drug laws[.]").

The community's interest is diminished, however, if the contraband "could have been recovered through far less intrusive means," such as a relatively passive approach: administering laxatives, keeping the defendant in the hospital, and monitoring his bowel movements.  752 F.3d at 1220.  See United States v. Cameron, 538 F.2d at 258 ("[L]ess intrusive means of obtaining the evidence may properly have been considered.  In time, the contraband in the rectal cavity might have been eliminated naturally.").

The presence or absence of a warrant is also an important consideration.  Courts are more likely to find even intrusive searches permissible where the officers involved seek and secure a warrant.  See  Winston v. Lee, 470 U.S. at 760-61; George v. Edholm, 752 F.3d at 1217 (9th Cir. 2014); United States v. Cameron, 538 F.2d at 259 ("In addition to certifying that a search is reasonably justified, a warrant can also assure that it is conducted in a reasonable manner.").  Searches that exceed the scope of the warrant, however, will likely violate the Fourth Amendment.  In United States v. Nelson, 36 F.3d 758 (8th Cir. 1994)(Ross, J.), the government obtained a search warrant for the suspect's "person."  36 F.3d at 760.  The United States Court of Appeals for the Eighth Circuit held that the warrant "was not sufficient to authorize a body cavity search."  36 F.3d at 760.  The Eighth Circuit declined to determine whether "the x-rays, the administration of laxatives, two days in the hospital under restraints, and the administration of narcotic sedatives also violated [the suspect's] Fourth Amendment rights," because the searches clearly exceeded the warrant's scope.  36 F.3d at 761.  In Cheek v. Cosby, No. 1:10-CV-01664-RRB, 2014 WL 7011943 (E.D. Cal. Dec. 10, 2014)(Beistline, J.), on the other hand,

the police obtained a warrant to search the "body cavities and person of Michael Cheeks."  2014 WL 7011943, at *2.  The United States District Court for the Eastern District of California held that this warrant "clearly authorized the search of Cheek's body cavities," adding that a physician conducted the search.  2014 WL 7011943, at *2.  In Spencer v. Roche, the First Circuit excused the X-ray's broad reach, which included the suspect's stomach, by explaining that "[a]ny observation of the stomach was [] an incidental result of the valid [] x-ray search and did not require an independent showing of probable cause." 659 F.3d at 149.

## ANALYSIS

The Court will grant the MTD and deny the MTA.  The Court will grant the MTD because, while there were constitutional violations, Dougherty did not participate in them and, in any case, the law was not clearly established.  Dougherty did not directly or indirectly violate Eckert's Fourth Amendment rights.  The search warrant affidavit established probable cause, and Eckert's transfer between hospitals did not contravene any of Eckert's rights under the federal constitution.  Dougherty had no opportunity to prevent police officers or physicians from engaging in misconduct.  Moreover, there is no evidence that Dougherty knew or should have known that his communications with police officers would result in an enema or a colonoscopy.  The law on many of these points was not clearly established at the time of the relevant events.  The Court will deny the MTA, because Eckert's proposed changes do not adequately allege proximate cause and are futile.  Accordingly, the Court will dismiss all of Eckert's claims against Dougherty with prejudice.

I.      **DOUGHERTY DID NOT VIOLATE ECKERT'S CLEARLY ESTABLISHED CONSTITUTIONAL RIGHTS AND IS THUS ENTITLED TO QUALIFIED IMMUNITY.**

To recover against Dougherty, Eckert must demonstrate, based on the facts alleged in his Complaint, "both that the defendant violated his constitutional or statutory rights, and that the right was clearly established at the time of the alleged unlawful activity." Riggins v. Goodman, 572 F.3d at 1107.  Eckert cannot, with his allegations, establish that Dougherty directly violated his constitutional rights and, in any case, the law on these rights is unsettled.  Eckert has alleged constitutional violations by police officers.  He cannot, however, show that Dougherty was a proximate cause of any of these violations.  Dougherty is thus not liable and is entitled to qualified immunity.

The Court will follow the process outlined in Saucier v. Katz, first determining whether Dougherty's actions violated the Constitution, and then, assuming any rights were violated, determining whether they were clearly established.  See 533 U.S. at 201.  Although the Court recognizes that this approach is no longer mandatory, it believes that it will be "beneficial" under the circumstances.  Pearson v. Callahan, 555 U.S. at 236.  Specifically, there "would be little if any conservation of judicial resources" here because it would be "difficult to decide whether a right is clearly established without deciding precisely what the existing constitutional right happens to be." Pearson v. Callahan, 555 U.S. at 236 (quoting Lyons v. Xenia, 417 F.3d 565, 581 (6th Cir. 2005)(Sutton, J., concurring)).  It is difficult to decide precisely what law is or is not clearly established unless the Court determines, as best it can, whether there is even a constitutional right at issue, what it is, what its scope is, and whether, under the facts and circumstances here, it was violated.  Less importantly, this case may also involve a recurring fact pattern, although unlikely exactly the same, requiring guidance on the challenged conduct's

constitutionality which will only face challenges in the qualified immunity context.  It is, in short, an appropriate case to "avoid avoidance," Camreta v. Greene, 131 S. Ct. at 2031, because the exercise of determining whether Dougherty violated Eckert's constitutional rights will help the Court determine whether the law was clearly established.  The Court will thus address whether any constitutional violations occurred before discussing whether the law was clearly established.

### A.    DOUGHERTY DID NOT DIRECTLY VIOLATE ECKERT'S CLEARLY ESTABLISHED CONSTITUTIONAL RIGHTS.

To determine whether Dougherty violated Eckert's rights, the Court must first identify Dougherty's actions.   See Binay v. Bettendorf, 601 F.3d 640, 650 (6th Cir. 2010)("Each defendant's liability must be assessed individually based on his own actions.").  Eckert describes Dougherty's involvement in various ways,[21] but the Complaint's account of his involvement boils down to two actions.  First, he approved the pursuit of a search warrant for Eckert's vehicle and person, and the underlying draft affidavit.   See Complaint ¶¶ 48-49, at 6.  Second, he "authorized Defendant Chavez to take" Eckert to a second emergency room.  Complaint ¶ 55, at 7.

---

[21]See Response at 1 ("Defendant . . . participated in the unlawful arrest and search of Mr. Eckert[.]").

> Dougherty also participated in the unlawful detention and arrest of Mr. Eckert by permitting police officers to hold a man in custody for at least three hours that he knew of and allowing him to be taken to Silver City from Deming for a search that went beyond the scope of the warrant.

Response at 13.  See id. at 15 ("oversaw a shocking violation of Mr. Eckert's bodily integrity"); id. at 17 ("approval of the arrest, approval of the prolonged arrest").

1.     **The Search Warrant Affidavit Establishes Probable Cause**.

The search warrant affidavit establishes probable cause.  The Magistrate Judge's task in reviewing the affidavit was "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. at 214.  The duty of a reviewing court is "to ensure that the magistrate had a substantial basis for concluding that probable cause existed."  Illinois v. Gates, 462 U.S. at 214.  Reviewing courts must base their determinations on "the totality of the information contained in the affidavit." United States v. Glover, 104 F.3d at 1578 (emphasis added).  They should not adopt a "divide-and-conquer approach," instead recognizing the "synergy of disparate elements considered collectively." United States v. Reed, 195 F. App'x at 824 (quotations omitted). In making his or her determination, the Magistrate Judge "may draw reasonable inferences from the material provided in the warrant application." United States v. Rowland, 145 F.3d 1194, 1205 (10th Cir. 1998).  The Magistrate Judge's probable cause determination "is entitled to great deference in this Court." Garcia v. Casuas, 2011 WL 7444745, at *45.

Eckert's piece-by-piece attacks on the search warrant affidavit have merit if viewed in isolation, but fail to preclude probable cause given the "totality of the information contained in the affidavit." United States v. Glover, 104 F.3d at 1578 (emphasis added).  First, Eckert correctly notes that the affidavit fails to describe the police canine's certification or training. See Response at 20.  He cites cases in which courts refused to find probable cause where police officers or search warrants failed to assert that the drug-sniffing dogs that alerted to a vehicle or container were certified or otherwise trained. See United States v. Ludwig, 641 F.3d 1243, 1251 (10th Cir. 2011)(Gorsuch, J.)("[A] dog's credentials provide a bright-line rule for when officers

- 88 -

may rely on the dog's alerts -- a far improvement over requiring them to guess whether the dog's performance will survive judicial scrutiny after the fact[.]"); United States v. Kennedy, 131 F.3d at 1376-77 ("As a general rule, a search warrant based on a narcotics canine alert will be sufficient on its face if the affidavit states that the dog is trained and certified to detect narcotics."); United States v. Spetz, 721 F.2d 1457, 1464 (9th Cir. 1983)(Reinhardt, J.)("A validly conducted dog sniff can supply the probable cause necessary for issuing a search warrant only if sufficient reliability is established by the application for the warrant."), abrogated on other grounds by United States v. Bagley, 765 F.2d 836, 844 (9th Cir. 1985).  He does not cite Florida v. Harris, 133 S. Ct. 1050 (2013), the Supreme Court's recent opinion on probable cause and drug-sniffing dogs.  Although Florida v. Harris "rejected rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible, all-things-considered approach," it nonetheless may have set out the minimum for affidavits describing dogs' qualifications.  133 S. Ct. at 1055. The Supreme Court stated that "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. . . . The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs."  133 S. Ct. at 1057.  The description in the affidavit here, which did not mention training or certification, falls below this standard.  Given the variety of police dogs, including dogs that sniff for explosives, control crowds, and subdue suspects, the affidavit's vague assertion alone was insufficient to establish probable cause.

Eckert also notes that the police officer's statement that Eckert "was known in Hidalgo County to insert drugs into his anal cavity," Complaint ¶ 42, at 5, lacked supporting or corroborating evidence, see Response at 21-22.   Independent police records, for example, did

not corroborate the tip.  See Illinois v. Gates, 462 U.S. at 241.  That Eckert's posture was "erect and he kept his legs together," Complaint ¶ 35, at 5, was similarly insignificant if viewed in isolation.

Eckert is incorrect, however, about the consequences of these flaws.  That the affidavit did not mention the dog's training or certification does not cause the dog's alert to "drop[] from the search warrant."  Response at 21.  The Court must examine "the totality of the circumstances," Illinois v. Gates, 462 U.S. at 230, keeping in mind that "[a] gap as to any one matter . . . should not sink the State's case; rather, that 'deficiency . . . may be compensated for, in determining the overall reliability of a tip, by a strong showing as to . . . other indicia of reliability.'"  Florida v. Harris, 133 S. Ct. at 1056 (quoting Illinois v. Gates, 462 U.S. at 233).

Eckert's argument that there was no link between the driver's seat alert and Eckert's anus does not prohibit a probable cause determination.  Officers could reasonably infer that "if one carry's [sic] drugs in one's anus, then the scent is going to be left in an area where he [sic] sat."  Response at 21.  Even a judge issuing a search warrant need only "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  United States v. Reed, 195 F. App'x at 821.  Dougherty and the police officers made a "common-sense decision" by linking a positive drug alert to a car seat to the possible presence of drugs in the occupant's anus.  There was no requirement that they provide "training, experience, or testing to show that the scent of illicit drugs can travel from a rectum to a car seat" in an affidavit.  Response at 21.

The totality of the circumstances establishes probable cause.  He kept his legs together, and his posture was erect.  See Complaint ¶ 35, at 5; Response at 5.  A K-9 officer walked his

dog around Eckert's vehicle, and the dog alerted to the driver's seat, where Eckert had been

sitting.  See Complaint ¶ 40, at 5; Response at 5.  At least one police officer responsible for a

narcotics canine then stated that "Plaintiff was known in Hidalgo County to insert drugs into his

anal cavity."  Complaint ¶ 42, at 5.  Given all of the statements in the affidavit, the state

Magistrate Judge and Dougherty logically concluded that there was a "fair probability that

contraband or evidence of a crime will be found in a particular place."  Illinois v. Gates, 462 U.S.

at 214.

### 2.   The Search Warrant Affidavit Described its Target with Sufficient Particularity.

Eckert also argues that the warrant affidavit is "so lacking in particularity that no

reasonable attorney, exercising professional judgment, would believe that the warrant would be

valid."  Response at 2.  The Court finds that the affidavit was sufficiently particular regarding the

area to be searched and the method of searching.  The searchers could "reasonably ascertain and

identify the things authorized to be seized."  United States v. Janus Indus., 48 F.3d at 1553.

Eckert's citation to United States v. Gray, 669 F.3d at 565, undermines his argument.  In United

States v. Gray, the Fifth Circuit found the search's execution unreasonable.  See 669 F.3d at 564.

It declined to hold that the underlying affidavit could not demonstrate probable cause, despite

that it targeted the plaintiff's "anal cavity," 669 F.3d at 560, and limited the search only "in

accordance with recognized medical procedures,"  669 F.3d at 565.  The warrant in Spencer v.

Roche, 659 F.3d 142 (1st Cir. 2011), "authorized a search of the appellant's anal cavity for

cocaine." 659 F.3d at 144.  Like the affidavits in these cases, the affidavit targeted Eckert's "anal

cavity."  Complaint ¶ 49, at 6.  Dougherty reasonably concluded that the affidavit supported

probable cause, because, in part, it was "more particularized than a search of the suspect's

'person.'"  United States v. Gray, 669 F.3d at 565.

### 3.   Dougherty did not Participate in an Unlawful Detention and Arrest by Allowing Police to Transfer Eckert to a Second Emergency Room.

Dougherty did not violate Eckert's rights by authorizing police officers to take him to a second emergency room.  The arresting officers had probable cause; the "anal cavity" warrant was sufficiently particular; and, although the search's duration and location may have violated state law, it did not violate the Fourth Amendment.

First, Eckert argues that Dougherty "participated in [his] unlawful arrest," because he knew that Eckert had been in custody for three hours, but allowed officers to continue to detain him and take him to a second hospital.  Response at 22.  See Manzanares v. Higdon, 575 F.3d 1135, 1150 (10th Cir. 2009)(Lucero, J.)("No reasonable officer could divine from our precedent the notion that a three-hour, handcuffed detention without any basis for the use of force was anything short of an arrest."); J.H. ex rel. J.P. v. Bernalillo Cnty., No. CIV 12-0128 JB/LAM, 2014 WL 3421037, at *89 (D.N.M. July 8, 2014)(Browning, J.).  Officers required Eckert to wear handcuffs.  See Complaint  ¶¶ 44, 59, 129, at 6, 7, 13.  They held him in custody from shortly after the traffic stop on January 2, 2013, until well after the completion of the colonoscopy at 2:15 a.m. on January 3, 2013.  See Complaint ¶¶ 32, 97-103, at 5, 10.  Eckert was under arrest.

Eckert's argument that this arrest was unlawful, however, is unconvincing because the police officers had probable cause.  See Gerstein v. Pugh, 420 U.S. 103, 114 (1975); United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a [Terry v. Ohio, 392 U.S. 1 (1968)] stop, however, may be constitutionally justified only by probable cause or consent.").  Police officers also had to restrain Eckert in order to execute the search warrant.

Second, Eckert contends that Dougherty "knew that the officers were requesting, at a minimum, a search of Eckert's rectum. The warrant did not authorize a search of the rectum." Response at 2.  Dougherty allegedly ignored this fact by authorizing the search.  See Complaint ¶ 55, at 7.  Eckert's argument relies on an overly technical distinction between Eckert's "anal cavity" and his "rectum."  Contrary to Eckert's claims, the court in United States v. Gray, did not expressly disapprove the use of the term "anal cavity" in a warrant.  669 F.3d at 565.  Spencer v. Roche, 659 F.3d at 144, "authorized a search of the appellant's anal cavity for cocaine."  Other courts have also used the term to refer to a particular part of the body.  See Bell v. Wolfish, 441 U.S. 520, 577 (1979); United States v. Booker, 728 F.3d at 550; United States v. Broadway, 580 F. Supp. 2d 1179, 1185 (D. Colo. 2008)(Babcock, J.); Jordan v. Bellinger, No. CIV.A. 98-230-GMS, 2000 WL 1239956, at *6 (D. Del. Aug. 28, 2000)(Sleet, J.) as amended, No. CIV. A. 98-230-GMS, 2000 WL 1456297 (D. Del. Sept. 21, 2000).

Finally, Eckert contends that Dougherty violated his rights by ignoring the warrant's geographic and temporal limits.  This argument is unconvincing for three primary reasons.  First, the transfer between hospitals was part of the same ongoing search.  The search began in Deming, within Luna County.  See Complaint ¶ 52, at 6.  The Complaint does not provide a time for Dougherty's call with Chavez, see Complaint ¶ 55, at 7, but it must have occurred before the second hospital admitted Eckert "at or around 9:04 PM," Complaint ¶ 60, at 7.  The second hospital thus admitted Eckert before the warrant expired at 10:00 p.m.  See Complaint ¶ 60, at 7. Dougherty could foresee that physicians would perform digital rectal scans and X-rays, and thus could not foresee that the search would extend past the warrant's validity, and the police officers and physicians did not contact him after his second call with Chavez.[22]  In United States v.

---

[22]The same may not be true for Dougherty's knowledge of the transfer across county

Huslage, 480 F. Supp. 870 (W.D. Pa. 1979)(Cohill, J.), the  police officers' initial attempt to search a vehicle for weapons at 4:10 a.m. failed because of inadequate lighting.  See 480 F. Supp. at 875.  The district court approved their decision to wait until 10:00 a.m. for better light, after the expiration time listed on the warrant, because "the second search was merely a continuation of the initial intrusion."  480 F. Supp. at 875.  The second hospital search was "merely a continuation" of the earlier searches.

Second, courts' strong aversion to nighttime searches focuses on intrusions into the home rather than the body.  See United States v. Gibbons, 607 F.2d 1320, 1326 (10th Cir. 1979)(Holloway, J.)("Although aversion to nighttime intrusion has continued to the present, the focal point of contemporary antipathy has centered around the intrusion into the home.").

Third, the violations alleged were more technical than substantive.  Both hospitals, and both counties, were located within the Sixth Judicial District.  A Magistrate Judge within that District reviewed the warrant request to ensure that it was legally sufficient and stated probable cause.  "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application."  Bell v. Wolfish, 441 U.S. at 559.  Each case "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails."  Bell v. Wolfish, 441 U.S. at 559.  A formalistic requirement that an otherwise

---

lines.  Dougherty was likely aware of the restrictions on the warrant -- he approved the affidavit and, as a deputy district attorney, probably would have been familiar with common judicial practices in his jurisdiction.  See Complaint ¶¶ 10, 49 at 3, 6.  The Court has, after a brief examination, been unable to find any other hospital emergency rooms within Luna County.  A fact finder could thus have reasonably inferred Dougherty's knowledge that a second emergency room would probably be in another county.  If the Court is incorrect and the jurisdictional shift violated the Fourth Amendment, Dougherty should have refused to allow the transfer. Nevertheless, because the law is not clearly established, Dougherty still cannot be held liable. See infra at 115.

valid search targeting an individual violates the Fourth Amendment because it was conducted across county lines would be inconsistent with this balancing test.

Finally, a breach of state law is not necessarily a violation of the Fourth Amendment. In United States v. Le, 173 F.3d 1258 (10th Cir. 1999), the Tenth Circuit considered whether a breach of Oklahoma's requirement that a search warrant affidavit "state the specific dates on which criminal activity was observed on the premises to be searched" resulted in a Fourth Amendment violation. 173 F.3d at 1265. The Tenth Circuit concluded that these requirements were "only parts of the totality of the circumstances which federal courts must consider in determining whether the affidavits underlying state search warrants are sufficient." 173 F.3d at 1265. In short, "the fact that the arrest, search, or seizure may have violated state law is irrelevant as long as the standards developed under the Federal Constitution were not offended." United States v. Dickerson, 195 F.3d 1183, 1187 (10th Cir. 1999)(quoting United States v. Le, 173 F.3d at 1264). Eckert does not cite any cases finding a Fourth Amendment violation because officers executed a warrant at the wrong time or in the wrong county.

## B.   DOUGHERTY DID NOT INDIRECTLY VIOLATE ECKERT'S CONSTITUTIONAL RIGHTS.

The Court's conclusion that Dougherty did not directly violate Eckert's constitutional rights does not end the inquiry. Dougherty may be indirectly liable: (i) through his failure to affirmatively prevent law enforcement personnel from violating Eckert's rights; or (ii) because he set in motion a series of events which he knew, or reasonably should have known, would cause others to violate Eckert's rights. The Court concludes that Dougherty is not indirectly liable on any of Eckert's theories. First, Eckert cannot establish that Dougherty violated his duty to prevent other law enforcement personnel from violating Eckert's rights. Second, although the state Magistrate Judge's warrant does not cut off Dougherty's liability, Eckert cannot show that

Dougherty knew or reasonably should have known that his actions would lead to anything other than the first digital search and the first X-ray.  Third, neither of these two searches violated Eckert's constitutional rights.  Fourth, Eckert cannot link Dougherty to the intrusive searches that violated his constitutional rights, including the second digital examination, chest X-ray, enemas, and colonoscopy.

### 1.    Dougherty is not Liable for Failing to Prevent Law Enforcement Personnel from Violating Eckert's Constitutional Rights.

Eckert argues that Dougherty had an affirmative duty to prevent other officers from violating his constitutional rights.  See Response at 23.  The cases that Eckert cites, however, would not apply this duty to Dougherty.  His quotation from Hall v. Burke, 12 F. App'x 856 (10th Cir. 2001), is irrelevant by its own terms: "[I]t is clearly established that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence."  12 F. App'x at 861 (emphasis added).  Dougherty was not in the presence of the other officers involved here.  Eckert also cites to Smith v. Kenny, 678 F. Supp. 2d 1124 (D.N.M. 2009)(Browning, J.), in which the Court rejected the plaintiff's argument that a police sergeant should have intervened because no unconstitutional acts were performed "in [her] presence, or at her direction."  678 F. Supp. 2d at 1147-48.  Like the police defendant in Smith v. Kenny, Dougherty was not present, and police did not perform any unconstitutional acts at his direction.  Even § 1983 cases finding liability for a defendant's failure to prevent unconstitutional acts outside of his personal presence would still require "the opportunity to intervene."  Lusby v. T.G. & Y. Stores, Inc., 749 F.2d 1423, 1433 (10th Cir. 1984) cert. granted, judgment vacated on other grounds by City of Lawton, Oklahoma v. Lusby, 474 U.S. 805 (1985).  See Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994)(Altimari, J.)("In order for liability to attach, there must have been a realistic opportunity to

intervene to prevent the harm from occurring.").  No jury could reasonably find that Dougherty had a realistic opportunity to prevent acts totally unknown to him.

**2.**      <u>**Dougherty Neither Knew nor Reasonably Should have Known That his Actions Would Lead to Constitutional Violations.**</u>

Dougherty neither knew nor reasonably should have known that his actions would lead to constitutional violations.  Section 1983 provides for liability for a state actor who "subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges or immunities secured by the Constitution."  42 U.S.C. § 1983.  That language means that defendants can be held liable for third parties' acts that they did not personally commit.  The courts have grounded that indirect liability under § 1983's concept of proximate causation.  <u>See, e.g.</u>, <u>Johnson v. Duffy</u>, 588 F.2d 740, 743 (9th Cir. 1978)("Anyone who 'causes' any citizen to be subjected to a constitutional deprivation is also liable.  The requisite causal connection can be established . . . by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury."); <u>Trask v. Franco</u>, 446 F.3d at 1046 ("Defendants are liable for the harm proximately caused by their conduct.").

The Tenth Circuit's test for proximate causation in § 1983 cases has three elements.  First, the state agent must have "set in motion" the series of events that resulted in a constitutional violation.  <u>Trask v. Franco</u>, 446 F.3d at 1046.  <u>See id.</u> ("[W]e can first reasonably infer that Mr. Trask's detention and arrest would not have occurred but for the probation officers' inspection and conduct[.]").  Second, the state agent must have known, or reasonably should have known, that the events he or she set in motion would result in a constitutional deprivation.  <u>See</u> <u>Trask v. Franco</u>, 446 F.3d at 1046.  Finally, no unforeseeable intervening and superseding act could have occurred between the events that the state agent set into motion and the ultimate constitutional violation.  <u>See</u> <u>Trask v. Franco</u>, 446 F.3d at 1046 (citing

- 97 -

RESTATEMENT (SECOND) OF TORTS § 442 (1965)).

In Martinez v. Carson, 697 F.3d 1252 (10th Cir. 2012)(McKay, J.), two New Mexico Department of Corrections officers, who worked as adjuncts on a task force with the Rio Rancho Department of Public Safety, unlawfully detained the plaintiffs for fewer than three minutes before transferring them to the Rio Rancho officers' custody for further investigation.  See 697 F.3d at 1254.  The Rio Rancho officers subsequently arrested and booked the plaintiffs.  See 697 F.3d at 1254.  The Rio Rancho officers unlawfully held one plaintiff for twelve hours and the other for five hours.  See 697 F.3d at 1254.  The Tenth Circuit held that the corrections officers were liable for the Rio Rancho officers' Fourth Amendment violation, because their initial unlawful seizure of the plaintiffs "set in motion a series of events" that the corrections officers "knew or reasonably should have known" would result in others depriving the plaintiffs of their constitutional rights.  697 F.3d at 1255 (quoting Trask v. Franco, 446 F.3d at 1046).  Judge McKay wrote:

> Plaintiffs' arrests and prolonged detentions would not have occurred had Defendants not seized them and transferred them to the custody of Rio Rancho officers. . . .  Although Defendants may not have foreseen the full extent of the detention, a jury could certainly find that they foresaw at least some additional period of detention while, for instance, the Rio Rancho officers conducted an investigation into probable cause.

Martinez v. Carson, 697 F.3d at 1255-56.  The Tenth Circuit remanded the case to the district court to allow a jury to determine the extent of the corrections officers' liability for the constitutional violation that the Rio Rancho officers committed by allowing the jury to consider evidence presented on the foreseeability of the extended detention.  See 697 F.3d at 1256.

Eckert does not plausibly allege that Dougherty proximately caused the police officers' violation of his Fourth Amendment rights.  Eckert satisfies the first element of the analysis -- but-for causation.  Eckert's "further unlawful detention and arrest would not have occurred but

for [Dougherty's] conduct."  <u>Martinez v. Carson</u>, 697 F.3d at 1255.  His actions "set in motion" the series of events that "cause[d] Eckert to be subjected" to invasive searches by police officers. <u>Martinez v. Carson</u>, 697 F.3d at 1255.

The Complaint alleges that the police officers involved Dougherty in this matter after they conducted a canine search of Eckert's vehicle, <u>see</u> Complaint ¶ 40, at 5, and detained Eckert at the Deming Police Department, <u>see</u> Complaint ¶ 44, at 6.  Although at least two officers supposedly believed that Eckert was "known in Hidalgo County to insert drugs into his anal cavity," Complaint ¶ 42, at 5, they did not perform a visual cavity search on the spot or at the police station.  They instead called Dougherty to request permission to seek a search warrant. <u>See</u> Complaint ¶ 48, at 6.  Dougherty approved an affidavit requesting a search warrant "to include but not limited to [Plaintiff's] anal cavity."  Complaint ¶ 49, at 6.  Armed with the resulting warrant, the police officers transported Eckert to the first hospital.  <u>See</u> Complaint ¶ 52, at 6.  The officers likely would not have obtained a warrant, transported Eckert to a hospital, or attempted to initiate any highly invasive searches without Dougherty's approval.  Dougherty's decision to allow officers to seek a search warrant and approval of the affidavit were thus a "but for" cause of the alleged violations.  <u>Martinez v. Carson</u>, 697 F.3d at 1255.

The Complaint also alleges that the police officers, after encountering resistance from Dr. Ash, "contacted Defendant Dougherty about Dr. Ash's refusal to conduct an anal cavity exam of Plaintiff."  Complaint ¶ 54, at 7.  Dougherty then "authorized" officers "to take Plaintiff to a different Emergency Room."  Complaint ¶ 55, at 7.  The officers likely would not have transported Eckert to a second hospital or initiated any of the more invasive searches without Dougherty's approval.

As in <u>Martinez v. Carson</u>, the "Plaintiff['s] arrest[] and prolonged detention[] would not

have occurred" had Dougherty not approved the request for the warrant, signed off on the warrant affidavit, and allowed police officers to transfer Eckert to a second hospital.  697 F.3d at 1255-56.   Dougherty's actions were thus an actual, or "but-for," cause of the alleged constitutional violations.

Dougherty should not, however, have foreseen that approving a request for a search warrant, signing off on the resulting affidavit, and authorizing transfer to a second hospital would result in any searches beyond a single digital rectal examination or an X-ray, much less a chest X-ray, a series of three enemas, and a colonoscopy.  In Martinez v. Carson, the defendants, having illegally seized the plaintiffs and transferred them to other officers' custody, could have foreseen "at least some additional period of detention while, for instance, the Rio Rancho officers conducted an investigation into probable cause."  697 F.3d at 1256.  In Mink v. Knox, the prosecutor approving a warrant request on an unjustifiable standard could have foreseen that her action would result in an unlawful search.  See 613 F.3d at 1003.  In Northington v. Marin, 102 F.3d 1564 (10th Cir. 1996), the prison guard defendants could have foreseen that labeling a particular prisoner as a "snitch" would put him at risk of assaults.  102 F.3d at 1567.  The government defendants in A.M. ex rel. Youngers v. New Mexico Dep't of Health could have foreseen that "transferring a thirty-two-year-old, developmentally disabled woman to live at an unlicensed group home for the elderly, without arrangements for funding from the State of New Mexico to pay for her care, would result in [her] being forced to work to cover her expenses." 2015 WL 3540161, at *49.

Like those defendants, Dougherty could anticipate that physicians and police officers would subject Eckert to a digital rectal examination and an X-ray, which, like the consequences described above, were likely under the circumstances.   He could not, given his lack of

information or medical expertise, have foreseen the chest X-ray, series of three enemas, or colonoscopy.[23]

Third, the police officers' and physicians' acts at the second hospital were unforeseeable intervening and superseding events that occurred between Dougherty's acts and the ultimate constitutional violations.  In <u>A.M. ex rel. Youngers v. New Mexico Dep't of Health</u>, the Court ruled out the possibility of an intervening and superseding act, "because the Individual DOH Defendants' transfer of A.M. to the Homestead House's care played out as they 'approved.'" 2015 WL 3540161, at *49 (D.N.M. May 15, 2015).   The defendants in that case were "deliberately indifferent to the likelihood that Plaintiff . . . would lose federal and constitutional rights."  2015 WL 3540161, at *48.  Eckert's Complaint does not allege that the searches played out as Dougherty approved.  <u>See</u> Complaint ¶¶ 137-152, at 14-16.  Dougherty was not, for example, "deliberately indifferent" to the risk to Eckert.  <u>A.M. ex rel. Youngers v. New Mexico Dep't of Health</u>, 2015 WL 3540161, at *48.  He was reasonably unaware of the risk.

Supreme Court precedent forecloses Dougherty's argument that the state Magistrate Judge's approval of the search warrant "breaks the chain" of liability.  Tr. 1 at 43:6-8 (Williams). In <u>Malley v. Briggs</u>, the district court found that the "act of the judge in issuing the arrest

---

[23]The Tenth Circuit noted in <u>Martinez v. Carson</u> that, while the defendants might "not have foreseen the full extent of the detention," which ultimately extended to twelve hours for one plaintiff, "a jury could certainly find that they foresaw at least some additional period of detention while, for instance, the Rio Rancho officers conducted an investigation into probable cause."  697 F.3d at 1256.  Eckert also might contend that the Court should allow for Dougherty's liability although he did not foresee the full extent of the search.  The Tenth Circuit added, however, that "the extent to which Defendants can be held liable for the further detention depends upon what they reasonably foresaw when they transferred Plaintiffs to police custody, and we conclude that this question is sufficiently disputed to require resolution by a jury."  697 F.3d at 1256.  The harm in <u>Martinez v. Carson</u> was an extension in the time of detention, whereas the harm in this case was a dramatic escalation in invasive search methods impossible for Dougherty to predict.  The Court finds that Eckert has not sufficiently disputed this question to require resolution by a jury.

warrants for respondents broke the causal chain between petitioner's filing of a complaint and respondents' arrest." 475 U.S. at 339.  The Supreme Court rejected this rationale, explaining that the law recognizes the "causal link between the submission of a complaint and an ensuing arrest." 475 U.S. at 344 n.7.  This outcome accords with the Supreme Court's earlier conclusion in <u>Malley v. Briggs</u> that "§ 1983 'should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'"  475 U.S. at 344 n.7 (quoting <u>Monroe v. Pape</u>, 365 U.S. 167, 187 (1961)).

> a.  **The First Digital Examination and X-ray did not Violate Eckert's Fourth Amendment Right to be Free from <u>Unreasonable Searches.</u>**

The defendants were on good constitutional ground in conducting the first digital rectal examination and the X-ray examination.  Although both searches intruded on Eckert's dignity and privacy, they were relatively safe, there was a strong community interest, and the officers obtained a warrant.

The Court fully acknowledges that these preliminary searches were serious invasions of Eckert's privacy and bodily integrity.  They "targeted an area of the body that is highly personal and private."  <u>United States v. Gray</u>, 669 F.3d at 564.  Although they occurred in a hospital setting, they were by their very nature demeaning and dehumanizing.  See <u>Blackburn v. Snow</u>, 771 F.2d at 564 (citation omitted).  The digital rectal search, in particular, is "one of the most intrusive methods of detecting contraband" and should be employed with caution.  <u>Tribble v. Gardner</u>, 860 F.2d at 325.  One aspect of the searches in this case was particularly concerning.  Eckert has alleged that the police officer defendants "did harass, mock and berate Plaintiff by making derogatory remarks about Plaintiff and his compromised position," and "did continually misplace Plaintiff's privacy curtain exposing him to the public hallway during the intimate and

humiliating searches."  Complaint ¶¶ 104-105, at 10.  This unnecessary harassment contravenes now-Justice Kennedy's concern for suspects' dignity in a situation "thus laden with the potential for fear and anxiety."  United States v. Cameron, 538 F.2d at 258.  See Sanchez v. Pereira-Castillo, 590 F.3d at 43 (noting the absence of "abusive or otherwise unprofessional conduct on the part of the correctional officers or the doctors during the rectal exams").

The Court recently discussed another plaintiff's dignity interests in Rivera v. Bates, 2014 WL 3421050.  In that case, police officers executing an arrest warrant forced Rivera to "walk over two-hundred-and-seventy-five feet while [his penis] was exposed to at least two neighbors."  2014 WL 3421050, at *49.  The Court expressed its concern about the significant intrusion on Rivera's dignity interests, noting that he "endured a circumstance more humiliating than a normal custodial arrest when his private parts were exposed, not only to the officers, but also to his neighbors."  2014 WL 3421050, at *53.

Neither of these searches, however, posed a significant threat to Eckert's safety or health.  The X-ray was a "routine medical procedure that is brisk, painless, and generally regarded as safe."  Spencer v. Roche, 659 F.3d at 147.  Millions of men in the United States have experienced digital rectal examinations -- while they are certainly unpleasant, the danger to Eckert's health was "slight" if not "nonexistent."  George v. Edholm, 752 F.3d at 1217.  See Diseases and Conditions: Prostate Cancer, MAYO CLINIC (Oct. 22, 2015), http://www.mayoclinic.org/diseases-conditions/prostate-cancer/in-depth/prostate-cancer/art-20048087?pg=2 (describing digital rectal examinations as "quick, safe, and easy").  Both tests were "performed by trained professionals in a hospital setting."  Spencer v. Roche, 659 F.3d at 147.  United States v. Gray did not even discuss the health risks resulting from the X-rays or the digital examination.  See 669 F.3d at 564.

The community also had a strong interest in accurately determining Eckert's guilt or innocence.  Eckert was suspected of a drug crime, and society has a strong interest "in the prevention and punishment of drug trafficking" that can justify invasive searches under some circumstances.  Rodriques v. Furtado, 950 F.2d at 811.  This interest is particularly strong where, as here, it might be impossible to prosecute the suspect without the evidence hidden in a body cavity.  See George v. Edholm, 752 F.3d at 1220.  Eckert alleges that a physician involved in his treatment "determined that if a strong suspicion of a retained foreign body existed, a Non-Contrast CT scan would be of additional benefit."  Complaint ¶ 65, at 8.  He adds that the "Defendants should have sought the less invasive CT scan suggested by [that physician] rather than a digital search of Plaintiff."  Complaint ¶ 66, at 8.  Although this argument is valid, admitting physician Dr. Wilcox's ultimate decision not to use a CT scan is not dispositive.  The digital rectal search was certainly faster and less intrusive than administering laxatives and monitoring the defendant's bowel movements.  See George v. Edholm, 752 F.3d at 1220.

Finally, the presence of a warrant supports the reasonableness of these two searches.  Courts tend to find that searches were reasonable when the government successfully pursued a warrant.  See Winston v. Lee, 470 U.S. at 760-61; George v. Edholm, 752 F.3d at 1217; United States v. Cameron, 538 F.2d at 259.  Courts note when the government fails to obtain a warrant and criticize that failure.  See Huguez v. United States, 406 F.2d at 374-79.

There are similarities between the facts surrounding the X-ray and digital rectal examination, and the situation in Spencer v. Roche.  See 659 F.3d at 144-45.  In both cases, police officers detained a suspect in the course of a traffic stop.  See Spencer v. Roche, 659 F.3d at 144; Complaint ¶ 32, at 5.  In both cases, officers ultimately arrested the suspect and sought a search warrant from a state judge.  See Spencer v. Roche, 659 F.3d at 144; Complaint ¶ 49, at 6.

- 104 -

After obtaining warrants to search each suspects' "anal cavity," the police transported both suspects to hospitals.  Spencer v. Roche, 659 F.3d at 144; Complaint ¶ 49, at 6.  They then physically restrained the suspects for non-consensual searches: one X-ray and one digital rectal examination.  See Spencer v. Roche, 659 F.3d at 144-45; Complaint ¶¶ 63-67, at 7-8.  The searches in each case were necessary to corroborate or dispel the police officers' reasonable suspicion that the suspect could be carrying drugs in his anal cavity.  See Spencer v. Roche, 659 F.3d at 148.  Like the searches in Spencer v. Roche, the first two searches authorized in this case were reasonable.

### b.      The Chest X-ray Exceeded the Warrant's Scope.

The chest X-ray performed on Eckert, but not the other searches, exceeded the warrant's scope.  The warrant authorized a search "to include but not limited to Eckert's anal cavity."  Complaint ¶¶ 48-49, at 6.  It was thus more specific than the "person" warrant that failed to authorize a body cavity search in United States v. Nelson.  36 F.3d at 760.  See Bolden v. Vill. of Monticello, 344 F. Supp. 2d 407, 417 (S.D.N.Y. 2004)(McMahon, J.)("[I]t is clear that the existence of a warrant authorizing the search of a person or persons, without more, does not justify the extraordinary invasion of privacy caused by a strip search, let alone a visual or invasive body cavity search.").  In Cheek v. Cosby, a warrant similar to the warrant in this case authorized a digital rectal search.  See 2014 WL 7011943, at *2.  Eckert also alleges, however, that the defendants took a chest X-ray, including images of his lungs and heart.  See Complaint ¶ 91, at 9.  This X-ray "was entirely irrelevant to Defendants' . . . search for contraband in Plaintiff's rectum."  Complaint ¶ 182, at 21.[24]  It was also outside the search warrant's scope.

---

[24]The Complaint indicates that the chest X-ray was the second of two X-rays.  See Complaint ¶¶ 63, 91, at 7, 9.  The possibility that the chest X-ray was "the only type of x-ray that can capture the entire anal cavity" is thus absent here.  Spencer v. Roche, 659 F.3d at 144-45.

c.     **The Second Digital Examination, Chest X-ray, Enemas, and Colonoscopy Violated Eckert's Fourth Amendment <u>Right to be Free from Unreasonable Searches.</u>**

The Court concludes that the remaining battery of invasive procedures employed violated Eckert's constitutional rights.   First, the Court considers whether these procedures posed a significant threat to Eckert's safety or health.   The second X-ray and digital rectal examinations, like the first, were routine procedures widely considered safe in a hospital setting.   See <u>Spencer v. Roche</u>, 659 F.3d at 147; <u>George v. Edholm</u>, 752 F.3d at 1217.   The enemas similarly posed little threat to Eckert's health or safety.   The colonoscopy involved at least some anesthesia, which carries a somewhat higher risk of complications.   See Complaint ¶ 97, at 10.   As in <u>United States v. Gray</u>, however, although "there was some risk of respiratory depression or arrest associated with the sedatives administered and risk of anal bleeding or perforation associated with the [operation], these risks were low in the hospital setting where the [operation] occurred." 669 F.3d at 564.   They did not rise to the level of the surgical risks in <u>Winston v. Lee</u>.   See 470 U.S. at 753.   <u>But see</u> <u>United States v. Booker</u>, 728 F.3d at 546 ("[A]lthough the medical risks are apparently not extremely high, they are the subject of dispute, and that very uncertainty may weigh against a finding of reasonableness.").

Second, the Court considers the nature and quality of the intrusion on Eckert's Fourth Amendment interests, including his privacy and dignity interests.   This series of procedures was the most invasive and humiliating search that the Court has considered.   Police officers and physicians subjected Eckert to an unnecessary second X-ray and second digital rectal examination.   See Complaint ¶¶ 74, 91, at 8-9.   They forcibly gave him three enemas, and forced

---

Moreover, the X-ray technique discussed in <u>Spencer v. Roche</u> did not capture images of the heart or the lungs.   See Complaint ¶ 91, at 9; <u>Spencer v. Roche</u>, 659 F.3d at 144-45 (explaining that the X-ray used on the suspect "also captures images of the stomach, kidneys, and other organs surrounding the anal cavity").

him to have bowel movements in the presence of a nurse and a police officer.  See Complaint ¶¶ 77-87, at 8-9.   They then prepped him for surgery, sedated him, and performed a full colonoscopy.  See Complaint ¶¶ 95-100, at 10.  At least twelve hours elapsed between Eckert's initial detention and his release from the second hospital after 2:15 a.m. the following morning. See Complaint ¶¶ 44, 97, at 6, 10.  "Execution of these several, intrusive procedures, enduring through the better part of one night, is sufficient to bring in question the propriety of the search." United States v. Cameron, 538 F.2d at 258.

The searches were also worse than those held unreasonable in similar cases.  Two of the most extreme cases seem roughly comparable.  In United States v. Booker, a canine drug-search police officer pulled over a car with expired tags.  See 728 F.3d at 537.  The dog "alerted near the front passenger side door of the car where [] Booker was seated."  728 F.3d at 537.  Officers were unable to find drugs on Booker's person, but they noticed that he "cl[e]nched his butt[ocks] together."  728 F.3d at 537 (modifications in original).  They arrested him for trace amounts of marijuana, "despite being unable to recover enough marijuana to justify such an arrest under Tennessee law."  728 F.3d at 537.  Officers then strip searched him.  See 728 F.3d at 538.  When they noticed "a small string protruding from [Booker's] anus," they took him to the hospital.  728 F.3d at 538.  Physicians there "intubated Booker for about an hour, rendered him unconscious for twenty to thirty minutes, and paralyzed him for seven to eight minutes" without his consent.  728 F.3d at 537.  The Sixth Circuit found that the procedure "shock[ed] the conscience at least as much as the stomach pumping that the Supreme Court long ago held [in Rochin v. California] to violate due process."  It explained that, "[h]ere, there is not only a probe into a tranquilized subject. Booker, naked and handcuffed, was paralyzed, intubated, and anally probed without his consent."  728 F.3d at 547.

In George v. Edholm, police officers arresting a suspect for a parole violation conducted a strip search.  See 752 F.3d at 1209.  They noticed that the suspect "reached under his body and started pushing his finger in his anus attempting to conceal an item, of what appeared to be some plastic baggie."  752 F.3d at 1209.  They transported the suspect to the hospital.  See 752 F.3d at 1209.  In the hospital, a physician sedated the suspect, opened his anus with an anoscope, and "inserted long forceps" into his rectum.  752 F.3d at 1218.  He continued by inserting a tube into the suspect's nose, running it into his stomach, and inserting a liquid laxative directly into the digestive system.  See 752 F.3d at 1218.  The suspect regained consciousness while the "bowel evacuation was still in progress."  752 F.3d at 1218.  The Ninth Circuit described the intrusion on his dignity interests as "extreme" and "more invasive than the stomach-pumping that *Rochin* described as 'close to the rack and screw.'"  752 F.3d at 1218.

Eckert alleges additional wrongs absent from either of these cases.  First, he states that the police officers "harass[ed], mock[ed], and berate[d] [him] by making derogatory remarks about Plaintiff and his compromised position," and "expos[ed] him to the public hallway during the intimate and humiliating searches."  Complaint ¶¶ 104-105, at 10.  This factor intensified his humiliation and undermines any impression that professionals carried out these procedures in a neutral hospital environment.  Eckert alleges more enemas than the suspects in the other cases. See Complaint ¶¶ 77-87, at 8-9.  The colonoscopy, which involved at least some anesthesia, was more invasive than the proctoscopy performed in United States v. Gray, see 669 F.3d at 564-65, the anoscopy conducted in George v. Edholm, see 752 F.3d at 1218, or the two-finger cavity search carried out in Spencer v. Roche, see 659 F.3d at 144.

Eckert's searches were more intrusive than those in numerous cases finding Fourth Amendment violations.  See Huguez v. United States, 406 F.2d at 379 (including nonconsensual

digital rectal examination); Henderson v. United States, 390 F.2d 805, 809 (9th Cir. 1967)(including visual inspection of vaginal and anal areas); Tribble v. Gardner, 860 F.2d at 325 (including digital rectal examination); Kennedy v. Los Angeles Police Dep't, 901 F.2d at 711 (including strip search with visual cavity inspection, "hops . . . like a rabbit would hop," and gratuitous sexual comments); Ellis v. City of San Diego, Cal., 176 F.3d 1183, 1191 (9th Cir. 1999)(Reinhardt, J.)(including nonconsensual anesthesia, and urine and blood sample collection through a catheter in the penis).

Next, the Court considers the countervailing governmental interests at stake, including the community's interests in accurately determining guilt or innocence, and preventing the distribution of illegal drugs. In analyzing these interests, the Court is careful not to judge the circumstances with the "20/20 vision of hindsight," but "from the perspective of a reasonable officer on the scene." Graham v. Connor, 490 U.S. at 396.

By the time the police officers and physicians initiated the second set of examinations, an X-ray had proven negative for any drugs. See Complaint ¶ 64, at 7. A digital rectal examination found "something soft" that "could have been stool." Complaint ¶ 68, at 8. At this point, the police officers' only other indications that Eckert possessed any drugs were the drug canine's positive alert to his car seat, see Complaint ¶ 29, at 4, and the uncorroborated tip that Eckert "was known in Hidalgo County to insert drugs into his anal cavity," Complaint ¶ 42, at 5. Searches that they conducted after this point did not serve the community's interests. There was no indication that Eckert had any concealed drugs after several negative searches, so the evidence sought in the new tests was not "indispensable to corroborate the officers' suspicion that the appellant had violated . . . drug laws." Spencer v. Roche, 659 F.3d at 147.

Less intrusive alternatives were available and appropriate here. Officers could have

waited until any contraband in the rectal cavity was "eliminated naturally."  United States v. Cameron, 538 F.2d at 258.  Even giving Eckert several enemas and "monitoring his bowel movements" would have been less intrusive than sedating him and giving him a colonoscopy. George v. Edholm, 752 F.3d at 1220.  One physician's suggestion of a CT scan would have been less intrusive and more conclusive than administering several enemas.  See Complaint ¶ 65, at 8. The Court concludes that the burden on Eckert's dignity and bodily integrity outweighed the community's interests in conducting the final set of searches.

### C.   EVEN IF DOUGHERTY VIOLATED ECKERT'S CONSTITUTIONAL RIGHTS, THESE RIGHTS WERE NOT CLEARLY ESTABLISHED.

Even if the Court could, on the record before it, conclude, as a matter of law, that Dougherty violated Eckert's Fourth Amendment rights, the Court concludes that the law was not clearly established such that a reasonable deputy district attorney in Dougherty's position would have recognized the unlawfulness of his decisions: (i) to approve the warrant request and affidavit; and (ii) to allow officers to take Eckert to a second hospital.

Qualified immunity provides broad protection for government officials where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818).  It operates to protect officials from the law's "hazy border[s]" and shields officers with "reasonable, but mistaken beliefs."  Saucier v. Katz, 533 U.S. at 205.  The Supreme Court and the Tenth Circuit have made it difficult for plaintiffs to demonstrate that the law in question was clearly established.  See Ashcroft v. al-Kidd, 131 S. Ct. at 2083 (requiring that the "contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right.")(emphasis added).  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on

point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001)(Murphy, J.).

As the Tenth Circuit has emphasized, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference." Kerns v. Bader, 663 F.3d at 1188 (emphasis in original). In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification." 663 F.3d at 1183 (emphasis added).

    **1.**    **The Limited Law Governing Prosecutors' Approval of Warrant Requests and Affidavits Was not Clearly Established, and to the Extent it Was Clear, it Supports Dougherty's Position.**

The law governing prosecutors' approval of warrant requests and affidavits was not clearly established at the time of the events in this case. Neither party provided a review of the law in this area, but the primary touchstones appear to be one Supreme Court decision, Malley v. Briggs, and one Tenth Circuit decision, Mink v. Knox.

The Supreme Court set out the test for qualified immunity in the warrant affidavit approval context in Malley v. Briggs, 475 U.S. 335 (1986). In that case, the plaintiffs brought a civil rights action against a police officer for violating their Fourth Amendment rights by applying for warrants for their arrest without probable cause. See 475 U.S. at 337-339. The Supreme Court found that the officer had qualified immunity, explaining that "[o]nly where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost." 475 U.S. at 344-345. See id. at 349

("[I]f officers of reasonable competence could disagree on this issue, immunity should be recognized[.]").

Subsequent cases have made it clear that this objective reasonableness standard also applies to prosecutors reviewing search warrant affidavits for sufficiency. In Mink v. Knox, a deputy district attorney reviewed and approved a search warrant affidavit, and a Magistrate Judge later issued a warrant. See 613 F.3d at 999. The search warrant's target later sued the deputy district attorney for her unreasonable approval of the warrant affidavit. See 613 F.3d at 999. The district court found that the deputy district attorney was entitled to qualified immunity. See 613 F.3d at 1000. The Tenth Circuit reversed, explaining that: (i) the defendant could be liable despite her lack of direct participation in the unconstitutional search; (ii) she had "base[d] her probable cause determination on an 'unjustifiable standard;'" (iii) the warrant was insufficiently particular; and (iv) the law was clearly established. 613 F.3d at 999-1012.[25]

Dougherty argues that the state Magistrate Judge's "signature and issuance of the search warrant cuts off any liability for DDA Dougherty on the grounds there was no probable cause to approve the affidavit for the warrant." MTD at 8. This characterization is incorrect. See Malley v. Briggs, 475 U.S. at 345 (holding that even a request for a warrant later approved by a judge could be unreasonable "because it created the unnecessary danger of an unlawful arrest.").

A Magistrate Judge's approval, however, makes it more difficult for plaintiffs to prevail against other government actors. See Messerschmidt v. Millender, 132 S. Ct. 1235, 1250 (2012)("The fact that the officers secured [district attorney and magistrate] approvals is certainly

---

[25]Dougherty argues in his Reply that the "Plaintiff fails to provide a case that holds a district attorney who reviews an affidavit for a search warrant for legal sufficiency before that search warrant is approved by a judge violates a person's constitutional rights. There is no such case." Reply at 3-4. Mink v. Knox is such a case.

pertinent in assessing whether they could have held a reasonable belief that the warrant was supported by probable cause.").

Probable cause determinations, along with decisions to approve warrant affidavits, are extremely fact-dependent.  An officer determining whether an affidavit is "so lacking in indicia of probable cause as to render official belief in its existence unreasonable," Malley v. Briggs, 475 U.S. at 344-345, or a magistrate weighing whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place," United States v. Reed, 195 F. App'x at 821, will necessarily weigh specific facts surrounding the search on a case-by-case basis.  A change in even a single fact may eliminate or sustain a finding of probable cause.  The Tenth Circuit's recent decision in Kerns v. Bader held that the law is not clearly established where "a distinction might make a constitutional difference."   663 F.3d at 1188 (emphasis in original).  Given that distinctions could have been very significant here -- for example, if the dog had not alerted to Eckert's vehicle -- the Court cannot conclude that the law on point was clearly established.

Eckert attempts to resolve this uncertainty, contending that his suggested rules on specific pieces of evidence are clearly established.  He first argues that United States v. Gray clearly requires warrant affidavits to authorize specific medical procedures.  See Reply at 19.  Even assuming that a single, subsequently vacated decision from the Fifth Circuit creates clearly established law in the Tenth Circuit, its application to this particular situation is not straightforward.  See United States v. Gray, 669 F.3d at 565.  The Fifth Circuit expressed "great concern" about possible police overreach and "urge[d]" Magistrate Judges to use more specificity, but even this encouragement was directed towards Magistrate Judges rather than prosecutors.  669 F.3d at 566.  The warrant here, unlike the warrant in United States v. Nelson,

went beyond permission to search Eckert's "person."  36 F.3d at 760.  There is no clear or specific guidance on this point in any circuit, much less in the Tenth Circuit.

The law whether prosecutors must include a narcotics canine's credentials in a warrant application is somewhat more settled, but still fluid.  Even Florida v. Harris involved a post-hoc assessment of probable cause that police officers had at the scene -- not a prosecutor's review of a warrant affidavit -- on a motion to exclude evidence of a canine search.  See 133 S. Ct. at 1056. The Supreme Court disapproved "an inflexible set of evidentiary requirements," holding that the relevant question is "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime.  A sniff is up to snuff when it meets that test."  133 S. Ct. at 1058.   It added that probable cause is "a fluid concept -- turning on the assessment of probabilities in particular factual contexts."  133 S. Ct. at 1056.  The Tenth Circuit has noted, albeit in an older case, that a Magistrate Judge could "likely" infer that a request for a "drug trained K-9," followed by the appearance of two dogs, established that the dogs were trained. See United States v. Ramirez, 61 F. App'x at 597.  The Sixth Circuit has stated that references to "narcotic dog Moose" in an affidavit reasonably implied "*trained* narcotic dog Moose."  United States v. Cook, 904 F.2d at 37 (emphasis in original).  Moreover, none of these cases involved § 1983 challenges against prosecutors who allegedly failed to include sufficient facts in a search affidavit.

Eckert then argues that Dougherty impermissibly linked the dog's alert to the presence of drugs in Eckert's anus, because "we should expect more of a showing in a request for an anal search than a mere inference."  Response at 21.  Neither Eckert nor Dougherty cite any cases on

point.   There appears to be no law directly addressing this issue,[26] aside from the general instructions to make "a practical, common-sense decision" whether drugs may be found.   United States v. Reed, 195 F. App'x at 821.   "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"   Lobozzo v. Colo. Dep't of Corr., 429 F. App'x at 710 (quoting Zweibon v. Mitchell, 720 F.2d at 172-73).   Dougherty was not "on fair notice that the described conduct was unconstitutional."   Pierce v. Gilchrist, 359 F.3d at 1298.

Courts have noted various suspects' posture at the time of arrest, but it remains unclear whether posture -- alone or with other cues -- can support probable cause.   See United States v. Booker, 728 F.3d 535, 537 (6th Cir. 2013)(noting that suspect "cl[e]nched his butt[ocks] together," but not discussing significance); United States v. Gray, 669 F.3d at 560 (stating that suspect "would only 'slightly bend at the knees and give a faint cough'" during strip search).   If anything, the cases seem to suggest that posture is not irrelevant and, with other factors, may support probable cause.   Because the cases do not focus on the posture's significance in the overall violation, however, the law on this point also seems unsettled.   The law governing Dougherty's conduct in approving the search warrant was not clearly established.

Under Kerns v. Bader, only a case with more factual similarities could create clearly established law in the Tenth Circuit.   See 663 F.3d at 1188.   The Court recognizes that a prior case does not have to have the exact facts, and that it is unlikely that any case will be exactly like this one.   But it would help if there were some case in which a prosecutor is wrestling with a

---

[26]The Sixth Circuit has noted that a drug-sniffing dog "alerted near the front passenger-side door of the car where [the suspect] was seated."   United States v. Booker, 728 F.3d at 537. That case, however, concluded that the search was unlawful on other grounds.   728 F.3d at 548.

number of factors -- none of which is sufficient by itself for probable cause -- that may be enough to nudge the case across the line.  Absent a case with some sort of canine alert, a police officer's statement about the defendant's reputation, a defendant's strange posture, or some other case where the prosecutor is looking at several facts that -- alone -- might not be sufficient, the Court cannot conclude that the law was clearly established.  Any missing or additional facts "*might*" [have made] a constitutional difference."  <u>Kerns v. Bader</u>, 663 F.3d at 1188 (emphasis in original).

    **2.**    **<u>The Law on Federal Constitutional Violations Arising from Violations of Time and Location Restrictions on State Warrants is not Clearly Established.</u>**

Qualified immunity protects Dougherty from liability even if the breach of state law governing warrant time and location restrictions was a Fourth Amendment violation, because the law is not clearly established.  Dougherty's citation to <u>United States v. Green</u>, 178 F.3d at 1099, is unconvincing.  In <u>United States v. Green</u>, there was "no dispute that the [police] officers obtained search warrants from magistrates of the relevant jurisdiction."  178 F.3d at 1106.  In other words, <u>United States v. Green</u> involved a search within Butler County that a Butler County Judge authorized.  <u>See</u> 178 F.3d at 1106 n.7.

Neither party has cited relevant cases to support or rebut Dougherty's precise position on the unlawful arrest allegations, likely because such cases are extraordinarily difficult to find.  The lack of precedent demonstrates the unsettled nature of the law in this area.  Existing precedent has not "placed the statutory or constitutional question[s] beyond debate.'"  <u>Reichle v. Howards</u>, 132 S. Ct. at 2093.

3.      **The Law is not Clearly Established that Prosecutors have a Duty to Prevent Police Officers from Violating Others' Constitutional Rights Outside of Their Presence and Without Their Knowledge.**

Eckert also contends that "[a]n officer who fails to intervene to prevent another officer from depriving a person of his or her civil rights may be liable under § 1983." Smith v. Kenny, 678 F. Supp. 2d at 1147-48.  He is correct that this specific rule is clearly established law.  See, e.g., Mick v. Brewer, 76 F.3d 1127, 1136 (10th Cir. 1996)(Baldock, J.)("[A] law enforcement official who fails to intervene to prevent another law enforcement official's use of excessive force may be liable under § 1983.").  For liability to attach, however, "an officer must have had a realistic opportunity to intervene to prevent the harm from occurring." Anderson v. Branen, 17 F.3d at 557.  There is no established law that a prosecutor unaware of and geographically isolated from police officers' constitutional violations must move to prevent them from occurring.  The Court will thus grant the MSJ on Eckert's unreasonable search and unlawful arrest claims against Dougherty.

II.    **ECKERT'S PROPOSED AMENDED COMPLAINT IS SUBJECT TO DENIAL FOR UNDUE DELAY AND WOULD BE FUTILE, BECAUSE HE CANNOT SUFFICIENTLY ALLEGE THAT DOUGHERTY PROXIMATELY CAUSED ANY CONSTITUTIONAL VIOLATIONS.**

District courts may deny leave to amend under rule 15 of the Federal Rules of Civil Procedure for two primary reasons: (i) where the plaintiff has unduly delayed raising certain theories; and (ii) where amendment would be futile.  Eckert's Proposed Amended Complaint falls within both of these rationales.

A.      **THE INFORMATION ADDED IN ECKERT'S PROPOSED AMENDED COMPLAINT WAS AVAILABLE AT THE TIME HE FILED HIS FIRST COMPLAINT.**

The additional facts alleged in Eckert's Proposed Amended Complaint were available at the time he filed his Complaint.  Eckert states that he "was not aware of the details of the

conversation between Ash and Dougherty prior to filing the complaint."  MTA at 4.  The Court

has no reason to doubt this assertion, but it does not end the matter.  In the Tenth Circuit, district

courts may deny leave to amend if a proposed amendment is not "based on new evidence

<u>unavailable</u> at the time of the original filing."  <u>Pallottino v. City of Rio Rancho</u>, 31 F.3d 1023,

1027 (10th Cir. 1994)(emphasis added).  Eckert's Response mentions Dr. Ash's affidavit, but

does not explain why it could not have obtained this evidence before filing the Complaint.  <u>See</u>

Response at 15-16.  The Complaint refers to Dr. Ash by name.  <u>See</u> Complaint ¶ 53, at 7.  Dr.

Ash's affidavit does not explain the delay.  <u>See</u> Affidavit of Dr. Adam Ash, filed December 27,

2013 (Doc. 45-1)("Ash Affidavit").  Eckert provides no excuse for his failure to contact Dr. Ash

until several months after filing his Complaint.

**B.      ECKERT'S PROPOSED AMENDED COMPLAINT IS FUTILE, BECAUSE HE CANNOT ALLEGE THAT DOUGHERTY KNEW OR SHOULD HAVE KNOWN THAT HIS ACTIONS WOULD RESULT IN CONSTITUTIONAL VIOLATIONS.**

The additional allegations in Eckert's Proposed Amended Complaint fail to state a claim

against Dougherty.  Eckert states that his Proposed Amended Complaint "does not add any new

theories."  MTA at 3.  Instead, it "seeks to add factual support" for the existing claims against

Dougherty.  MTA at 1.

The Court's First Order allowed Eckert to amend the Complaint "to allege that

Dougherty directed police officers to conduct an unlawful search."  First Order at 2.  "Plaintiff

does not and cannot allege that Dougherty directed the officers to conduct an unlawful search."

MTA at 3.  He instead contends that his new facts show that Dougherty "knew or reasonably

should have known" his actions would "cause others" to violate Eckert's constitutional rights.

Second Reply at 1 (quoting <u>Poolaw v. Marcantel</u>, 565 F.3d 721, 732-33 (10th Cir. 2009)(Lucero,

J.)).

Eckert provides the correct standard, but his Proposed Amended Complaint still fails to meet it.  Dr. Ash advised Dougherty that the search was "medically unethical."  MTA at 2.  The Proposed Amended Complaint includes several communications between Dr. Ash and Dougherty:

> 35.    Dr. Ash had a discussion with Mr. Dougherty over the phone at the hospital and explained his concern that it was unethical to subject a patient to a digital rectal exam when he denies medical complaints.
>
> 36.    Dr. Ash explained to Mr. Dougherty his concern that examining and testing a patient who does not have a medical complaint is unethical as it exposes the patient to the many risks of false positive testing.
>
> 37.    Dr. Ash explained to DDA Dougherty that he could find something incidental in the digital rectal exam that would result in him having to perform further, possibly more invasive testing.

Proposed Amended Complaint ¶¶ 35-37, at 10.   Taking these allegations as true, Dougherty should have known that there was some risk that a false positive test on a digital rectal examination would lead to further testing.  It was not reasonably foreseeable, however, that police and physicians at the second hospital would administer a chest X-ray, three enemas, or a colonoscopy.   Dougherty, a medical layman, neither knew nor should have known that his actions would lead to such severe consequences, and no jury could reasonably infer that he should have known.

Eckert also seeks "a ruling whether the allegations made in the proposed amended complaint amount to direction from Dougherty that a search be completed."  MTA at 4.  The Court finds that the new allegations would not allege such a direction for two reasons.  First, Eckert has already conceded this point.  See MTA at 3 ("Plaintiff does not and cannot allege that Dougherty directed the officers to conduct an unlawful search.").   Second, the Proposed Amended Complaint does not include new facts showing that Dougherty directed an

unconstitutional search.  Its revised allegations relate to Dr. Ash and do not alter the Court's conclusions regarding the first Complaint.  <u>See</u> Proposed Amended Complaint ¶¶ 20-45, at 8-11.

**IT IS ORDERED** that: (i) Defendant Deputy District Attorney Daniel Dougherty's Motion to Dismiss on the Grounds of Immunity, filed December 11, 2013 (Doc. 41), is granted; and (ii) Plaintiff's Opposed Motion to Amend Complaint, filed January 30, 2015 (Doc. 75), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Joseph P. Kennedy
Shannon L. Kennedy
Laura Schauer Ives
Kennedy, Kennedy & Ives, LLC
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Patricia Williams
Wiggins, Williams & Wiggins
Albuquerque, New Mexico

      *Attorneys for Defendant Daniel Dougherty*

Tony F. Ortiz
Santa Fe, New Mexico

      *Attorney for Defendants City of Deming, Bobby Orosco, Robert Chavez, and
FNU Hernandez*

Blaine T. Mynatt
Casey B. Fitch
Damian L. Martinez
Holt Mynatt Martinez P.C.
Las Cruces, New Mexico

     *Attorneys for Defendants Hidalgo County, David Arredondo, Robert Rodriguez, and Patrick Green*

Charles P. List
Sharp Law Firm
Albuquerque, New Mexico

     *Attorney for Defendant Gila Regional Medical Center*

Tamara R. Safarik
McClaugherty & Silver, PC
Santa Fe, New Mexico

     *Attorney for Defendant Robert Wilcox*

Melissa Ann Brown
Remo E. Gay, Jr.
Brown & Gay, P.C.
Albuquerque, New Mexico

     *Attorneys for Defendant Okay Odocha*